1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEBRASKA
2

3    SAGE SCHMIDT, A Minor,      )
     By and Through Doran        )
     Schmidt, her natural mother)
4    and Next Friend, and DORAN )
     SCHMIDT, Individually,      )
5                                )
              Plaintiffs,        )          8:13CV143
6                                )
          vs.                    )
7                                )          Omaha, Nebraska
     THE BELLEVUE MEDICAL        )          July 8, 2015
8    CENTER, LLC,                )
                                 )
9              Defendant.        )


10
                  TRANSCRIPT OF MARTIN GUBERNICK TESTIMONY
11            BEFORE THE HONORABLE LAURIE SMITH CAMP
                 CHIEF UNITED STATES DISTRICT JUDGE
12

                         A-P-P-E-A-R-A-N-C-E-S
13

     FOR THE PLAINTIFFS:          Mr. Patrick J. Cullan
14                                Mr. Joseph P. Cullan
                                  Cullan, Cullan Law Firm
15                                1113 Harney Street
                                  Omaha, NE 68102
16

     FOR THE DEFENDANT:           Mr. Brien M. Welch
17                                Ms. Kathryn J. Cheatle
                                  Cassem, Tierney Law Firm
18                                9290 West Dodge Road
                                  Suite 302
19                                Omaha, NE 68114-3320


20

     COURT REPORTER:             Ms. Brenda L. Fauber, RDR, CRR
21                               111 S. 18th Plaza
                                 Suite 3122
22                               Omaha, NE 68102
                                 (402) 661-7322
23


24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

1          (Proceedings held but not transcribed.)

2          (Telephone call placed.)

3          THE COURT:  Dr. Gubernick, this is Judge Laurie Smith

4     Camp.  Can you hear me?

5          THE WITNESS:  I can.

6          THE COURT:  Very good.  Thank you for joining us

7     today.

8        I would ask you first to state your name for the record.

9          THE WITNESS:  Martin Gubernick.

10         THE COURT:  Very good.

11         MARTIN GUBERNICK, PLAINTIFF'S WITNESS, SWORN

12         THE COURT:  Very good.

13       Your counsel now will ask you questions.

14                        DIRECT EXAMINATION

15    BY MR. PATRICK CULLAN:

16    Q.   Dr. Gubernick, the Court stated at the onset of this

17    hearing -- and you weren't here -- she is concerned -- she has

18    a hard time understanding what violations of the standard of

19    care occurred at the Bellevue Medical Center that led to these

20    injuries --

21    A.   Okay.

22    Q.   -- and how you base your opinions.

23    A.   Okay.  So here's something crystal clear:  When this

24    patient arrived at Bellevue hospital, she had what's known as

25    an arrest of the active phase of labor.  She had been 7

 1      centimeters dilated for multiple hours.  The average patient

 2      dilates somewhere between 1.2 to 1.4 centimeters per hour.

 3      And she had been sitting at 7 centimeters for hours.

 4          By definition, that is an arrest of labor, arrest of the

 5      active phase of labor, to be specific.  Because she's 7

 6      centimeters, that puts her in the active phase.

 7          The gold standard -- not the standard, but the gold

 8      standard comes from Emanuel Friedman, former chairman for the

 9      -- at Harvard University, at Beth Israel Hospital; did his

10      residency at Columbia where he did the gold standard work on

11      arrest of the active phase of labor.

12          I'd venture to say every obstetrician in the country

13      understands what you have to do when there's an arrest of the

14      active phase of labor.  There's probably no labor and delivery

15      chart in the United States that doesn't have the Friedman

16      Curve.  And that is, you're in a fork in the road.  One or two

17      things is going on.  There's either a dystocia, what we call

18      cephalopelvic disproportion, and that could be a function of

19      baby too big, the pelvis too small, or the position of the

20      baby not being right.  In plain language, the baby -- it's

21      like a round peg going through a square hole.  It's just not

22      fitting.

23          Or the contractions, what we call the forces of labor,

24      are not strong enough.  So in other words, the hammer isn't

25      hitting the peg hard enough.  One of those two things are

1       happening.  Either the hammer isn't hitting the peg hard

2       enough, or it's a round peg through a square hole for the

3       reasons that I gave.

