**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **DORAN SCHMIDT, Individually; and S.S., a minor, by and through Doran Schmidt, her natural mother and next friend;**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**BELLEVUE MEDICAL CENTER L.L.C.,**<br><br>**Defendant.** | **8:13CV143**<br><br>**MEMORANDUM AND ORDER** |

Sage Schmidt was born at the Bellevue Medical Center on November 2, 2012, with severe brain damage. Before trial, Sage Schmidt and her mother, Doran Schmidt, reached a settlement with former Defendants Heather Ramsey, the treating certified nurse midwife, and The Midwifie's Place, where Doran Schmidt received her prenatal care as well as care during the early stages of labor. On August 6, 2015, following a two-week trial, the jury returned a verdict in favor of Plaintiff Sage Schmidt and against the Bellevue Medical Center in the amount of $17,000,000.00.

The matter is now before the Court on The Bellevue Medical Center's Post-Trial Motions Pursuant to Fed. R. Civ. P. 50, 59 and 60 and Request for Oral Argument (Filing No. 263).

First, Defendant Bellevue Medical Center, L.L.C. ("Bellevue Medical Center") moves for a new trial pursuant to Fed. R. Civ. P. 59, asserting:

a. The Court failed to instruct the jury on determination of the settling parties' liability pursuant to Neb. Rev. Stat. §§ 25-21,185.09 and 25-21,185.11;

b. The Court failed to provide a verdict form which included an apportionment of obligation;

c  The Court instructed the jury on joint and several liability in the second paragraph of Instruction No. 11;

d. The Court failed to follow Nebraska law regarding the duty of nurses as set forth, in part, in *Jensen v. Archbishop Bergan Mercy Hosp.*, 459 N.W.2d 178 (Neb. 1990), and failed to instruct the jury in accordance therewith; and

e. The damages awarded were excessive.

Second, Bellevue Medical Center moves pursuant to Fed. R. Civ. P. 60(b) for correction or vacation of the judgment by:

a. Limiting the amount of the judgment to $1,750,000.00, because Bellevue Medical Center is a qualified health care provider under the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 to 44-2855, and the amount recoverable is limited by Neb. Rev. Stat. § 44-2825;

b. Vacating the judgment for failure to deduct the share of responsibility attributable to settling parties Heather Ramsey and The Midwife's Place, L.L.C.

Third, Bellevue Medical Center renews its earlier motions pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law, or in lieu thereof for a new trial, for the reasons stated during trial.

## STANDARDS OF REVIEW

### Fed. R. Civ. P. 50

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A)

resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

Fed. R. Civ. P. 50(a).

"In ruling on the renewed motion [after trial], the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b).

## Fed. R. Civ. P. 59

"The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a).

## Fed. R. Civ. P. 60

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons:
(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

**DISCUSSION**

**I. Motion for New Trial Pursuant to Fed. R. Civ. P. 59**

*A.  Failure to Instruct on Determination of Settling Parties' Liability*

Neb. Rev. Stat. § 25-21,185.09 provides:

Any contributory negligence chargeable to the claimant shall diminish proportionately the amount awarded as damages for an injury attributable to the claimant's contributory negligence but shall not bar recovery, except that if the contributory negligence of the claimant is equal to or greater than the total negligence of all persons against whom recovery is sought, the claimant shall be totally barred from recovery.  The jury shall be instructed on the effects of the allocation of negligence.

Neb. Rev. Stat. § 25-21,185.11 provides:

(1)  A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable shall discharge that person from all liability to the claimant but shall not discharge any other persons liable upon the same claim unless it so provides.  The claim of the claimant against other persons shall be reduced by the amount of the released person's share of the obligation as determined by the trier of fact.

(2) A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable shall preclude that person from being made a party or, if an action is pending, shall be a basis for that person's dismissal, but the person's negligence, if any, shall be considered in accordance with section 25-21,185.09.

No issue of contributory negligence, comparative negligence, or allocation of negligence was raised by the parties in the Order on Pretrial Conference, which listed the controverted and unresolved issues remaining for trial.  (*See* Filing No. 219 at 3–4.) Although defense counsel submitted a proposed verdict form suggesting an allocation of negligence, (*see* Filing No. 227), defense counsel submitted no proposed jury instruction on such allocation.  Defense counsel had an opportunity to object to the Court's proposed jury instructions, and raised no objection to the fact that the Court's

proposed instructions did not include any instruction on the issue of comparative negligence or allocation of negligence. That objection is now waived, and Bellevue Medical Center's Motion for New Trial on this basis will be denied.