4           And the standard of care, the gold standard, is to

5       evaluate whether the contractions are strong enough.  And

6       that's what we do in modern medicine.  We put an internal

7       pressure transducer in.  We measure the strength of the

8       contractions.  We have definitions of what is considered

9       adequate and not adequate.  They're called Montevideo units.

10          And if the contractions are inadequate, if the hammer

11      isn't hitting the peg hard enough, we add Pitocin.  And it's

12      totally appropriate.

13          But if the hammer is hitting the peg hard enough, if we

14      put in an internal pressure transducer, we measure how strong

15      the contractions are, we know -- if we've ever -- you know,

16      anybody that's done any carpentry, if you're trying to get a

17      round peg through a square hole and the hammer is already

18      hitting it, if you hit it hard enough, you are either going to

19      hurt the hammer, or you're going to hurt the peg, which is the

20      baby, or you're going to hurt the hole, which is, you know,

21      the mother's pelvis.

22          So if you have inadequate contractions -- which there is

23      no evidence of in this case because they never put an internal

24      pressure transducer in -- you give Pitocin.  That's

25      appropriate.

1          If you have adequate contractions, the standard of

2     care -- the gold standard of care is to perform a caesarian

3     section.  And that was the deviation from good and acceptable

4     practice.  That's where it started.

5          Then once they gave this Pitocin -- if you're trying to

6     get a round peg through a square hole and it's not working,

7     what's going to happen?  You're going to change the oxygen

8     delivery to the baby.  Because if baby -- as you're putting

9     it -- you know, you're increasing the contractions with the

10    Pitocin.  The baby is trying to get into the pelvis, okay?

11    The trauma of the baby trying to get into a pelvis that it

12    can't fit in over time is going to cause ischemia, it's going

13    to cause local trauma to the head, and it's ultimately going

14    to injure the baby.

15         And how do we see this?  We see this from the tracings so

16    clearly going from a category I to a category II to a category

17    III.

18         So I mean really what happened here is just so obvious

19    that through the inappropriate use of Pitocin, by not

20    adequately evaluating the strength of the uterine

21    contractions, by giving the Pitocin inappropriately, they try

22    to force the baby that wasn't naturally fitting through the

23    pelvis into the pelvis.

24         Now, it's absurd for other defense experts to say, well,

25    I never heard of this trauma business.

 1        Well, if I would say to them so you mean you would let a

 2    baby labor for a week, two weeks, three weeks, four weeks?

 3    There's going to reach a point where someone is going to say,

 4    well, that's absurd.  We don't -- you know, that's how

 5    caesarian sections were invented, to protect the baby.

 6        Long before we ever monitored the baby, long before we

 7    ever did fetal heart rate monitoring, we did caesarian

 8    sections.  Why?  It's like a lifeguard going in to save the

 9    baby because we know if you allow people to labor long enough,

10    and the contractions just keep trying to move a baby down into

11    the pelvis that isn't fitting through, you're going to hurt

12    the baby.

13        We've known that, not for decades, probably known it for

14    a couple hundred years.

15            MR. WELCH:  Your Honor, would it do any good if I

16    objected to this?

17            THE COURT:  Well, I think that counsel is indicating

18    that the response has become narrative and so --

19            THE WITNESS:  Okay.  So what can I answer?  Ask me a

20    question.

21            THE COURT:  Let me ask a few questions, if I may --

22            THE WITNESS:  Sure.

23            THE COURT:  -- because I'm the one who was looking

24    through the materials initially.

25            THE WITNESS:  Sure.

1          THE COURT:  First of all, let me say that two of the

2     causation theories or opinions that you have have not been

3     objected to.  And I anticipate that you will be allowed to

4     testify to those things.

5          THE WITNESS:  Yes.

6          THE COURT:  And one is there was insufficient oxygen

7     in the fetal blood due to the excessive uterine activity after

8     the Pitocin was administered.

9          THE WITNESS:  Yes.

10         THE COURT:  And the second is that inflammation --

11         THE WITNESS:  Chorioamnionitis.

12         THE COURT:  -- resulted from -- right -- the rupture

13    of the membranes --

14         THE WITNESS:  Yes.

15         THE COURT:  -- due to the long intense labor.

16         THE WITNESS:  Yes.

17         THE COURT:  Where your testimony and also Dr. Glass's

18    testimony have been subject to objection under the standards

19    that I'm required to apply --

20         THE WITNESS:  Yes.

21         THE COURT:  -- as a judge, is dealing with the issue

22    of trauma to the infant's head before the head began the

23    descent through the cervix, the cervical area.