## B. Failure to Provide a Verdict Form that Included an Apportionment of Obligation

Defense counsel stated, on the record, that the Bellevue Medical Center had no objection to the Court's proposed verdict form, which did not include any provision for allocation of negligence. Bellevue Medical Center's Motion for New Trial on this basis will be denied.

## C. Instruction No. 11

Defense counsel objected to the inclusion of the second paragraph in Instruction No. 11. That paragraph instructed the jury:

> Where the independent acts, or failures to act, of one or more than one person combine to proximately cause the same injury, each such act or failure to act is a proximate cause, and each such person may be held responsible for the entire injury. This is true though some may have been more negligent than others.

Bellevue Medical Center argues that this instruction was improper because Nurse Heather Ramsey and The Midwife's Place settled with the Plaintiffs; therefore, joint and several liability was inapplicable. (Defendant's Brief, Filing No. 265 at ECF 10–11 (citing *Tadros v. City of Omaha*, 735 N.W.2d 377 (Neb. 2007)).)

While the Court agrees that the question of joint and several liability was inapplicable, the language included in the second paragraph of Instruction No. 11 was appropriate to guide the jury on the question of causation. The undisputed evidence showed that at least two nurses working for Bellevue Medical Center were involved in the care and treatment of Doran Schmidt during labor and delivery. The Plaintiffs

alleged that a variety of acts and omissions on the part of more than one employee of Bellevue Medical Center deviated from the standard of care and combined to cause injury to Sage Schmidt. Bellevue Medical Center's Motion for New Trial on the basis of Instruction No. 11 will be denied.

### D. *Jensen v. Archbishop Bergan Mercy Hospital*

Defense counsel objected to the Court's failure to instruct the jury that hospital staff members lack authority to alter or depart from the orders of a certified nurse midwife or advanced practice registered nurse. In support of its proposed instruction, defense counsel cited *Jensen*, in which the Nebraska Supreme Court held:

> "As a general rule, hospital staff members lack authority to alter or depart from an attending physician's order for a hospital patient and lack authority to determine what is a proper course of medical treatment for a hospitalized patient. The foregoing is recognition of the realities and practicalities inherent in the physician-hospital nurse relationship."

*Jensen v. Archbishop Bergan Mercy Hospital*, 459 N.W.2d 178, 183 (Neb. 1990).

First, this Court was not persuaded that the Nebraska Supreme Court would extend its ruling in *Jensen* to certified nurse midwives or advanced practice registered nurses.

Second, expert testimony at trial demonstrated that the standard of care requires medical professionals in a hospital setting to work as a team, *i.e*, each professional who works with a patient or gathers data to assist in a patient's treatment is expected to communicate with other providers and raise questions when a course of treatment appears contraindicated.

Third, while Plaintiffs' expert criticized Nurse Ramsey's prescription of Petocin for Doran Schmidt, and suggested that Nurse Ramsey may have failed to conduct thorough

pelvic/cephalic measurements, the great weight of the Plaintiffs' breach-of-standard-of-care and causation evidence focused on the interpretation of fetal-heart-monitor data by Bellevue Medical Center employees. Based on the Plaintiffs' expert's testimony, it was reasonable for the jury to conclude that Sage Schmidt's damages were caused by the Bellevue Medical Center employees' alleged mis-reading of fetal heart monitor data, and/or their failure to read the data in a timely manner and alert a medical provider to the need for emergency action. Those alleged acts or omissions did not involve the following of any order of Nurse Ramsey.

Bellevue Medical Center's Motion for New Trial on the basis of the Court's failure to give the Defendant's requested instruction based on *Jensen* will be denied.

*E.  Excessive Damages*

Although the evidence presented at trial provided the jury with a reasonable basis for the calculation of damages awarded, the damages will be reduced pursuant to the Nebraska Hospital Medical Liability Act, discussed below.

**II. Motion for Correction or Vacation of Judgment Pursuant to Fed. R. Civ. P. 60(b)**

*A.  Nebraska Hospital Medical Liability Act*

*1. Bellevue Medical Center's Status as a Qualified Heath Care Provider*

To be a qualified health care provider under the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 to 44-2855 (the "Act"), the provider must meet the qualifications set out in Neb. Rev. Stat. § 44-2824, monitored by the Director of Nebraska's Department of Insurance: "(1) To be qualified under the [Act], a health care provider . . . shall: (a) File with the director proof of financial responsibility . . . ; and (b) Pay the surcharge and any special surcharge levied on health care providers . . . ."