24         And so I'd like you to focus on that.  And I understand

25    your linking -- it's very helpful to know your linking of the

 1    standard of care and the alleged breach of the standard of

 2    care with the causation.

 3            THE WITNESS:  Yes.  You can --

 4            THE COURT:  What I'm having --

 5            THE WITNESS:  I'm trying to answer your question, but

 6    I'm not sure I understand.

 7            THE COURT:  I'll ask it more clearly.  That was kind

 8    of background.  And I'm being narrative here, too, but I guess

 9    I get to do that.

10            THE WITNESS:  Okay.

11            THE COURT:  What I'm asking is with respect to your

12    theory --

13            THE WITNESS:  Yes.

14            THE COURT:  -- that the infant in this case suffered

15    trauma to the cranium and the brain --

16            THE WITNESS:  Yes.

17            THE COURT:  -- in utero --

18            THE WITNESS:  Yes.

19            THE COURT:  -- before beginning the descent through

20    the cervix, is this theory something that is generally

21    accepted in the medical community and has it been subjected to

22    peer review and publication?

23            THE WITNESS:  To answer both your questions,

24    absolutely and absolutely; not -- it's absolute that -- you

25    don't need the baby to be at a certain station in order for

1        the baby to have contact with the mother's pelvis.

2              The definition of engagement is the biparietal diameters

3        are at the level of the ischial spines.  But long before that

4        happens, at a minus 1, minus 2 station, the top of the baby's

5        head is already in contact with the mother's bony pelvis.

6              So the issue of engagement, where this baby is at certain

7        points, it's irrelevant.  You can have a completely unengaged

8        head -- when I say unengaged, all that means is the biparietal

9        diameter -- you know, the parietal bones are near the ears.

10       The biparietal diameter is not at the level of the ischial

11       spines.  That's the definition of engagement.

12             But at a minus 1 station, a minus 2 station, which is

13       unengaged, every time the uterus contracts, the top of the

14       baby's head is pressed against the mother's pelvis.

15             THE COURT:  Okay.  And can you tell me, if you know,

16       what -- is there a specific medical term that is used to

17       describe that condition or phenomenon?

18             THE WITNESS:  I don't know which phenon- -- I don't

19       know which phenomenon you're talking about.

20             THE COURT:  The trauma of the baby's head hitting

21       against the pelvic bones while the head is still in utero.

22             THE WITNESS:  Well, that's the only time the baby's

23       head hits the mother's pelvis.  In other words, the only time

24       the baby is not in utero is after the baby is born.

25             THE COURT:  Well, when --

1            THE WITNESS:  So when you're saying in utero -- in

2       other words, the in utero concept doesn't end until birth.

3            THE COURT:  Okay.  And I'm drawing a distinction

4       between when the baby is entirely within the uterus with the

5       head not yet crowning, not yet coming through the cervix, and

6       when that head begins to come through the cervical area into

7       the birth canal where we have heard most of the pressure is

8       likely to occur.

9            THE WITNESS:  But Judge, you've got to understand

10      something.  You could see -- the baby could be -- you could

11      see the baby's head, okay?  You could see the baby's head

12      crowning.  That doesn't mean there's been any descent of the

13      bony aspect of the baby's head.

14          Because there's something called molding, okay?  So -- I

15      mean, that's the biggest pitfall in obstetrics.  That's -- you

16      take a look, the mother's pushing, you see the baby's hair,

17      you think the baby's head is down.

18          But in fact, the bones of the baby -- because -- this is

19      one of the number one reasons that, you know, we have lawsuits

20      over forcep deliveries, because the argument is, "Well, I saw

21      the baby's head, I saw the hair."  But in fact, the baby's

22      bones are pressed up against the mother's pelvis because

23      they've never gone through the pelvis.

24          So the business about going through the cervix, crowning,

25      it's irrelevant.  It's where the bones of the baby's head are

1      in relation to the bones of the mother's pelvis, because you

2      could have crowning and the baby could be unengaged.

3             THE COURT:  Okay.  And is it your opinion that the

4      phenomenon you've described is a trauma phenomenon as you

5      talked about the hammer beating the peg against the hole --

6             THE WITNESS:  Judge --

7             THE COURT:  -- or --

8             THE WITNESS:  -- yeah, "or", I'm sorry.

9             THE COURT:  -- or do you agree with Dr. Glass in his

10     description of a general pressure around the cranium

11     restricting the blood flow to the brain?