Bellevue Medical Center has submitted the Affidavit of Stephanie L. Hobelman (Filing No. 264-1), an insurance analyst for the Nebraska Department of Insurance who serves as the Department's contact person for confirmation of status of health care providers under the Act. Hobelman attests that Bellevue Medical Center "had taken all the steps necessary to qualify under the Act pursuant to § 44-2824, and was a qualified healthcare provider pursuant to the Act in November 2012," the time when the acts or omissions giving rise to this action took place. (Filing No. 264-1 ¶ 5.)

Plaintiffs assert that there is a third requirement a health care provider must satisfy in order to be qualified for limited liability under the Act, *i.e.*, the posting of a notice informing patients of the health care provider's qualification for limited liability under the Act and the patients' right to file an opt-out statement with the Director Nebraska's Department of Insurance:

> Each health care provider *who has qualified* under the act shall post and keep posted in his or her waiting room or other suitable location a sign of a size and type to be prescribed by the director stating: (name of health care provider) has qualified under the provisions of the Nebraska Hospital-Medical Liability Act. Patients will be subject to the terms and provisions of that act unless they file a refusal to be bound by the act with the Director of Insurance of the State of Nebraska.

Neb. Rev. Stat. § 44-2821(4) (emphasis added).

Plaintiffs have submitted affidavits from several people, including Doran Schmidt, who frequented Bellevue Medical Center at the time of the incidents giving rise to this action and who did not see any notice posted pursuant to Neb. Rev. Stat. § 44-2821(4). (*See* Filing No. 268.) Plaintiffs also suggest that even if Bellevue Medical Center did post a notice pursuant to § 44-2821(4), the notice may not have been posted in a "suitable" place.

A plain reading of Neb. Rev. Stat. §§ 44-2824(1) and 44-2821(4) suggests that the posting of notice to patients is a requirement the Act *imposes* on qualified health care providers, but is not a requirement *to be* a qualified health care provider under the Act. Nor does the Act suggests that a health care provider's qualification under the Act is forfeited if there is some defect in the posting of the required notice.

This Court recognizes that in 1996, a panel of the U.S. Court of Appeals for the Eighth Circuit stated, "[i]n order to qualify under the Nebraska Act, a health care provider must file proof of financial responsibility, pay an annual surcharge into the excess liability fund, and post a notice of qualification under the Nebraska Act." *Lozada v. United States*, 974 F.2d 986, 987 (8th Cir. 1996) (citing Neb. Rev. Stat. §§ 44-2821, and 44-2824). However, the federally owned hospital in *Lozada* posted *no* notice of participation under the Act,[1] and the Court of Appeals held the Act's limitation on liability applied, because the hospital was in "like circumstances" with qualified health care providers under the Act. *Id.* at 989. The holding in *Lozada* is consistent with this Court's reading of the plain language of Neb. Rev. Stat. §§ 44-2824(1) and 44-2821(4), *i.e.*, that the posting of notice to patients is a requirement the Act *imposes* on qualified health care providers, but is not a requirement *to be* a qualified health care provider under the Act.

Whether or not Bellevue Medical Center had a notice posted pursuant to § 44-2821(4) in a "suitable" place at the time of the Plaintiffs' care and treatment, this Court concludes that Bellevue Medical Center was a qualified health care provider under the Act.

---

[1] *Lozada*, 974 F.2d at 989 (Heaney, J., dissenting).

## 2. *Constitutionality of the Act's Limitation on Liability*

Under the Nebraska Hospital-Medical Liability Act:

> (1) The total amount recoverable . . . from any and all health care providers and the Excess Liability Fund for any occurrence resulting in any injury . . . of a patient may not exceed . . . (d) one million seven hundred fifty thousand dollars for any occurrence after December 31, 2003, and on or before December 31, 2014.
> (2) A health care provider qualified under the act shall not be liable to any patient or his or her representative who is covered by the act for an amount in excess of five hundred thousand dollars for all claims or causes of action arising from any occurrence during the period that the act is effective with reference to such patient.
> (3) Subject to the overall limits from all sources as provided in subsection (1) of this section, any amount due from a judgment or settlement which is in excess of the total liability of all liable health care providers shall be paid from the Excess Liability Fund . . . .