12            THE WITNESS:  So that's the spectrum, Judge.  And

13     that's why we have electronic fetal monitoring because during

14     a normal labor, when you don't force the issue, there are

15     pressures -- there are always normal -- in normal labor, there

16     are normal pressures.  And we're all built to, you know, not

17     be traumatized by these normal pressures.

18          That's not what happened in this case.  Okay?

19          These aren't the normal pressures of labor.  They started

20     Pitocin, okay?  And it's the gold standard that you have to

21     rule out cephalopelvic disproportion before you start the

22     Pitocin.

23          So this isn't -- so I mean, Dr. Glass is correct that in

24     any labor, there's going to be forces on the baby's head.  And

25     in 99 percent of the time, those forces are well tolerated and

 1    you have a healthy, happy baby.

 2         But when you have a baby that's not fitting, and this

 3    baby is not coming through in the normal way -- and we know

 4    this baby isn't coming through in the normal way because the

 5    mother is stuck at 7 centimeters.  That's not normal.

 6              THE COURT:  Let me back you up for a moment on the

 7    alleged breach of the standard of care, because I think you

 8    mentioned a couple of them.

 9              THE WITNESS:  Okay.

10              THE COURT:  And one was you said you thought that

11    there was a failure to take measurements to determine the

12    mother's pelvic structure, space available, and also to

13    determine the size of the baby and --

14              THE WITNESS:  And the position of the baby.

15              THE COURT:  -- determine the --

16              THE WITNESS:  It's the P's; path -- the passage, the

17    passenger -- that's what we teach the students.  Passage,

18    pelvis, passenger -- baby -- and position of the baby, because

19    position is very important where the head is flexed or

20    extended, yeah.

21              THE COURT:  Okay.  So that's one standard of care.

22    And then the other standard of care you referred to had to do

23    with the --

24              THE WITNESS:  The hammer.

25              THE COURT:  Well, yeah, the forces of labor.

1              THE WITNESS:  Yes.

2              THE COURT:  And is it an opinion that you're offering

3      that the defendants at Bellevue hospital failed to determine

4      whether the mother was engaged in active forces of labor,

5      active contractions; or are you saying she, in fact, was still

6      engaged in active contractions and therefore Pitocin was

7      contraindicated?

8              THE WITNESS:  What I'm saying is there's a technology

9      available.  That's the standard of care.  It's called an

10     internal pressure catheter.  That's the standard of care.

11         And you can -- you can't know how strong the forces

12     are -- there's no way of knowing it, okay?  You know, before

13     this, we -- you know, in the '40s and '50s, we didn't know.

14         Since 1975 we've had available to us an instrument called

15     an internal pressure catheter where we can actually quantify,

16     quantify how strong the contractions are.  And through studies

17     of millions of obstetrical patients -- millions -- we know

18     what a normal quantity is, and we know what an abnormal

19     quantity is.

20         And if the woman is already making a normal quantity; in

21     other words -- and those are called Montevideo units.  If she

22     already is -- you know, if the hammer is already hitting the

23     peg hard enough, it's not okay to hit the peg harder.  And

24     that's what the Pitocin did.

25             THE COURT:  I'll interrupt you again.

1          So in this case, are you saying you don't know whether

2     the mother was engaged in the active contractions, but you are

3     saying Bellevue didn't check?

4               THE WITNESS:  No.  What I'm saying is I know the

5     mother was contracting.  There's no issue here.  No one is

6     disputing the mother was contracting.

7          The only indication for the Pitocin -- if you look at the

8     package insert, okay?  The only indication for the use of

9     Pitocin in the arrest of the active phase of labor is

10    inadequate uterine contractions.  And this was never proven in

11    this case.  And not proving it put this baby in harm's way.

12              THE COURT:  So you're --

13              THE WITNESS:  So of course the woman's contracting.

14    There's no question she's --

15              THE COURT:  I'm stopping you again.

16         So you're saying there's no question she was contracting.

17              THE WITNESS:  Yes.

18              THE COURT:  So we're not talking about the failure of

19    Bellevue to determine whether she was contracting.  There's no

20    dispute that she was contracting.  You're saying the use of

21    Pitocin was contraindicated because she was contracting.

22              THE WITNESS:  That's exactly right.  Of course

23    there's no -- I'm saying just, you know, the opposite of what

24    you just -- I'm sure she was contracting.  I'm sure she was

25    contracting, you know, greatly.  She got to 7, which is really

1    good.  You know, she's contract- -- I'm sure she was having

2    fabulous contractions.