Neb. Rev. Stat. § 44-2825.

The Plaintiffs now challenge the constitutionality of the Act under the Constitutions of the state of Nebraska and the United States on five general bases: (1) violation of the right to jury trial, (2) violation of takings clauses, (3) violation of the right of access to the courts, (4) violation of equal protection, and (5) violation of the right of substantive due process.

The Nebraska Supreme Court has held that the cap on damages in § 44-2825(1) does not violate principles of special legislation, equal protection, open courts, the right to a remedy, the right to jury trial, the taking of property, or separation of powers under the Nebraska constitution. *Gourley v. Nebraska Methodist Health Sys.*, 663 N.W.2d 43, 64–78 (Neb. 2003).

"That the statutory provisions [of a state law] are not in conflict with the Constitution of [a state] is for this court foreclosed by the decision of the highest court of

the state." *Brown v. State of New Jersey*, 175 U.S. 172, 174 (1899). "[A] state is not tied down by any provision of the Federal Constitution to the practice and procedure which existed at the common law. Subject to the limitations heretofore named[2] it may avail itself of the wisdom gathered by the experience of the century to make such changes as may be necessary." *Id.* at 175.

Accordingly, this Court adopts the Nebraska Supreme Court's well-reasoned analysis in *Gourley* as to the Plaintiffs' challenges to the Nebraska Hospital-Medical Liability Act under the Nebraska Constitution, and will address only those challenges raised under the United States Constitution, recognizing that "state statutes are presumed constitutional, and the [party challenging the constitutionality of a state statute] has the burden to show otherwise." *Branson v. O.F. Mossburg & Sons., Inc.,* 221 F.3d 1064, 1065 n.4; *see Fitz v. Dolyak*, 712 F.2d 330, 333 (8th Cir. 1983).

### *a. Right to Jury Trial*

Amendment VII to the United States Constitution recognizes the right to trial by jury in civil cases:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

U.S. Const. amend. VII.

Plaintiffs acknowledge that the United States Supreme Court has held that the Seventh Amendment to the United States Constitution is not applicable to the states. (Plaintiffs' Brief, Filing No. 267 at ECF 52–53 (citing *Palko v. Connecticut*, 302 U.S. 319

---

2 "[T]he qualification that such procedure must not work a denial of fundamental rights, or conflict with specific and applicable provisions of the Federal Constitution." *Brown*, 175 U.S. at 175.

(1937), *overruled on other grounds by Wolf v. Colorado*, 338 U.S. 25 (1949); *Walker v. Sauvinet*, 92 U.S. 90 (1875)).  Nonetheless, Plaintiffs suggest that the Seventh Amendment *should* be made applicable to the states due to the Supreme Court's evolving view of the incorporation of the Bill of Rights through the Fourteenth Amendment's Due Process Clause.  Plaintiffs encourage this Court to engage in the analysis prescribed in *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), and be the first to declare such incorporation.

In *McDonald*, the Supreme Court addressed the issue of incorporation by determining whether a right enumerated in the Bill of Rights was fundamental to the nation's scheme of ordered liberty, or "deeply rooted in this Nation's history and tradition."  *McDonald*, 561 U.S. at 767 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997)) (internal quotation marks omitted).  After applying that analysis, the Supreme Court concluded that the Second Amendment's right to bear arms was applicable to the states through the Fourteenth Amendment's Due Process clause.  *Id.* at 777–78.

While it is true that the right of trial by jury in civil as well as criminal cases is deeply rooted in our nation's history and tradition, and may even be fundamental to the nation's scheme of ordered liberty, the right of trial by jury in every civil case *where the amount in controversy exceeds twenty dollars* is not.  As the Supreme Court stated in *McDonald*, when an individual guarantee of the Bill of Rights is applied to the states by incorporation through the Fourteenth Amendment's Due Process Clause, the right is not watered down, but is enforced according to the same standards that protect against federal encroachment.  *Id.* at 765.  The limited jurisdiction of federal courts prevents

them from being used by litigants seeking jury trials in twenty-dollar disputes—a protection that state courts of general jurisdiction might not possess. Accordingly, this Court declines the Plaintiffs' invitation to be the first to declare the Seventh Amendment applicable to the states by way of Fourteenth Amendment incorporation.