3         And why did she get stuck at 7?  Not because the

4    contractions pooped out.  She got stuck at 7 because the baby

5    wasn't fitting through.

6              THE COURT:  Okay.  So when there is this

7    disproportion and the baby isn't fitting through and there's a

8    dystocia -- the head's too big, the shoulders are too big,

9    whatever --

10             THE WITNESS:  Right.

11             THE COURT:  -- the pelvis is too small, does that

12   prevent dilation of the cervix?

13             THE WITNESS:  Absolutely.

14             THE COURT:  Okay.

15             THE WITNESS:  Absolutely.

16             THE COURT:  All right.  I'm going to --

17             THE WITNESS:  Because if the head doesn't descend and

18   put pressure on the cervix, it only gets to a certain point.

19   And that's why -- you know, that's why she arrested.  That's

20   the definition of arrest of the active phase of labor.

21             THE COURT:  So it's not the contraction itself that

22   is causing the cervix to dilate, you're saying it is the

23   pressure of the head --

24             THE WITNESS:  Yes.

25             THE COURT:  -- on the cervix.

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.  That helps me.

3         Mr. Cullan, you go ahead and question.

4                   DIRECT EXAMINATION (Cont'd.)

5    BY MR. PATRICK CULLAN:

6    Q.   Yeah.  I was just -- can you communicate -- I guess two

7    concepts I don't know the judge necessarily is following.

8         The first is, the number one reason for caesarian

9    sections in this country today is dystocia.  Can you tell us

10   what that means?

11   A.   We already talked about cephalopelvic disproportion,

12   which means -- and I talked about the P's.  Either the pelvis

13   is too small, either the passenger is too big, or the position

14   of the baby is not right, or the powers -- that's the last

15   P -- for uterine contractions even despite the use of Pitocin

16   can't be raised strong enough to get the baby out.

17             THE COURT:  I'm going to take this pause to ask you

18   another question.

19             THE WITNESS:  Sure.

20             THE COURT:  Doctor, you may have seen that in this

21   case when we had the motion in limine filed, there was an

22   amicus brief filed by --

23             THE WITNESS:  ACOG.

24             THE COURT:  -- ACOG.  And they disagreed with the

25   theory concerning the trauma.

1          THE WITNESS:  And does that surprise you, Judge, a

2     political organization that represents obstetricians is going

3     to deny that Pitocin and prolonged, excessive labor leads to

4     birth trauma?  Does that, like, really shock you?

5          THE COURT:  Okay.  They indicated that the theory has

6     not been widely accepted.

7          THE WITNESS:  How many authors would you like me to

8     give you that have written papers on the very topic that I've

9     just discussed?

10          THE COURT:  Well, maybe your lawyers can point out to

11     me in the evidence the peer-reviewed journals that --

12          THE WITNESS:  Including ACOG, by the way.  Including

13     ACOG.

14      ACOG actually wrote an article saying that birth -- that

15     trauma causes ischemic injury to the baby.  ACOG.  Would you

16     like -- you know, I can give you that -- that source too.

17     That was written by ACOG.

18          THE COURT:  All right.

19      I'm going to turn you back to your lawyer.  Mr. Cullan is

20     going to continue questioning.

21     BY MR. PATRICK CULLAN:

22     Q.   There have been items brought up that aren't -- as

23     exhibits but I think they were attached to some of the

24     affidavits.

25      Can you tell us what the two-hour rule was with respect

1    to ACOG's publications in terms of dystocia?

2    A.    Which ACOG rule?  What are you referring to?

3    Q.    That's okay.

4          Explain to us through your background, your experience

5    and training, your knowledge of what ACOG has said and not

6    said, why is trauma an exclusion in their own publication to

7    their essential criteria?

8    A.    I'd be happy to answer that.  Because they have a

9    specific injury which they call -- they named it hypoxic

10   ischemic encephalopathy.  That's a very specific kind of --

11   there are many kinds of ischemic injuries.