Plaintiffs also argue that the Act's cap on damages infringes on the jury's authority to determine damages as fact-finder. Because this argument is based on the premise that the Seventh Amendment right of trial by jury in civil cases applies to the states, the argument fails. The argument also fails for the reasons set out by the Nebraska Supreme Court in *Gourley*, *i.e.*, a jury performs its function as fact-finder and a court performs its function by applying the law, including a determination of the remedy available as a matter of law; and because state legislatures have the power to abolish common law causes of action, they have the power to limit recovery in such causes of action. *Gourley*, 663 N.W.2d at 75.

### b. Takings Clause

The Fifth Amendment to the United States Constitution ends with the phrase, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The clause is applicable to states as well as the federal government. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) ("The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not be taken for public use, without just compensation." (internal quotation marks and citation omitted)).

Plaintiffs argue that the Act's cap on damages constitutes a taking of property from persons severely injured through medical malpractice, and that the property

effectively is used for a public purpose, *i.e.*, ensuring the availability of competent medical and hospital service to the public at a reasonable cost.  Plaintiffs cite *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–29 (1982), for the proposition that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause."

While the Supreme Court recognized that "a cause of action is a species of property," it also stated: "The hallmark of property . . . is an individual entitlement *grounded in state law*, which cannot be removed except 'for cause.'"  *Id.* at 430.  As discussed above, states may limit or eliminate common law causes of action.[3]  *Brown v. State of New Jersey*, 175 U.S. at 175.

Worker compensation laws provide a useful analogy.  The Nebraska Supreme Court has determined that Neb. Rev. Stat. § 48-148 foreclosed common law negligence actions by employees against employers for work-related injuries.  *Skinner v. Ogallala Public Sch. Dist. #1*, 631 N.W.2d 510, 520 (Neb. 2001) (citing Neb. Rev. Stat. § 48-148; *Levander v. Benevolent and Protective Order of Elks,* 596 N.W.2d 705, [709] (1999)) ("[T]he Nebraska Workers' Compensation Act is an employee's exclusive remedy against an employer for an injury arising out of and in the course of employment."); *see also Schweitzer v. American National Red Cross,* 591 N.W.2d 524, 529 (Neb. 1999) (citing Neb. Rev. Stat. §§ 48-101 and 48-109; *Kaiser v. Millard Lumber*, 587 N.W.2d 875 (Neb. 1999); *Daniels v. Pamida, Inc.*, 561 N.W.2d 568 (Neb. 1997)).

The United States Supreme Court similarly recognized that workers compensation statutes provide the exclusive remedy for workers covered by such laws,

---

[3]  For example, the Nebraska legislature abolished common law civil causes of action for criminal conversation and alienation of affections in 1986.  *See* Neb. Rev. Stat. § 25-21,188.

eliminating common law causes of action against employers, such as actions in negligence, that might result in greater awards of damages:

> Historically, workmen's compensation statutes were the offspring of a desire to give injured workers a quicker and more certain recovery than can be obtained from tort suits based on negligence and subject to common-law defenses to such suits. Thus compensation laws are practically always thought of as substitutes for, not supplements to, common-law tort actions.

*United States v. Demko*, 385 U.S. 149, 151 (1966) (citing *Patterson v. United States*, 359 U.S. 495, 496 (1959); *Johansen v. United States*, 343 U.S. 427, 441 (1952)).

Here, the Act helps ensure a "more certain recovery" for plaintiffs injured due to medical malpractice, because it provides an incentive for hospitals and health care providers to maintain specified liability insurance, Neb. Rev. Stat. § 44-2827, and to make payments of premium surcharges as determined by the Director of Nebraska's Department of Insurance to Nebraska's Excess Liability Fund. Neb. Rev. Stat. §§ 44-2829 and 44-2830.

If Sage Schmidt had suffered an injury as the result of malpractice on the part of a health care provider *not* qualified under the Act, her ability to recover damages would depend on the defendant's ability to pay. Like workers compensation statutes, the Act serves the objective of "more *certain* recovery," while placing a limit on the *amount* of recovery. Employees seeking to recover from wealthy employers for on-the-job injuries may be disadvantaged by workers compensation laws, while employees seeking to recover from employers with limited financial resources likely benefit. Similarly, medical-malpractice plaintiffs with severe injuries seeking to collect damages from qualified health care providers who have vast financial resources are disadvantaged by

the Act; but plaintiffs seeking to collect damages from qualified health care providers with limited resources likely benefit.