12         Their specific hypoxic ischemic encephalopathy excludes

13   the traumatic ischemic encephalopathies.  So they said if you

14   want to call something HIE, if you want to call it -- and

15   again, it's just a name that they gave a specific -- so in

16   other words, they're defining a specific encephalopathy that

17   has nothing to do with trauma.

18         So they said you must exclude the traumatic causes of

19   ischemic encephalopathy in order to call something hypoxic

20   ischemic encephalopathy.

21   Q.    Okay.  And what types of trauma are they referring to?

22   A.    There are many kinds of trauma.  I mean, you can have --

23   you can have this trauma that we're talking about.  You can

24   have trauma from forceps.  You can have trauma from a vacuum.

25   You can have trauma that, if the baby has some underlying

1    hematologic problem, that the normal forces of labor cause an

2    intracranial bleed.  That could be traumatic.

3        So there are many kinds of -- that could be true trauma,

4    like the mother got hit with a baseball bat on her belly.

5    There could be, you know, an abruption leading to trauma.  So

6    there are all kinds of trauma that excludes hypoxic ischemic

7    encephalopathy.  That doesn't mean the trauma doesn't cause

8    ischemic encephalopathy.  It just doesn't cause what they

9    named hypoxic ischemic encephalopathy.

10   Q.   Okay.  Is the type of birth trauma that you're talking

11   about and that you're opining occurred here encompassed in the

12   term "birth trauma"?  And I don't know that I showed you this

13   or not, but the Court has an Exhibit 1001, which was presented

14   to it, that states that a known etiology of this type of

15   injury is birth trauma.

16       Is this the same concept that you're discussing with the

17   Court here now?

18   A.   I think if I understand your question -- and I'm not 100

19   percent sure -- I'm talking about birth trauma, yes.

20   Q.   Okay.

21       (Off-the-record discussion had.)

22            MR. PATRICK CULLAN:  If the Court has any other

23   specific concerns, I think we're kind of into the issue.

24            THE COURT:  Okay.  We will allow cross-examination.

25   Now the lawyer for the defendant is going to ask you a few

1    questions, Doctor.

2              THE WITNESS:  Okay.

3                    CROSS-EXAMINATION

4    BY MR. WELCH:

5    Q.  Dr. Gubernick, when I took your deposition in December of

6    2014, you had not read any articles on CCIE, had you?

7    A.  I had not read anything published.  But as I told you in

8    my office, Mark Evans is in my office, who writes with Barry

9    Schifrin.

10       So I was very aware of this stuff before it was even

11   published, but I didn't see anything in published print yet.

12   I saw it before it was in published print.

13   Q.  And that's what you're talking about in this case, are

14   you not?  You're talking about a compressive ischemic

15   encephalopathy on this child.

16   A.  Which is just another name for something we've known for

17   decades and decades and hundreds of years.  But with all due

18   respect to Barry Schifrin who calls it compressive cerebral

19   ischemic encephalopathy, we're just talking about head trauma.

20   Q.  Okay.  But you're talking about specifically that

21   hypertonic or, as you called it, tetanic contractions

22   basically compressed this child's skull, which led to the lack

23   of profusion to brain tissue.  And that's what caused this

24   trauma, true?

25   A.  Not just that.  I mean, what I told you is there -- this

1    was multifactorial, okay?  That we couldn't -- and we went

2    through this, I think, for two hours in my deposition.

3         I said that there was more than one thing going on.  So

4    it's not just the tetanic contractions because hypothetically

5    speaking, she -- the Pitocin in another case could have caused

6    regular uterine contractions.  But because this baby just

7    never would fit through would still cause a traumatic injury.

8    So you didn't have to have tetanic contractions; but in this

9    case, yes, there were tetanic contractions.

10   Q.   Well, and to be fair, Doctor, what you told me was that

11   we've got several different things working here, in your

12   opinion --

13   A.   Yes.

14   Q.   -- that caused the injury.

15   A.   Yes, I did.

16   Q.   One of those was chorioamnionitis and --

17   A.   Yes.

18   Q.   -- this child had chorioamnionitis, true?

19   A.   I agree with that.

20   Q.   Okay.  And another area that you said that was causing

21   trama to this child was what?

22   A.   I talked about chorioamnionitis.  I talked about oxygen

23   deprivation, which was caused by multiple factors.  It was

24   caused by excessive uterine contractions.  It was caused by

25   tetanic contractions.  And it was caused indirectly from the

1    the chorioamnionitis causing local tissue damage and ischemia,

2    all leading to oxygen deprivation.