This Court concludes that Sage Schmidt had a property interest in her cause of action only as it was "grounded in state law;" she never had a vested property interest in a jury award exceeding the Act's limit on damages; and the Act's limit on damages is not an unconstitutional taking of property for a public use without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

### c. Access to the Courts

Plaintiffs argue that the Act's limit on recoverable damages impairs the fundamental right of access to the courts which is "grounded in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses." (Plaintiffs' Brief, Filing No. 267 at ECF 68–69 (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002)).)

Plaintiffs suggest that the right of access to the courts is not meaningful if full compensation for an injury cannot be obtained. They also assert that the Act's limit on recoverable damages impairs an injured party's ability to retain qualified counsel.

In *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971), the Court said, "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." In *Logan,* the Court said, "having made access to the courts an entitlement or a necessity, the State may not deprive someone of that access unless

the balance of state and private interests favors the government scheme." 455 U.S. at 430 n.5 (1982). The Court reiterated its holding that "[t]he hallmark of property . . . is an individual entitlement *grounded in state law*, which cannot be removed except "for cause." *Id.* at 430 (emphasis added) (citing *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12 (1978); *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 576–78 (1972)).

Because this Court has concluded that that Sage Schmidt had a property interest in her cause of action only as it was "grounded in state law," she was not denied access to the courts for any claim of "right" or "entitlement." Her challenge to the Act's limitation on damages on this basis fails.

### d. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

> Dissimilar treatment of dissimilarly situated persons does not violate equal protection. *See Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir. 1994). Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her. *See, e.g.*, *Samaad v. City of Dallas*, 940 F.2d 925, 940–41 (5th Cir. 1991). Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim. *See id.* at 941 (holding that black residents failed to state an equal protection claim where they did not allege the existence of a similarly situated group of white residents who were treated differently). Thus, before we may reach the merits of their equal

protection claim, we must determine if the plaintiffs and [the comparator group] are similarly situated.

*Klinger v. Nebraska Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

Here, Plaintiffs suggest that Sage is similarly situated to medical malpractice claimants who have suffered less severe injuries, yet such claimants are treated favorably under the law because they can receive compensation for a greater percentage of their damages while the cap limits Sage to receiving a smaller percentage of her damages. Plaintiffs suggest that this disparity causes Sage to bear an unfair share of the burden of resolving the perceived medical malpractice liability crisis that gave rise to the Act and the liability cap. Plaintiffs ask the Court to apply a strict scrutiny analysis and determine whether the Act is narrowly tailored to serve a compelling state interest, because Plaintiffs contend that the Act burdens the fundamental rights of trial by jury and access to the courts. As discussed above, however, this Court has determined that the Act does not burden the fundamental rights of trial by jury or access to the courts.

"If a legislative classification or distinction neither burdens a fundamental right nor targets a suspect class, we will uphold it so long as it bears a rational relation to some legitimate end." *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (internal quotation marks and brackets omitted).

Assuming, without deciding, that Sage is similarly situated to less severely injured medical malpractice claimants for the purpose of collecting damages from health care providers, and recognizing that the Act limits her collection of damages in a manner that some less severely injured claimants are not limited, the Court nonetheless concludes that the Act's liability cap bears a rational relationship to legitimate legislative goals.

Those goals and objectives are stated in Neb. Rev. Stat. § 44-2801 (ensuring, *inter alia*, the availability of competent medical and hospital service at reasonable cost, and the availability of malpractice insurance at reasonable rates), and were summarized by the Nebraska Supreme Court in *Gourley*. *See Gourley*, 663 N.W. 2d at 72 ("[T]he Legislature was concerned about a perceived insurance crisis that could affect the ability of the state to recruit and retain physicians and increase the costs of medical care. Reducing health care costs and encouraging the provision of medical services are legitimate goals which can reasonably be thought to be furthered by lowering the amount of medical malpractice judgments."). Because the Act's liability cap bears a rational relationship to legitimate legislative goals, Plaintiffs' equal protection challenge fails.

### e. Substantive Due Process

Plaintiffs' substantive due process argument consists of a single sentence. They contend that the Act's cap on liability and its notice provisions violate "the minor Plaintiff's right to life, liberty, and pursuit of happiness."[4] (Plaintiffs' Brief, Filing No. 267 at ECF 74.)