3    Q.   And it's your opinion -- and I don't think this hearing

4    is going to cover it, but I have to say it, it's your opinion

5    that we have a hypoxic ischemic injury even though we have

6    normal blood gases, true?

7    A.   Let me be really clear on something.  What ACOG calls

8    HIE, I don't -- this does not meet their criteria.

9         They made the criteria.  They, you know, made -- they

10   covered a very narrow area of ischemic injury.  And it doesn't

11   meet their criteria.  This is an ischemic injury, yes, even

12   with the blood gas and whatnot.

13        But if we're talking about HIE -- which is just a name,

14   like Joe or Sam or Harry -- if we're talking about HIE, what

15   ACOG calls HIE, no, this is not HIE.

16   Q.   All right.  Doctor, I'm going to try to finish up here

17   real quickly and see if you can answer my questions directly.

18   A.   I think I did.

19   Q.   Well, okay.

20   A.   You may not have liked the answer, but I think I answered

21   directly.

22   Q.   Well, Doctor, isn't it true that one of the opinions that

23   you're giving here today on the cause of injury to this child

24   was the compressive forces of labor due to tetanic

25   contractions that compressed the fetal head, which then caused

1    a lack of blood profusion, which caused a hypoxic ischemic

2    injury to the child, true?

3    A.   An ischemic injury to the -- not a hypoxic ischemic

4    encephalopathy because that's a different criteria, but an

5    ischemic injury to the child, yes.

6    Q.   Okay.  And that was caused, in your opinion, due to the

7    fact that we have compressive forces on the head which

8    decreased the profusion to brain tissue that then caused

9    injury, true?

10   A.   As well as other substantial issues such as oxygen

11   deprivation and infection, yes.

12   Q.   Okay.  You are not a member of ACOG, correct?

13   A.   No, I'm not.

14   Q.   There are no skull fractures in this case, true?

15   A.   No, no skull fractures.

16        MR. WELCH:  That's all I have, your Honor.

17        THE COURT:  Redirect?

18        MR. PATRICK CULLAN:  Just really quickly, your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. PATRICK CULLAN:

21   Q.   In the fetal head, is the skull like an adult head where

22   the sutures are fused?  Or tell us why there's no skull

23   fracture and why skull fractures aren't expected.

24   A.   Yes.  Because, you know, babies have soft heads with

25   suture lines that have not fused yet.  And that's -- you know,

1    nature is smart about that.  So as the baby is trying to get

2    through the pelvis, those bones actually move; because if they

3    didn't move, they would break.

4         So, you know, a skull fracture has nothing -- you know,

5    it's an irrelevant question as to the amount of pressure that

6    would be on the head as if there wasn't a skull fracture.

7    That means there wasn't a lot of pressure.  These bones move

8    and they're designed to move -- nature's smart about that --

9    so they don't break.

10   Q.   Dr. Barnes, a pediatric neuroradiologist, looked at the

11   films and saw the degree and severity of the overlapping

12   bones, and he --

13   A.   And that's the thing.  He -- not only he looked at these

14   films, and he said directly -- he's -- he's an expert in the

15   field, and he said this is a traumatic injury directly related

16   to the forces of labor.  And I will take it one step further:

17   Due to the inappropriate use of Pitocin.

18        I mean, here's a guy who -- look, he's not just talking

19   about in general, he's looking at these pictures.  He saw the

20   asymmetry of the injury, he saw that the scalp was

21   traumatized, he saw the overriding sutures four days after

22   birth which is markedly unusual.

23        So he's not in -- he's not even speaking in the

24   hypothetical term, he's speaking in this particular case,

25   which -- I don't understand why we even have a debate about

1       this.

2                   MR. PATRICK CULLAN:  If the Court has any further --

3                   THE COURT:  No.  Thank you.

4           I appreciate you joining us by telephone here today,

5       Dr. Gubernick.  And thank you very much.

6

7

8                       (END OF REQUESTED PROCEEDINGS)

9

10

11

12          I certify that the foregoing is a correct transcript from
        the record of proceedings in the above-entitled matter.

13

14          _____/s Brenda L. Fauber_____          _____7-15-15_____
        Brenda L. Fauber, RDR, CRR                    Date

15

16

17

18

19

20

21

22

23

24

25