"Before official conduct or inaction rises to the level of a substantive due process violation, it must be so egregious or outrageous that it is conscience-shocking." *Forrester v. Bass,* 397 F.3d 1047, 1058 (8th Cir. 2005) (quoting *Burton v. Richmond*, 370 F.3d 723, 729 (8th Cir. 2004) (internal quotation marks omitted)). "Substantive due process is concerned with violations of personal rights so severe so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless

---

[4] While "the pursuit of happiness" is listed as an inalienable right in the Declaration of Independence, it is not among those rights protected by due process under the Constitutions of the United States or the State of Nebraska.

or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power." *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012) (quoting *Golden ex rel. Balch v. Anders*, 324 F.3d 650, 652–53 (8th Cir. 2003)) (internal quotation marks omitted).

The Act and its application do not constitute a violation of Sage Schmidt's right to substantive due process.

### B. Apportionment of Liability to Settling Parties

As discussed above, Bellevue Medical Center did not preserve within the Order on Pretrial Conference any issue as to allocation of negligence; nor did Bellevue Medical Center present any evidence of negligence on the part of Nurse Ramsey or The Midwife's Place at the time of trial; nor did Bellevue Medical Center request an instruction on allocation of negligence; nor did Bellevue Medical Center object to the Court's failure to include such an instruction; nor did Bellevue Medical Center object to the Court's verdict form.

There was no apportionment of liability to the settling parties by the trier of fact, and it would be improper for the Court to attempt any such apportionment. Because Bellevue Medical Center's liability to the Plaintiffs is limited by the Nebraska Hospital-Medical Liability Act to a small percentage of the total damages awarded by the jury, the Court also finds that pro tanto reduction[5] of the jury award would be improper.

---

[5] Nebraska "common law follows the traditional rule that if the plaintiff settles with one of the jointly and severally liable tort-feasors, then the plaintiff's recovery against the remaining tort-feasors is reduced by the actual settlement amount. This is often referred to as pro tanto reduction." *Tadros v. City of Omaha*, 735 N.W.2d 377, 380 (Neb. 2007) (footnotes omitted). Here, the amount of any settlement paid to the Plaintiffs by The Midwife's Place or Nurse Heather Ramsey is unknown to the Court. It is also unknown to the Court whether The Midwife's Place or Nurse Ramsey were qualified medical providers under the Nebraska Hospital-Medical Liability Act.

**III. Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50**

The Bellevue Medical Center's renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 is denied for the same reasons stated on the record during trial.

**CONCLUSION**

Because Bellevue Medical Center is a qualified health care provider under the Act, and because the limit on liability for qualified health care providers under the Act is not unconstitutional, this Court concludes that the total amount recoverable by the Plaintiffs for the injuries suffered by Sage Schmidt is one million seven hundred fifty thousand dollars ($1,750,000.00). Bellevue Medical Center is liable for five hundred thousand dollars ($500,000.00) of that amount, as a qualified health care provider. The remaining one million two hundred fifty thousand dollars ($1,250,000.00) shall be paid from the Excess Liability Fund pursuant to the limitations in Neb. Rev. Stat. § 44-2825(3). Accordingly,

IT IS ORDERED:

1.    The Bellevue Medical Center's Post-Trial Motions Pursuant to Fed. R. Civ. P. 50, 59 and 60 and Request for Oral Argument (Filing No. 263) are granted in part as follows:

Pursuant to Fed. R. Civ. P. 60(b)(6), the Judgment shall be amended to reflect the total amount recoverable by the Plaintiffs for the injuries suffered by Sage Schmidt is one million seven hundred fifty thousand dollars ($1,750,000.00). Bellevue Medical Center is liable for five hundred thousand dollars ($500,000.00) of that amount, as a qualified health care provider. The remaining one million two hundred fifty thousand dollars ($1,250,000.00) shall be paid from the Excess Liability Fund pursuant to the limitations in Neb. Rev. Stat. § 44-2825(3) (Cum. Supp. 2014);

2.    The Motions are otherwise denied;

3. The Motion for Briefing Schedule (Filing No. 280) filed by the Intervenor, the State of Nebraska, is denied as moot; and

4. An Amended Judgment will be entered and the Stay of Judgment (Filing No. 262) lifted.


Dated this 25th day of November, 2015

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge