```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2

     SAGE SCHMIDT, A Minor,      )
 3   By and Through Doran        )
     Schmidt, her Natural Mother)
 4   and Next Friend, and DORAN  )
     SCHMIDT, Individually,      )
 5                               )
                Plaintiffs,      )        8:13CV143
 6                               )
          vs.                    )        Omaha, Nebraska
 7                               )        July 28, 2015
     THE BELLEVUE MEDICAL        )
 8   CENTER, LLC,                )
                                 )
 9              Defendant.       )

10

11            VOLUME II - TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE LAURIE SMITH CAMP
             CHIEF UNITED STATES DISTRICT JUDGE
12

13                  A-P-P-E-A-R-A-N-C-E-S

     FOR THE PLAINTIFFS:        Mr. Patrick J. Cullan
14                              Mr. Joseph P. Cullan
                                Cullan, Cullan Law Firm
15                              1113 Harney Street
                                Omaha, NE 68102
16

     FOR THE DEFENDANT:         Mr. Brien M. Welch
17                              Ms. Kathryn J. Cheatle
                                Cassem, Tierney Law Firm
18                              9290 West Dodge Road
                                Suite 302
19                              Omaha, NE 68114-3320

20

     COURT REPORTER:            Ms. Brenda L. Fauber, RDR, CRR
21                              111 S. 18th Plaza
                                Suite 3122
22                              Omaha, NE 68102
                                (402) 661-7322
23

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

1          (At 9:14 a.m. on July 28, 2015, with counsel for the

2     parties, plaintiff Doran Schmidt, and the defendant's

3     representative present, and the jury NOT present, the

4     following proceedings were had:)

5          THE COURT:  Good morning.

6          MR. WELCH:  Good morning, your Honor.

7          MR. PATRICK CULLAN:  Good morning, your Honor.

8          THE COURT:  I understand that there are some matters

9     that counsel would like to discuss before the jury comes in.

10     I'll start with the plaintiff.  Any issues that the

11     plaintiff would like to discuss?

12          MR. PATRICK CULLAN:  Yeah, just a couple procedural

13     ones.

14     At one point during the examination -- I don't know

15     when -- I would like the witness to be able to walk down and

16     use the actual fetal monitor tracing -- two of them actually.

17     One was marked up by the defendant nurses at their deposition

18     -- and describe and explain what it is.

19     And then the second one would be to just take a clean

20     monitor strip and explain the concepts that he will have

21     already described and its applicability to the strip.

22     And then the strip itself, your Honor, is about 12 hours

23     of recording.  So it's -- I don't know the best way to do it,

24     I mean -- because he'll need to reference it here.  Is it okay

25     that he comes here?  Where would you want me to question him?

 1          THE COURT:  Well, let me explain a little bit about

 2      the technology here.

 3          MR. PATRICK CULLAN:  Okay.

 4          THE COURT:  I understand that these exhibits you're

 5      referring to, the fetal monitor strip exhibits, are, in fact,

 6      paper exhibits; is that correct?

 7          MR. PATRICK CULLAN:  That's correct, your Honor.

 8          THE COURT:  Okay.  So you can put those on that

 9      overhead.  And if they are received into evidence, they can be

10      shown to everyone, including the jury.

11          If they're not yet received into evidence, they could be

12      shown just to the witness and to me and to counsel.  And

13      Ms. Frahm can assist with that technology.  And the witness

14      sitting in the witness box can view the exhibit and can, in

15      fact, mark on the exhibit using his finger on the screen,

16      marking arrows, drawing lines.

17          And that is usually the preferable way to get that

18      evidence into the record and explain it to the jury without

19      the witness needing to leave the witness box.  And that way he

20      is right next to the microphone, and it's less confusing.

21          So does that answer your question?

22          MR. PATRICK CULLAN:  Yeah.  That would -- maybe we

23      can play around with it so he knows how to use it.

24          THE COURT:  Well, people usually play around with

25      that before trial.

1           MR. PATRICK CULLAN:  Okay.  I didn't know that --

2      okay.

3           THE COURT:  And I know that you are a little bit

4      concerned about trying to get Dr. Gubernick's testimony

5      completed today.  So you may want to go ahead and get him out,

6      especially since we have the long mid-day break today.  I will

7      suggest that we just go until 11:30 without a 15-minute break.

8      That will help a little bit.

9         But it's up to you.  It's your time, it's your witness.

10     If you wish to try to learn how the equipment works at this

11     time with your witness, we will sit and wait while you do

12     that.

13          MR. PATRICK CULLAN:  Would you be okay if he does

14     it -- if he can -- would you be okay if he came down and just

15     drew on it?  Or do you prefer the --

16          THE COURT:  Well, he needs to be by a microphone

17     where everyone can hear him.  And I won't tell you how to put

18     on your case.  As long as the exhibit is in evidence, it can

19     be shown to the jury.

20        And if it's on that overhead projector, we can make sure

21     that the jury can see it on the monitors.

22          MR. PATRICK CULLAN:  Okay.

23          THE COURT:  Beyond that, it's up to you how you want

24     to present your case.

25          MR. PATRICK CULLAN:  Okay.  Thank you.

1          We'll try it with the technology when he's seated.  Do

2     you want to try it now?

3               THE WITNESS:  I'd be happy to.

4               THE COURT:  Okay.  We'll just go off the record now.

5          (Off-the-record discussion had.)

6               MR. PATRICK CULLAN:  There's one other issue.

7               THE COURT:  Let's go back on the record then.  We're

8     on the record again.

9               MR. PATRICK CULLAN:  There was another issue that

10    came up last night with defense counsel.

11         During discovery, they produced policies and procedures.

12    They're not on the exhibit list but they are the hospital's

13    policies and procedures.  Defense counsel suggested last night

14    that we can't make a reference to them because they weren't on

15    the exhibit list.

16         My understanding is that that's not true, we can make

17    reference to them, we can discuss what they state.  Putting

18    them in evidence is different because they're not on the

19    exhibit list.

20         I would represent to the Court it is what it is.  It's

21    the hospital's policies.

22              THE COURT:  And again, I can't rule until there is a

23    motion or an objection.

24         If there is a witness on the stand who has knowledge of a

25    certain practice, procedure, regulation, that witness may be

1    qualified to testify on that subject.

2         Certainly witnesses cannot read from documents that are

3    not in evidence.

4         That may not answer your question.  But until there is an

5    objection, I have nothing to rule on.

6              MR. PATRICK CULLAN:  Okay.

7              MR. WELCH:  Just to pick up on that, your Honor,

8    counsel's correct, the policies and procedures, one, have not

9    been listed as an exhibit in this case.  That's number one.

10        Number two, with this witness, if the issue of Bellevue

11   Medical Center's protocols and procedures come up, it's a

12   violation of Rule 26 because nowhere in this witness's report

13   does he ever list that he has reviewed those policies and

14   procedures.  That's number one.

15        And nowhere in his 20 -- or 267-page deposition does he

16   ever refer once to the policies or procedures.  And I

17   specifically asked him for all of his opinions with respect to

18   Bellevue Medical Center and the basis for those opinions.  And

19   those policies and procedures are never mentioned.

20        So this is unfair surprise if counsel is going to either

21   just simply, through testimony, elicit whether the nurses met

22   or complied with our own policies.

23        So it goes much deeper than just not listing it on the

24   exhibit list.  And I think it's improper.  It violates Rule

25   26.  He had to disclose all of his opinions and the basis for

1     those opinions, and he didn't.

2          So you're right, we're not there yet.  But I wanted to

3     bring it to your attention that we have a strenuous objection

4     to him being able to discuss any of that at all because it's

5     never been disclosed before, that that's one of his opinions.

6          I don't mean to cut you off.  Do you have any other

7     issues?  Because I've got two more.

8               MR. PATRICK CULLAN:  Go ahead.

9               MR. WELCH:  Okay.

10              THE COURT:  And I will just note that if an expert

11    begins to offer testimony that is outside the scope of the

12    expert's report, and there's an objection, we'll probably have

13    a sidebar, I will look at the report; and unless counsel who

14    is engaged in the examination of the witness can point out in

15    the report where this opinion is disclosed and the basis for

16    the opinion is disclosed, I'll sustain the objection.

17         So that may help you -- give you a heads-up and help

18    avoid some sidebar conversations.

19              MR. PATRICK CULLAN:  Thank you, your Honor.

20              THE COURT:  Mr. Welch?

21              MR. WELCH:  Your Honor, I want to go back to an issue

22    that we talked about yesterday.  It's the *Jensen vs. Bergan*

23    case.  You brought up an issue with respect to mid-level

24    provider, nurse-midwife as opposed to physician.

25         I expect that there will be objections today as to the

1    nurses, their ability -- whether they should diagnose and

2    whether they have to follow specific orders.

3        I placed a phone call to my office yesterday, had some

4    quick research done.  I apologize to counsel, I only have one

5    copy.  And I would like to provide to the Court -- this is

6    from the Nebraska Health and Services -- Human Services

7    regulation and licensure.

8        It talks about a certified midwife and that they have a

9    -- have to have a corroboration agreement with a physician.

10   And specifically in the practice agreement, they provide, in

11   paragraph 104-005.01, that they have a practice agreement and

12   they outline their scope of practice, one of which is

13   attending cases of normal childbirth, providing prenatal

14   intrapartum and postpartum care, providing normal obstetrical

15   and gynecological services for women, providing care for the

16   newborn immediately following birth, and prescribing legend

17   drugs, Schedule II controlled substances, for up to 72 hours

18   for pain control and Schedule III, IV, and V controlled

19   substances.

20       There's also another section that I will provide to the

21   Court -- and I've tabbed both of these -- for APRNs, advance

22   practice registered nurses, of which Nurse Ramsey is also.

23   And it also provides for an integrated practice agreement

24   where they have to have a corroborating physician and -- when

25   they practice.

1          So I guess my point is, your Honor, I understand the

2     distinction.  But I think, given the circumstances how this

3     woman was practicing as it relates to vis-à-vis the nurses,

4     they have an obligation to follow that provider's orders.

5          And the fact that that provider is supervised by a

6     physician, has a corroborating agreement with that physician

7     by the regs, and that she has privileges at the hospital to

8     prescribe medication -- narcotic medication, and to provide

9     delivery services, it's a distinction, but I don't think it's

10    a difference.  The nurses still have an obligation to follow

11    the instructions of that provider.

12          THE COURT:  So what you're offering to show me is

13    part of the Nebraska Administrative Code; is that correct?

14          MR. WELCH:  Yes, your Honor.

15          THE COURT:  Okay.  Well, I believe I can take

16    judicial notice of the Nebraska Administrative Code.  And

17    counsel should be able to access the Nebraska Administrative

18    Code if you provide him with the citation to it.

19          MR. WELCH:  I will.

20          THE COURT:  And ultimately, this may be something

21    that we need to address at the jury instruction conference to

22    instruct the jury about the responsibility of the nurses to

23    either follow the orders of the certified midwife or not.

24          But I'm not prepared to rule on that at this time.  I

25    guess that's as much as I can say at this juncture.

1          I appreciate you providing me with that information.  I

2     realize that there are many different classifications of

3     medical professionals now, including nurse practitioners,

4     including physician assistants.  And they have different

5     levels of expertise and authority.

6          But I'm not an expert or someone well versed on the

7     various distinctions and who is obligated to follow the orders

8     of whom, other than what you've pointed out to me in the

9     Nebraska Supreme Court cases regarding physicians and nurses.

10          MR. WELCH:  Okay.  And just so I don't get crosswise

11     with the Court, when that -- if that issue comes up with this

12     witness, in order to preserve my record, I will be making

13     objections, citing the *Jensen vs. Bergan* case to the Court,

14     and that that testimony would be a violation of Nebraska law.

15          So that's why I brought it up to the Court now.  I don't

16     want to, you know -- I didn't want to blindside you on my

17     objections and the basis for my objections.  And I understand

18     your ruling.

19          THE COURT:  Well, and I can tell you and counsel for

20     the plaintiff that if any witness begins to offer testimony as

21     an expert on the law, that line of questioning will be

22     objectionable, and I will sustain objections to that.

23          So if any witness indicates that a nurse is not obligated

24     to follow the instructions of a nurse-midwife, that may be a

25     question of law.  And it's my job to instruct the jury on what

1    the law is, and I will advise the jury of that.

2        All right.  Anything else?

3            MR. WELCH:  One more.

4            THE COURT:  Okay.

5            MR. WELCH:  Plaintiff's counsel -- I don't know if

6    he's going to with this witness, he has in the past used a

7    Pitocin package insert.

8        It's never been listed as an exhibit.  So if he wants to

9    refer to it, I will have objections on that because I believe

10   it's outside the scope of what the witness has previously

11   testified to or at least within his report.

12       But I don't want any publishing to the jury of a package

13   insert on Pitocin.  That's all I have.

14           THE COURT:  All right.  Any documents that have not

15   been received into evidence may not be published to the jury.

16           MR. PATRICK CULLAN:  Just -- my intention with

17   that -- and I do believe it is on the exhibit list -- my

18   intention was just as a learned treatise hearsay exception.

19   He can read from it but it cannot be presented to the jury.

20           THE COURT:  Well, if it's something that he relied on

21   in reaching his opinion and that was fairly disclosed, then he

22   may testify accordingly.

23       Anything further before the jury comes in?

24           MR. WELCH:  No, your Honor.

25           THE COURT:  Mr. Cullan?

```
 1            MR. PATRICK CULLAN:  No, your Honor -- oh, I think

 2     I --

 3            THE COURT:  Very good.  Please bring in the jury.

 4            (Jury in at 9:31 a.m.)

 5            THE COURT:  Please be seated.  Good morning.

 6        Thank you very much for your patience.  The lawyers and I

 7     have been going through some procedural matters here while you

 8     were waiting.  And I hope that what we were accomplishing

 9     during that half an hour will actually end up saving you time.

10        I will mention that our schedule today is a little bit

11     different from our standard day.  You will have a long noon

12     break today.  I hope that the weather clears up so that if you

13     want to take a stroll and explore the culinary opportunities

14     in a wider radius around the courthouse, you can do that.

15        But just so you're aware of the schedule, we will be in

16     court until 11:30.  So we won't take another break since this

17     will simply be a two-hour period of time.  And we will break

18     at 11:30.  And then we will reconvene at 2 and go until five

19     o'clock.

20        At this time, the plaintiff may call her next witness.

21            MR. PATRICK CULLAN:  Your Honor, at this time we

22     would call Dr. Martin Gubernick.

23            THE COURT:  Dr. Gubernick, if you'll please come

24     forward to the courtroom deputy here -- you're fine.  The

25     courtroom deputy will swear you in right over here.
```

1              Thank you.

2                   COURTROOM DEPUTY:  State your full name for the

3        record, please, and spell your last name.

4                   THE WITNESS:  Martin Gubernick, G-u-b-e-r-n-i-c-k.

5                   MARTIN GUBERNICK, PLAINTIFFS' WITNESS, SWORN

6                   THE COURT:  You may inquire.

7                   MR. PATRICK CULLAN:  Thank you, your Honor.

8                           DIRECT EXAMINATION

9        BY MR. PATRICK CULLAN:

10       Q.   Doctor, could you state your name and spell your name --

11       last name for the record?

12       A.   Martin Gubernick, G-u-b-e-r-n-i-c-k.

13       Q.   What is your occupation?

14       A.   I'm an obstetrician/gynecologist.

15       Q.   What is an obstetrician/gynecologist?

16       A.   I take care of women.  And half of my professional life,

17       I take care of pregnant women.

18            And taking care of pregnant women means taking care of

19       them during their pregnancy, while they're in labor, and then

20       in what we call their postpartum period after they deliver.

21       Q.   Okay.  So there's an obstetrician part and a gynecologist

22       part.

23       A.   And there's a Gyn part where we take care of women's

24       needs throughout their life, Pap smears when they're younger,

25       and then various issues that come up later in life, the

1    importance of mammography, screening for various cancers.

2         I'm also a gynecologic surgeon, so I do laparoscopic

3    procedures, minor procedures like D&Cs, major procedures like

4    hysterectomies, things of that nature.

5    Q.   Have you come here to Omaha today to render opinions to

6    the jury about whether or not the Bellevue Medical Center, by

7    and through its nurses, violated safety principles in the care

8    and treatment of Doran Schmidt and her baby, Sage?

9    A.   Yes.

10        MR. WELCH:   Objection, form of the question, your

11   Honor; violates the Court's motion in limine.

12        THE COURT:   Overruled.

13   A.   Yes.   That's why I'm here.

14   BY MR. PATRICK CULLAN:

15   Q.   And before we get to the opinions, I need to lay some

16   foundation.   So tell me -- walk us through your educational

17   experience.   Is that --

18   A.   Sure.   So I grew up in New York City, went to public

19   school there.   Then in 1974, I went to Bucknell University in

20   Lewisburg, Pennsylvania.   I received a degree of bachelor of

21   science in biology.   I graduated Phi Beta Kappa, highest in my

22   class in grades.   And then I graduated in 1978.

23        And then in 1978, I went to Northwestern University.

24   That's in downtown Chicago.   And that was a four-year program

25   -- medical school is a four-year program.   I attended medical

1    school from 1978 until 1982.  I graduated in 1982 with an MD

2    degree.

3        And from there, I went to the New York Hospital.  That's

4    part of Cornell University.  Now it's part of both Cornell

5    University and Columbia.  Those two Ivy League schools have

6    merged together under one umbrella.  When I was there, it was

7    just part of Cornell.  I did a four-year residency, completed

8    that residency in 1986.

9        I became a clinical instructor at the medical school.

10   And then I went into private practice, what we call voluntary

11   -- part of the voluntary staff of the New York Hospital.  So I

12   have a nonpaid position at the hospital as a clinical

13   instructor.  Not a professor, I don't do classroom -- what we

14   call didactic teaching.  I'm not one of those people that go

15   in and write on the blackboard and give exams.

16       I teach the clinical aspect of being an

17   obstetrician/gynecologist.  So I teach to nurses, nursing

18   students, medical students, residents, on occasion fellows and

19   other attendings.

20       I also have a private practice outside of the hospital,

21   which is about seven or eight blocks from the hospital.  And

22   I've done this since 1986.  So I continue to be a clinical

23   instructor.  I'm board certified in ObGyn.  And I have a

24   private practice both in obstetrics and gynecology.

25   Q.  You mentioned a couple things here and I just want to

1    talk about those.

2         One thing you just mentioned was you're board certified.

3    Tell us about what that is and what the significance is.

4    A.    Sure.  There's an entity called the American Board of

5    ObGyn.  And they're a licensing -- they're an accreditation

6    board.  In order to call yourself board certified, you begin

7    with a two-step process.

8         You're eligible to take a written exam upon completion of

9    your residency program.  And if and when you pass that exam,

10   you then collect all your cases for a year, all your

11   obstetrical cases and all your Gyn cases, everybody you've

12   operated on, everybody you've delivered.  You collect those

13   cases.  You submit it to the board.

14        And examiners of the boards are usually people like

15   chairmens of the departments throughout the country.  And you

16   submit it and -- well, when I was taking my oral boards, it

17   was in Chicago -- coincidentally where I went to medical

18   school.  And you sit in a hotel room with three examiners.

19   And they ask you all kinds of questions about your list, why

20   you -- how you managed this labor patient, why you operated on

21   that patient, what were you thinking, what were you -- what

22   were the options.  And then when they're done with their list,

23   they ask you whatever questions they want to ask you in

24   general.

25        So I passed my boards in 1987, the earliest time I could

1    have done because I took my written exam in '86; passed it,

2    submitted a year's worth of data to them in '87, took my oral

3    exams in '87.

4        And then in the '80s and '90s, recertification required

5    you take a written exam every ten years to get recertified.

6    So I took a written exam in 1997.  I was -- passed that.  I

7    was due to take an exam in 2007.  And then approximately 2002,

8    2003, the board said rather than take an exam every ten years,

9    we'd rather have -- we're going to give you an option that

10   we'll send you 50 articles a year, and you're going to take a

11   test on those 50 articles.  And if you pass -- if you read

12   those articles, then you're board certified.  So starting

13   2003, 2004, somewhere around there, I started to do that.

14       And as of recently -- now they've even said -- they've

15   gotten a little tougher -- they say, not only do you have to

16   take the -- read those papers, but every six years, you have

17   to then take your written exam over again, instead of every

18   ten years because you've been doing the articles.

19       So in 2014, I took my written exam, passed that, and I'm

20   current.  And I did my papers this year already in 2015.

21   Q.   Okay.  Now just walk us through globally by your career

22   as a physician, in any capacity, whether residency, so forth,

23   how many deliveries have you participated in?

24   A.   So I've done thousands of deliveries; probably my

25   residency, I don't know, maybe 500 to a thousand.  For the

GUBERNICK - DIRECT                                          206

1    majority of my professional career, I've done about 100

2    deliveries a year, 100 to 120 a year.

3         The last five to seven years, what happens naturally in

4    the field of obstetrics and gynecology, as the doctor gets a

5    little older, the patients who follow you through time get a

6    little older.  So my Gyn practice has gotten a little busier.

7    My OB practice has gotten a little bit lighter.

8         Now I'm doing about 60, 75 deliveries a year.  I'd say

9    that's been going on for five, seven years or so.  My Gyn

10   service has probably gotten a little bit busier.  That's the

11   natural course of what happens to us.

12   Q.   Okay.  How many -- that was labors.

13        Let's talk about pregnancies itself.  How many

14   pregnancies have you followed and managed, again encompassing

15   your entire career?

16   A.   Thousands.  You know, because -- well, I went into

17   practice in 1986.  I can't believe it, but it's going to be 30

18   years next year.

19        So if I've averaged somewhere around 90 to 100 deliveries

20   for most of my career, that puts me at about 2500 to 3,000

21   deliveries, excluding the amount I did in my residency.

22        New York Hospital is an extremely busy institution.  We

23   do 6,000 deliveries a year.  As a resident, you do lots and

24   lots of deliveries.  So I've done my share of deliveries.

25   Q.   Okay.  I guess we talked about pregnancies, labors --

1    A.    Yeah.

2    Q.    -- and deliveries, you mentioned.

3          And I guess if you could break us down, percentage that

4    you would have a patient deliver vaginally versus operative,

5    vaginal versus caesarian sections, explain the difference of

6    those and explain what your experience is with each one of

7    those.

8    A.    Sure.  Well, there are three ways -- we sort of break it

9    down.  There's caesarian section, there's vaginal deliveries,

10   and there's operative vaginal deliveries.

11         Operative vaginal deliveries is using forceps and

12   vacuums.  Up until the mid '90s, they were very popular tools

13   in facilitating deliveries.  They've become much less popular

14   in the last five or ten years.  Throughout the entire United

15   States, there's much less use of vacuums and forceps, although

16   I did a lot of that -- a lot of forcep.  We weren't big on

17   vacuums.  I did a lot of forcep deliveries in my career in the

18   '80s and '90s.  I would say that's a fairly infrequent event

19   now that -- forceps are almost unheard of.  We're not training

20   our residents to learn how to use forceps.  So it's unusual to

21   see a young ObGyn who even knows how to put a forcep on.

22         We're one of the most prestigious institutions in the

23   United States.  And I can tell you residents coming out of our

24   program really don't -- they don't know how to use forceps.

25   But they do know how to use the vacuum.  It's easier to put

GUBERNICK - DIRECT                                           208

1   on.  Put it on the baby's head and pull.  So I would say 10

2   percent of the deliveries are vacuum deliveries.

3        As far as vaginal deliveries, caesarian section, I have a

4   low caesarian section rate compared to the U.S. statistics,

5   mostly because I have a fairly healthy population.  I take

6   care of generally healthy people.

7        I don't hold it against people with a high caesarian

8   section rate because if you have a complicated patient base,

9   if you're a maternal-fetal medicine expert, you have a lot of

10  high-risk obstetrics, you may have a 30, 40 percent section

11  rate.  I have about a 20 percent section rate.  The national

12  statistic is somewhere around 28 to 30 percent right now.

13       So I would say roughly one out of five or so of patients

14  that I take care of the pregnancy end up with a caesarian

15  section.

16  Q.   Okay.  One concept we might hear about at some point

17  during this trial is what's the difference between an

18  obstetrician and a family practice physician who engages in

19  obstetrics?

20  A.   Well, there are different kinds of people who deliver

21  babies.  And family practitioners are one kind.  For un- --

22  they have -- they do a four-year residency, some of them have

23  three years, some of them have four years in family medicine.

24  And they probably spend about four to six months doing

25  obstetrics.

1        In my training, I did four years of obstetrics.  And

2    every day of the week what I do is obstetrics.  A family

3    practitioner, they may be taking care of diabetes, they may be

4    taking care of hypertension, they may be taking care of -- you

5    know, all kinds of different things, and they may do a

6    delivery now and then.

7        So for an uncomplicated delivery, a routine delivery, I'm

8    sure they do a fine job.  When it comes to issues in

9    pregnancy, they do not have the same expertise as somebody --

10   as I do, nor do I have the expertise of taking care of

11   diabetes in a 60-year-old man.  It's not that they have a

12   shortcoming, it's just that they haven't been trained to do

13   the things that I've been trained to do.  And similarly, I

14   haven't been trained to do some of the things that they can

15   do.

16   Q.   Okay.  What hospital do you currently practice in?

17   A.   So the name of my hospital -- I've been at that hospital

18   since 1982 when I started my residency.  It was the New York

19   Hospital.  Now it's called the New York Presbyterian Hospital

20   because, as I told you a few minutes ago, Columbia University

21   and Cornell University have merged.  They've merged fiscally.

22   They're all under a single umbrella.

23       So we call our hospital -- because it's Columbia

24   Presbyterian, we call our hospital, for political correctness,

25   the New York Presbyterian Hospital.

1    Q.   Okay.  Now I want to talk about your experience with

2    working with nurses who are engaged as healthcare

3    professionals in labor and delivery.

4    A.   So I couldn't do my job without the nurses.  Nurses are

5    an integral part of what we do on labor and delivery.  We're a

6    team.  It's part of a team.  And they're no more -- in the old

7    days, there were bosses on the team.  Doctor was the boss; the

8    nurse, you know, different commands -- different levels,

9    captains, lieutenants.

10        Now we're a team.  And I'm not -- as a matter of fact,

11   there are charge nurses on the floor, there are floor nurses

12   on the floor.  I'm the obstetrician.  I have a boss, too.

13   There's a head of OB; and he has a boss, the chairman of the

14   department.  And he has a boss, the head of the hospital.

15        So what we have is we have a team approach, including

16   nurses, where we all have a common goal.  And our common goal

17   is to be an advocate in obstetrics for two people, for the

18   mother and for the baby.  So we all have the same goal.  Send

19   those two people home healthy and happy.

20   Q.   Okay.  I want to talk about a couple concepts you

21   introduced in that answer.

22        The most recent you talked about, there's two patients.

23   Talk about how that's unique to the role you play as an

24   obstetrician versus other healthcare providers --

25   A.   It's the only specialty that works that way.  Most of the

1    time, the majority of the time, the concept is relatively easy

2    because the needs of the mom and the needs of the baby

3    converge.  In other words, they have the same needs.  And

4    what's in the mom's best interests is in the baby's best

5    interests.

6         But that's not always so.  Many times -- it's not always

7    -- sometimes what's in the best interests of the baby is not

8    necessarily what's in the best interests of the mom.

9         And we have to have a dialogue about that.  And moms have

10   to be aware of that, that there are things sometimes we have

11   to do that the mom may not necessarily -- in the ideal world,

12   if it was just her, she wouldn't necessarily want done.  But

13   in the best interests of the baby, we do that.  You know,

14   we -- we have to go to a plan B.

15        And vaginal delivery versus caesarian section is a

16   classic example.  As a general principle, vaginal deliveries

17   are better for mom.  It's not an operative procedure.  They

18   heal quicker, faster recovery, something they like.

19        As a general principle, a general principle, caesarian

20   sections are safer for babies.  They don't go through the

21   trauma of the birth process.

22        Most of the time, they have a converging interest; in

23   other words, the baby does just fine having a vaginal

24   delivery, the mom does just fine.  But it's not always so.

25   And we have to sometimes make decisions to say in the best

1     interests of the baby -- sometimes it's in the best interests

2     of the mom to have a caesarian section.  So sometimes we do

3     caesarian sections for the mom.  But many times the indication

4     for the caesarian section is something we're doing for the

5     best interests of the baby.

6     Q.   So I guess we can start talking a little bit about the

7     principles and the terms that we may be using throughout the

8     trial and your testimony here today.

9          I guess this may be obvious, but I know there's a

10    definition.  What is labor?

11    A.   So it's not so obvious.  It's a good question.

12         Labor are uterine contractions -- let's start off by

13    saying that the baby grows inside of a muscle.  And that

14    muscle is called the uterus.  And the uterus is a contractile

15    organ.  And it's designed, you know, like a tube of

16    toothpaste, to squeeze out the contents, to squeeze out the

17    baby.  And the way it does that, it's like any other muscle in

18    our body, it contracts when it's time.

19         Now, sometimes it contracts, but they're not real strong

20    and they don't really do anything.  We call those Braxton

21    Hicks contractions during pregnancy.  And they just sort of --

22    you know, the uterus is testing itself out for what's to come.

23         But what is labor?  Labor is regular uterine contractions

24    that lead to changes to the cervix, cervical dilatation and a

25    thinning of the cervix, what we call effacement.

1        So when the uterus contracts, and as a result of those

2   contractions, the cervix dilates and is effaced, that, by

3   definition, is labor.

4   Q.    Okay.  Two concepts you introduced again there.  What is

5   dilation and what is effacement?

6   A.    So the outlet of the uterus is called the cervix.  The

7   cervix sits in the top wall of the vagina.  It looks likes a

8   doughnut -- a doughnut with a little -- like a hole in the

9   middle.

10       What has to happen is the lower uterine segment needs to

11  expand to let the baby in.  And that doughnut needs to open

12  up.  And we call that opening of the cervix dilation.

13       And just like a doughnut that's kind of thick, we need to

14  get paper thin.  So not only is the cervix open, but as it

15  opens, it thins out.  It gets like paper.  It's what we call a

16  hundred percent effaced.  And it completely thins out.

17       So what we want to do is flatten out the cervix like a

18  pancake and open up the middle.  So that's dilation and

19  effacement.

20  Q.    Okay.  And how do you check and see what the dilatation

21  is and what the effacement is, how is that done?

22  A.    You do that with a vaginal exam.  When you've done enough

23  vaginal exams -- we use two fingers.  And I know if I can open

24  my two fingers this far (indicating), the patient is 5

25  centimeters dilated.  And if I open up this far, she's 7.  And

 1    then the goal is to get to complete dilation.  That's 10

 2    centimeters.

 3         And just to keep it in perspective, there's 2.54, two and

 4    a half centimeters to an inch.  So the cervix has to open

 5    about four inches in order to let the baby through.

 6    Q.   Okay.  Are there -- so labor, we know you gave us a broad

 7    definition of that.  Is it broken down in any way?

 8    A.   Yes.  So what we do as obstetricians, we study labor.  We

 9    want to know when labor is normal; and for the health and

10    well-being of both mother and baby, we want to know when labor

11    is abnormal.

12         So the advantage we have in obstetrics, we have millions

13    and millions of people who go into labor all the time.  And we

14    can study these people and we study the timeline.  And we know

15    by looking -- and there are champions in the field who have

16    looked at that.  The gold standard is a man called Emanuel

17    Friedman, who actually did that at Colombia University in New

18    York.  And almost every obstetrical chart in the United States

19    has, in the chart, what's called the Friedman Curve.

20         And what it shows is over time, what happens to the

21    cervix in terms of how it dilates, what happens to the cervix

22    as it effaces, and how the baby moves into the birth canal and

23    comes out.  So we call that change in station, the movement of

24    the baby down and out.

25         So we've looked at -- not we because I didn't do those

1    studies, I don't want to pretend like I did -- but people like

2    Emanuel Friedman, he looked at these women, and he measured it

3    over time, how long it takes the average woman who is having

4    the first baby to dilate from 1 centimeter to 3 to 4 to 5; how

5    long it takes for somebody that's got three or four babies,

6    because depending on the number of babies you have, will

7    determine the speed of how fast the baby comes out.

8         So he broke down labor into stages.  And the first stage

9    of labor is the start, the cervical dilatation, what we talked

10   about before, contractions leading to cervical dilatation and

11   effacement.  That's the start of the first stage.  And the

12   first stage ends when the woman is fully dilated.

13        And that stage is broken down into a latent phase that

14   moves slowly -- because the first couple of centimeters don't

15   go so fast -- and then the active phase that's much faster.

16   And we know during the labor phase how long it should take,

17   during the active phase.  And we know for primips, first-time

18   mothers, and for multi, second-time mothers.

19        And then there's the second stage of labor.  That's when

20   the mom starts to push.  And that ends when the baby comes

21   out.

22        And the third stage of labor is when we deliver the

23   placenta.

24   Q.   Okay.  So those are the stages.  Are there -- I guess

25   that's normal labor.

1    A.   So normal labor, when we talk about normal labor, what

2    are we talking about?  We're talking about a baby who is

3    moving at the right speed and a cervix that's dilating in the

4    proper time frame and effacing in a proper time frame.

5         And we have this curve, this graph that we look at.  And

6    we know that in the early parts of labor, if you see the

7    graph, you know, if it's a -- if the bottom line is time, and

8    the -- you know, the vertical is dilation, it's kind of a flat

9    line.  It moves kind of slowly until the woman gets to be 4 or

10   5 centimeters dilated.  And then the curve starts to go like

11   this (indicating) because the cervix starts to change quickly

12   over a short period of time.  So the curve sort of looks like

13   a hockey stick.  You know, the bottom, it's kind of flat; and

14   then, boom, it takes off.

15   Q.   Okay.  Is it a fair assessment that the further one is

16   into the labor process, the faster the labor should go?

17   A.   Yes.  Once we're in the active phase of labor -- and in

18   all fairness, since Emanuel Friedman did his work in the late

19   '60s, early '70s, other authors like Zang came ahead and said

20   -- because Friedman said you should expect things to start

21   happening quickly when the cervix is 4 centimeters.

22        Well, now there's some talk that maybe we should wait

23   until it's, you know, really call it 5 or even 6 centimeters.

24   So there's a little debate what the -- when the active phase

25   of labor really starts.

1          I'll tell you most obstetricians in the United States

2     follow the Friedman philosophy of it being about 4

3     centimeters.  But very reasonable people will talk about maybe

4     starting at 5 or 6 centimeters.

5     Q.   Okay.  That's an academic difference.  Does that have --

6     A.   And that's an academic --

7          THE COURT:  As you know, we can only have person

8     talking at a time.

9          We'll go ahead with the question, Mr. Cullan.

10    BY MR. PATRICK CULLAN:

11    Q.   Does that academic difference have any applicability to

12    this case?

13    A.   Nothing whatsoever.

14    Q.   Okay.  Because it's -- when things went wrong here, we're

15    at 7 centimeters.

16    A.   We were 7 centimeters.  We were --

17         MR. WELCH:  I'm going to interpose an objection to

18    the form of the question.

19         THE COURT:  All right.  Sustained.

20         MR. WELCH:  And ask that the jury be instructed to

21    disregard.

22         THE COURT:  The jury will disregard that last

23    response.

24         Go ahead, Mr. Cullan.

25         MR. PATRICK CULLAN:  Okay.

1    BY MR. PATRICK CULLAN:

2    Q.   So let's look at those principles and -- so what is -- we

3    talked about a normal labor.  What is abnormal labor?

4    A.   So when things don't go well, right -- now we're not

5    talking about, like, emergencies, like a placenta separating,

6    abruption.  There's all kinds of things that can happen.  But

7    let's focus in on the labor curve, what's abnormal.  That's

8    what we're going to be talking about today.

9         And abnormal means something's either occurring too

10   slowly or it's actually stopped.  And when it's occurring too

11   slowly, we call it a protraction phase.  It is -- it's moving

12   too slow.  And when it stops, we call it an arrest.  What

13   we're going to be talking about here today is an arrest of the

14   active phase of labor.

15   Q.   Are there recognized time limits for -- are these terms

16   defined, I guess?

17   A.   Yes.

18   Q.   And so what would be a protraction -- okay.  Are the

19   times broken up between first-time moms and women who have had

20   more than one pregnancy?

21   A.   Yes.  So remember what I said before -- and we all know

22   this.  When you've had a lot of kids, babies come out quickly,

23   okay?  And when it's your first time, it happens slower.  It

24   happens, but it happens slower.  And we all know that.

25        And I will tell you, in the active phase of labor, we

1    expect the cervix, for a first-time mother, to dilate 1.2

2    centimeters an hour.  And that's by looking -- where do we

3    come up with that number?  That's by looking at thousands and

4    thousands of deliveries, maybe millions of deliveries, and

5    plotting it out over time.  And from the start of the active

6    phase of labor to full dilatation, we expect that to be 1.2

7    centimeters.

8         A multip, one or more children, it's 1.4 to 1.5

9    centimeters an hour.  They're faster.  Okay?

10        And so when it gets stuck and the cervix just doesn't

11   move anymore, we call that an arrest.  And when it gets stuck

12   for any -- and again, reasonable people, Emanuel Friedman, the

13   godfather, says when it gets stuck for two hours, that's an

14   arrest.  Some reasonable people have challenged him and said,

15   well, maybe it should be four hours and not two hours, we

16   should give people a little more time.

17        So somewhere with good uterine contractions, the uterus

18   contracting really nicely, if you're -- if you believe in the

19   school of Emanuel Friedman, you say if someone is stuck for

20   two hours, that is an arrest.  If you're in the more -- a

21   newer school and you want to give people more time, you can

22   say no, I think it should be four hours.

23        Anything slower than that 1.2 or 1.4, depending on

24   whether it's a first baby or not, if you have more than one

25   baby, we call that protraction of labor.  Hasn't arrested, but

1    it's not moving at a great pace.

2    Q.   Okay.  So talk to us now -- this is kind of in line but

3    we're going to introduce a concept.  What is a differential

4    diagnosis?

5    A.   So a differential diagnosis is when something is going

6    on, you have an -- something has happened, you want to have an

7    idea why has that happened?  And that's what a differential

8    diagnosis is.

9         In other words -- let's cut to the chase here.  If, all

10   of a sudden, the baby gets stuck, you want to know why is the

11   baby stuck.  Because in the differential diagnosis, there is

12   more than one possibility.

13        Should I talk about those possibilities?

14   Q.   That was my next question.  What are the various

15   possibilities applicable to the situation?

16   A.   So here's what we teach every medical student in the

17   country who's doing obstetrics and gynecology.  When a baby

18   gets stuck, you've got to think Ps.

19        What is Ps?  You've got to think of the passage.  You've

20   got to evaluate the size of the mom's pelvis because maybe the

21   pelvis is small and things get stuck because the person has a

22   small pelvis.

23        Then there's the passenger, and that's the baby.  And

24   maybe the baby is too big.  It's just that simple.  Maybe the

25   baby is too big, and the baby can't fit through the pelvis.

 1              Then there's position, because a certain size baby may be

 2    able to fit through if it gets into a nice flexed position

 3    with its chin to its chest, you know, think about -- think

 4    about when you're jumping into a swimming pool.  If you're

 5    jumping in head first, you don't need a lot of room in front

 6    of you in the water.

 7              But imagine you're doing a back flip.  And you want to go

 8    -- come back this way (indicating).  You need a lot more room

 9    in the pool or you're going to hit your head on the side of

10    the pool.

11              So depending on the position of the baby, whether the

12    baby has its head flexed or extended, or whether it's looking

13    to the side or it's looking up at the sky or it's looking down

14    at the floor, the position can have an effect on whether

15    things -- why something has gotten stuck.

16              Then there are the powers.  What do we mean by "powers"?

17    The force of the uterine contractions.  Because in some cases,

18    the mother's contractions are not strong enough.  So we have

19    to evaluate that because we have a drug that can increase the

20    force of the contraction.

21              But before increasing the force of the contraction, we

22    have to go through a differential diagnosis because if baby's

23    too big, if the pelvis is too small, if the position is not

24    right, and the powers are just fine, the very last thing you

25    want to do is increase the powers.  That's not a good idea.

1          It's like, you know, if the desk isn't fitting through

2     the doorjamb, and you try to change the angle, you've

3     evaluated the size of the doorjamb, you've evaluated the size

4     of the desk, the answer to get the desk through the doorjamb

5     is not to push harder through the doorjamb.  You're going to

6     hurt the jamb, you're going to hurt the desk.

7          So you've got to make sure before you mess with the

8     powers that the powers are the problem.

9     Q.   Okay.  So you talked about a couple things there.  What

10    are the risk factors when you take a woman -- to give you an

11    idea if there could be a potential problem with the first P,

12    the pelvis?

13    A.   So the first thing we do is we examine patients.  We

14    examine patients early in pregnancy to try to get a feel of

15    their pelvis.  I'll tell you, that's the hardest thing.  Of

16    all those things we talked about, that's the hardest thing to

17    do, to do a vaginal exam and get an idea that -- you know,

18    there are different shapes, four basic shapes that women's

19    pelvises can have.  And the best of obstetricians have trouble

20    with that.  I'm not saying we can't do it, but it's a hard

21    thing to do.  We try.  We've looked into doing things called

22    allometry, where you actually take pictures with X-rays and

23    MRIs and CAT scans to see if we can -- that doesn't work well.

24         So anyway, we do our best.  It's a clinical assessment.

25    We do it with the pelvic exam to try to assess the size of the

1    pelvis.

2    Q.   Okay.  And how about -- let's go to position.  Talk about

3    what are the various positions, which are optimal, and which

4    are more likely to cause a problem.

5    A.   When do we start thinking about positions?  Somebody

6    approaches term and are ready to deliver.  And what we want to

7    know is where is this baby in the pelvis?  And I'll tell

8    you -- remember we talked about station, where the baby is in

9    terms of the pelvic outlet?

10        Now, most, 80 plus, maybe 90 percent, of women just

11   prior -- before they go into labor, their baby engages.  It's

12   what we call zero station.  Zero is the engagement.  It's when

13   the biparietal diameters -- and this is the parietal bones of

14   the head -- is at the level of the woman's spines in her

15   pelvis.

16        And most women are engaged.  When you're not engaged, as

17   an example in this case, at 39 weeks, it's not a red flag.  It

18   doesn't mean the baby is not going to fit.  But it's a yellow

19   flag.  It's like, why is this baby high?  And you start

20   thinking.  Is it a position?  Is the baby looking to the left?

21   Is the baby looking to the right?  Is the baby looking up to

22   the sky?

23        We want the baby -- like that diver going into the pool,

24   the optimal position is the baby's back to the mother's back,

25   the chin tucked in, and the baby looking down at the floor.

1    That needs the least amount of room to get through the pelvis.

2    That's the most optimal position.

3         So if the baby is sitting here -- we know in this case,

4    before she went into labor, the baby was at a minus three

5    station.  It was an unengaged station.  It's a yellow flag

6    that why is this baby, before labor, not getting into the

7    right zone?

8    Q.   Okay.  You mentioned the position, but what is OA or

9    occiput anterior, and how does that differ from --

10   A.   Okay.  So --

11        THE COURT:  Wait, wait.  I'm going to interrupt you

12   again because we still have an overlap between the questions

13   and the answers.

14        THE WITNESS:  I apologize.

15        THE COURT:  I'm going to ask Dr. Gubernick to wait

16   for a beat after the question before you start the answer.

17        Go ahead.  Thank you.

18        THE WITNESS:  My apologies.

19   A.   So we have jargon.  And we decide that when we talk about

20   positions based on the occiput, the top of the head, what we

21   call OA means the occiput is anterior.  It's up towards the

22   mother's belly button.  So the baby is looking down at the

23   floor.

24        OP, it's posterior.  The baby is looking up at the sky.

25   And then there's all sorts of variations.  ROA, to the

GUBERNICK - DIRECT                                                        225

1      mother's right, still looking to the floor; LOA to the left.

2      Then we have transverse.

3          It's just jargon.  Basically if you just think about the

4      baby, it would be like a clock.  Either it's looking at six

5      o'clock or it's looking at nine o'clock or it's up looking at

6      12 o'clock or three o'clock.  And those are the various

7      positions.

8      Q.   Okay.  Which of those -- I guess what's the significance

9      of what's called a persistent occiput posterior?

10     A.   Well, persistent occiput posterior is a hard way to

11     deliver.  It's us going into the pool in a black flip.  I'm

12     not saying it can't be done.  And if you ever hear women talk

13     about back labor, that's what an -- kills their back because

14     the baby is pressing on their spine.  So it's a very

15     uncomfortable way to deliver.

16         It leads -- it's a hard way to deliver.  People do it.

17     I'm not saying -- if your pelvis is big enough, the baby is

18     small enough, the contractions are good enough, we deliver.

19         But it's a poor prognostic sign for a vaginal delivery,

20     persistence OP, meaning the baby is just -- won't rotate as

21     labor goes on, just keeps looking up at the sky.

22     Q.   Okay.  And how about what's known as a deep transverse

23     arrest.  What's the significance of that?

24     A.   Well, a deep transverse arrest is usually indicative of

25     an abnormal shaped pelvis, not a -- what we call a gynecoid

1    pelvis.  And the baby just naturally comes in sideways looking

2    to the right and the left.  And they -- they get into the

3    pelvis deep but looking in the wrong way.

4         And unless you are extremely competent with the use of

5    forceps, that woman is going to end up with a caesarian

6    section.

7    Q.   Okay.  From your experience -- do you have experience in

8    reading medical records related to labor and delivery?

9    A.   Yes, I do.

10   Q.   How many times have you looked at and interpreted medical

11   records related to labor and delivery?

12   A.   For people other than myself --

13   Q.   Or for your own patients.

14   A.   For my own patients, thousands, obviously, because I've

15   delivered thousands of patients.  And I'm looking at medical

16   records of thousands of people over 30 years.

17        I've also been asked -- I've been doing medical

18   malpractice reviews since the late 1980s.  I've been doing it

19   for 25 years.  So I've been asked clearly over a hundred times

20   to review records of other physicians who have -- physicians

21   or midwives or family practitioners, people review records of

22   people who have gone through the labor process.  I've been

23   asked to do that over a hundred times.

24   Q.   Okay.  Now I got a two-part question.  Number one is when

25   you have this arrest situation we've discussed, and you

1   mentioned it's imperative to determine the position of the

2   baby -- I guess you kind of already explained it, but real

3   quickly again, why is it important to know the baby's

4   position?

5   A.   Well, when there's an arrest, that's a fork in the road.

6   Something's got to be done.  The baby's stuck.  You can't

7   leave a baby stuck.  You just can't -- it can't be done -- you

8   know, you can't do it.  Something has to happen.

9        So what are one of the things we can do when someone gets

10  stuck?  We can give a drug to increase the contractions.  But

11  we better know the position.  We better have some evaluation

12  of the pelvis and we better have some understanding of the

13  size of the baby -- passenger, passage, position -- before we

14  increase the powers because it gets back to the desk going

15  through the doorjamb.  Because if you already have adequate

16  contractions, and you start increasing those beyond adequate,

17  you're putting the mother in harm's way and you're putting the

18  baby in harm's way.

19  Q.   Okay.  How -- this OA, OP, how is that recorded in the

20  medical record?  If it's been assessed for, what should we see

21  in the medical record?

22  A.   It should be under "position".  And we should be talking

23  about whether it's OA, OP, and what the station is.

24  Q.   Okay.  So you know how to look at a medical chart and

25  determine whether or not it's ever been assessed?

1    A.   Yes.

2    Q.   Okay.  Now you talked about the power, maybe one of the

3    reasons the baby could be stuck is that the power is not

4    sufficient.  How is it determined -- I mean, how do you know?

5    A.   Okay.  So there was a time, prior to 1960s, how did they

6    know where the powers were strong enough?  Doctors, midwives,

7    you know, various people who facilitated women having babies.

8    They put their hands on the women's uterus and they felt, they

9    palpated the contractions.  And experience would say this

10   feels mild, this feels moderate, this feels strong.

11        Then comes the 1960s and we start monitoring.  We have

12   sonographic belts that can actually record the contraction

13   pattern.  And then we got even better than that, because what

14   those things do is they tell us when the contractions are

15   coming, but they don't tell us how strong they are, these

16   belts.  They can't measure strength.  The only thing they can

17   do is measure frequency.

18        So you put the belt on and you see nice ups and downs.

19   You don't know what those ups and downs are.  You can palpate

20   and say, as an experienced person, they feel mild, moderate,

21   or severe.

22        Then we got a better technology called an internal

23   pressure catheter where we actually insert something like a

24   straw.  It's flexible, you know, it's rubber.  And it's long

25   and thin.  And we can connect it to a monitor that, when the

1     uterus contracts, it actually gives you a number.  It tells

2     you how many millimeters of mercury the uterus is contracting.

3         So in a normal labor, things are going hunky -- you know,

4     everything is going smooth, baby is moving down and dilated.

5     We don't use that because we like what's happening.  The baby

6     is moving, cervix is dilating, cervix is effacing.

7         But when somebody gets stuck, and we call it an arrest of

8     the active phase of labor, and we're thinking about giving a

9     drug, we're thinking about intervening and giving a drug that

10    can do a lot of potential good if the contractions are

11    inadequate, but could do a lot of potential harm if the

12    contractions are already adequate, you need to put a pressure

13    catheter in.

14        So we know, do we have -- because we know what good is,

15    we know what good powers are, and we know what not good powers

16    are.  We'll probably talk about that in a minute.

17    Q.   Okay.  First, I guess, when you're looking at the

18    adequacy of contractions, is there an objective manner to

19    assess it using this catheter?

20    A.   Yes.  Because, you know, when a person puts their hand on

21    the belly and feels a contraction, that's subjective.  You

22    know, mild, moderate, severe.  One person's mild is another

23    person's moderate; one person's moderate is another person's

24    severe.

25        But when you put a catheter in, you get a reading from a

1    machine, assuming the machine is accurate.  It's going to tell

2    you exactly how many millimeters of mercury that force is when

3    that uterus contracts.

4    Q.    Okay.  And what is the limit?  What is the number that

5    tells us is it ineffective uterine activity or is there

6    adequate uterine activity and therefore something else causing

7    it?

8    A.    So we have units, and we call them Montevideo units

9    because the gentleman, the doctor who invented it came from

10   Montevideo.  That's the only reason it's named that.  They're

11   called Montevideo units.

12        And we know that in a ten-minute window, we expect the

13   uterus to contract so many times at such an amplitude.  And

14   what we do is -- I'm going to give you a hypothetical.

15        If the contraction starts at a zero and goes up to 75,

16   and there are three contractions in a ten-minute window, well

17   that's 200 -- we just add them up, 75, 75, 75.  That's 225

18   Montevideo units.  And we know there are good powers if the

19   Montevideo are 200 or greater.

20        Now if each contraction -- if one contraction is 30 and

21   one is 25 and one is 50, and we add it up and it's 130, then

22   we say, you know, the Pitocin can be extremely helpful because

23   we can bring it up to 200, see if we can get this baby out

24   vaginally.

25        But if the Montevideo units are already at 200, 225, 250,

1    you're putting the mother in harm's way and you're putting the

2    baby in harm's way by elevating the contractions above what's

3    already normal and adequate.

4    Q.   Is this intrauterine pressure catheter you're discussing,

5    is it only in use at your facility?

6    A.   No, it's used throughout the world.  It's used throughout

7    the United States.  It's used in Nebraska.  It's used in New

8    York.  It's used in Europe.  It's used everywhere.

9    Q.   Is it really expensive?  Is there some big costs

10   associated with this --

11   A.   I would imagine the catheter probably costs -- it could

12   cost 20, $40, something like that.  I'm not sure.  It's not a

13   big -- it's a straw with a wire that you attach to a machine

14   that the facilities own.

15   Q.   Is there an incredible difficulty in placing this?

16   A.   No, it's easy.  Interns -- in many institutions, nurses

17   place them, midwives place them.  We have our medical students

18   and residents place them.  It's a fairly easy thing.  You just

19   thread this straw around the baby's head into the uterus.

20   Q.   How many have you used in your career?

21   A.   Hundreds, if not thousands.

22   Q.   Have you ever had an adverse outcome because of its use?

23   A.   Never.

24   Q.   Is it thought to be a dangerous type of procedure?

25   A.   Not at all.

1    Q.   So when is it indicated?  We've been talking about

2    abnormal labor.  When is it indicated for use?

3    A.   So it's indicated when you're in the fork in the road,

4    when you've got to decide, are we going to do a caesarian

5    section?  Or we going to augment her labor?  Are we going to

6    increase the P, the power?  Okay?

7         So that's the fork in the road.  When somebody's stuck,

8    you have one of two options:  Deliver the patient or augment

9    the labor.

10        Because once you've gone beyond a certain point in time,

11   it's not safe anymore for the mother and baby.  You've got to

12   cut bait.  You've got to either deliver the baby or you've got

13   to augment the labor.

14        And before augmenting the labor, the standard of care is

15   to see what's going on with the contractions.  And the easiest

16   thing, the simplest thing, the standard of care is to put a

17   pressure catheter in.

18   Q.   Okay.  You mentioned a couple things I want to talk about

19   in your answer.

20        You mentioned augment labor.  What does that mean and how

21   is it different from induction of labor?

22   A.   Okay.  An induction of labor -- first of all, let's talk

23   about Pitocin for a minute.  It's a drug that the brain

24   normally makes.  And it's used -- one of the functions in the

25   body is to make the uterus contract.  It has other functions.

1    It brings the milk down postpartum.  But one of the things

2    that it does is makes the uterus to contract.

3        An induction is when you take someone who is not in labor

4    and for whatever reason -- there are multiple reasons in the

5    differential diagnosis, many reasons why we sometimes say that

6    it's safer to end the pregnancy rather than to keep going on.

7    A lot of different reasons.  And if we're going to try for a

8    vaginal delivery, we take someone who is not in labor, give

9    them Pitocin, that's an induction.

10       An augmentation is somebody who is already in labor, but

11   we've evaluated that patient, we've decided that the power

12   isn't good enough, and that's why things aren't moving the way

13   we would like them to move.

14       And we're going to add to what the -- to the Pitocin that

15   the mother's brain is already making, we're going to give her

16   Pitocin in the IV.

17   Q.   Okay.  Another concept you mentioned in your earlier

18   answer was you talked about standard of care.  What is the

19   standard of care?

20   A.   The standard of care is what somebody of qualification,

21   what anybody would do in the community, in a similar or same

22   situation.

23       So in other words, what a competent person is expected to

24   do in the same or similar situation.  That's what defines the

25   standard of care.

1    Q.   Okay.  And I think in Nebraska, for legal purposes, would

2    you assume if I'm talking about the standard of care or the

3    safety principles applicable to this case, could you assume

4    we're using a reasonably prudent healthcare provider in

5    similar circumstances -- in like or similar circumstances?

6    A.   Yeah.  I said it in a different way, but I thought that

7    was --

8    Q.   And also as we're going through your testimony, if you're

9    going to give any opinion, can you agree to do so to a

10   reasonable degree of medical certainty?

11   A.   Yes, sir.

12   Q.   Okay.  The standard of care -- are you familiar with the

13   standard of care as it applies to an obstetrician who is

14   managing a labor and delivery?

15   A.   I am.

16   Q.   Are you familiar with the standards of care which would

17   be applicable to labor and delivery nurses managing a labor

18   such as this?

19   A.   I am.

20   Q.   How?

21   A.   Because that's what I do.  I -- on a weekly basis, I'm on

22   labor and delivery.  And I'm working with labor nurses, charge

23   nurses on labor and delivery floor.  And as I said, we're a

24   team.  And that's what we do.

25       So it's not only from 30 years of personal experience,

1    I'm also a board certified obstetrician/gynecologist.  I read

2    a lot.  I talk to people a lot.  I attend national conferences

3    a lot.  And so besides my individual -- and by the way, I'm at

4    an academic institution that has over 75 obstetricians/

5    gynecologists who practice.  And I regularly attend

6    conferences where we review our healthcare.

7        So as a result of my experience, my board certification,

8    my reading, I know what the standard of care is as it pertains

9    to labor and delivery and the role that the healthcare

10   providers on a labor and delivery floor need -- what they need

11   to do to meet the standard of care.

12   Q.   Okay.  And those -- encompassed within that healthcare

13   provider would be labor and delivery nurses, correct?

14   A.   Absolutely.  They're an integral part of the team.

15   They're a vital part of the team.

16   Q.   When you conduct these reviews at the hospital level,

17   also when you're doing forensic legal reviews like you've done

18   here, one of the things that's done is to analyze and assess

19   the care and treatment rendered by labor and delivery nurses

20   with respect to whether or not they met the standard of care.

21   A.   Absolutely.

22   Q.   Also, do you have grand rounds or in-hospital in-services

23   where you participate with nurses in teaching and things like

24   that?

25   A.   Weekly.

1    Q.   Okay.  Are you also familiar with what are called

2    hospital policies and procedures that are either applicable to

3    a maternity service itself or to labor and delivery nurses?

4    Are you familiar with those?

5    A.   Yes.

6    Q.   Do those also help set the standard?

7    A.   Yes.

8    Q.   What is the ultimate purpose of these standards?  Why do

9    they exist?

10   A.   The ultimate purpose -- well, it's a good idea for people

11   to practice similarly because again, we have a common goal.

12   Whether we're in Nebraska, New York, California, Florida, our

13   common goal is to send people home healthy and happy.  What we

14   have is experience in the field.

15        We have -- I'm not a researcher, but we do have

16   researchers who do the work.  And they do studies.  And they

17   look at thousands of patients, and they review thousands and

18   thousands of hospital records from multiple institutions.  And

19   they come to a consensus as to what's safe and what isn't

20   safe, what's correct and what isn't correct.

21        Now, these things are not written in stone.  And I would

22   agree that the standard of care can change at times as

23   information becomes available, as technology changes.

24        But you want to be -- you want to feel confident when you

25   go into an emergency room in Omaha or you go into an emergency

1    room in New York or you go into an emergency room in Chicago,

2    you're going to get the same level of care no matter where --

3    because we're all entitled to the same level of care.

4    Q.   Okay.  If there's an -- that's often referred to as the

5    national standard of care?

6    A.   Yes.

7    Q.   So is it your opinion that it is a national standard of

8    care with respect to how labor and delivery nurses should

9    handle a situation like we're going to examine here today?

10   A.   Absolutely.

11   Q.   Now, if there's a suggestion or an argument or a

12   statement made to the jury that there is no national standard

13   of care, it's dependent on the community you're in, that

14   there's a different standard of care, that women in labor get

15   treated differently at the Bellevue Medical Center than they

16   would in New York or Chicago or anywhere else, what would you

17   say to that?

18   A.   I'd say that's ridiculous.  The American Board of ObGyn,

19   they don't ask different questions of people due to what state

20   they're from.  To become board certified, you take the same

21   exam -- you take the same written exam and you've got to

22   answer the same kind of questions.

23       It is true that in remote areas of the United States,

24   practices may be different than in the major -- in a city like

25   this where there are major institutions, a city like mine

GUBERNICK - DIRECT                                           238

1      where there are major institutions.

2           But as a general principle, as a general principle,

3      doctors have a responsibility -- healthcare providers and

4      doctors have a responsibility to our patients.  And our

5      responsibility is to set a standard that wherever you live,

6      you have an expectation that you're going to get cared for in

7      that manner.

8      Q.    Okay.  Are there textbooks and articles that are

9      published that would only be applicable to outside of the

10     Bellevue Medical Center?

11     A.    No.

12     Q.    Okay.  I'll just jump back.  I forgot what I was going to

13     get into.

14          You mentioned earlier Pitocin.  Is Pitocin a safe

15     medication?  I made a representation that it is a high-alert

16     medication in opening statement.

17     A.    Right.

18     Q.    Counsel said it's safe.  Which is it?  Talk about that.

19     A.    It's both.  You are both right because when used

20     correctly, it's a safe and terrific medication because it can

21     help lower caesarian section rate.  It can take somebody who

22     is not having effectual contractions, you give it to them and

23     as a result of giving Pitocin, they have a vaginal delivery, a

24     healthy baby, a healthy mom.  What could be better?

25          It's also a very dangerous drug if it's used

1    inappropriately.  Like most things in life, if you use it

2    correctly, it's a wonderful tool.  If you use it incorrectly,

3    it can be incredibly dangerous, and for the reasons I've

4    talked about and I won't repeat it again.  If you use it

5    inappropriately, you put both mother and baby in harm's way.

6    Q.   Okay.  I was going to talk about two concepts.  And I

7    guess in this case, because it's relevant to it, the

8    particular application to Pitocin.  What is an indication?

9    Generally what is an indication with respect to Pitocin?

10   A.   Indication for Pitocin?

11   Q.   Indication.  What's that mean and how --

12   A.   Induction of labor and augmentation of labor.  We've gone

13   over the augmentation.  It's a power -- if there is a power

14   problem in the labor that causes the baby to get stuck, if you

15   determine that there is ineffectual contractions and that's

16   the reason that the baby isn't coming, that's the number one

17   indication for Pitocin; ineffectual contractions.

18   Q.   Okay.  And what is a contraindication?  What does that

19   mean generally?

20   A.   A contraindication means it's dangerous to use and should

21   not be used in the setting that you're thinking about using it

22   in.

23        And there are many contraindications for the use of

24   Pitocin.  Someone who has unexplained vaginal bleeding because

25   if someone has an abruption of the placenta, the placenta

1    separating, you don't want to use Pitocin.

2         If somebody has -- I'm going to use a term I haven't used

3    yet today.  If someone has cephalopelvic disproportion, in

4    other words, the baby's not going to be able to fit through

5    the pelvis, regardless of how much power you -- no matter how

6    much you put your foot on the pedal, that baby is not going to

7    come through, that's a contraindication.

8         So you have to rule out cephalopelvic disproportion

9    through all those Ps that we've talked about to make sure that

10   you don't cause the uterus to just be contracted which causes

11   a uterine rupture, which happens as a result of the

12   inappropriate use of Pitocin, or damaging a baby, which can

13   happen as a result of continued uterine contractions that are

14   not resulting in movement of the baby.  And the baby is just

15   stuck in the pelvis.

16   Q.   Okay.  You mentioned cephalopelvic disproportion.  Is

17   there an abbreviation that you use?

18   A.   CPD, yes.

19   Q.   Break down that phrase.  What does it mean?

20   A.   It means the baby is stuck.  It's that simple.  It means

21   one of the powers is off, either the pelvis is too small, the

22   baby is too big, or some combination of the two, or the

23   position isn't right.  That's cephalopelvic disproportion.

24   Q.   Okay.  Is it sometimes referred to as fetal pelvic

25   misfit?

1    A.    I'm sure.  I don't like -- I don't like "misfit".  I

2    don't like that term, but I'm sure somebody uses that.

3    Q.    Okay.  But it's the same concept?

4    A.    Yes.  It's really -- it's no more complicated than we've

5    got a stuck baby.

6    Q.    We talked about abnormal labor to some degree.  You

7    talked about abnormal dilation.  What is arrest of that?  I

8    think you got into it a little bit, but explain more about

9    what that means and how it's diagnosed.

10   A.    So once somebody's gone into the active phase of labor --

11   my personal belief, that's 4 centimeters; somebody may say 5,

12   somebody may say 6.  The most extreme data says you can wait

13   until 6, okay?  I say the majority of the community of ObGyns

14   in the country agree that 4 is the right number.  But 5 and 6

15   are acceptable, okay?

16        But once somebody gets stuck at 6, that's an arrest.  And

17   once they're stuck for two hours with good contractions,

18   that's the definition of an arrest of the active phase of

19   labor.  That's the definition.

20   Q.    How about -- well, you talked a little bit about station

21   again.  What's the -- what's the significance of the situation

22   where you have an arrest and the station is high, remaining

23   above the zero station, or not descending into the pelvis?

24   A.    That's one of those yellow flags.  Because, I mean, think

25   about it.  The baby's stuck and you're not happy with how low

1    the baby is.  I mean, I call that a yellow flag.  I don't say

2    it's an absolute indication to stop, you know, and do a

3    caesarian section.  But you've got to say to yourself, you

4    know, the cervix has all of a sudden stopped dilating.  It

5    stopped effacing.  And the baby has stopped descending into

6    the pelvis.

7         And I told you that the majority of women having their

8    first baby, they start at a zero station.  They start with the

9    baby engaged.  That's what nature -- that's how nature planned

10   it, okay?

11        So if you're above zero station and in the active phase

12   of labor, you're 5, 6, 7, 8 centimeters, and you're above zero

13   station, that's not -- you know, we're not happy with that.

14   I'm not -- and I'm not saying in the world, you know, that

15   that person can't deliver vaginally.  I'm not saying that.

16   What I'm saying is that's a troubling sign.

17   Q.   How do you measure station?

18   A.   Again, that's a pelvic exam.  And that's also something

19   that, you know, has tremendous amount of variability from

20   examiner to examiner.

21   Q.   What is caput?

22   A.   That's exactly -- so what happens is, as the baby

23   descends into the pelvis, the soft tissue -- just talking

24   about the soft tissue.  The soft tissue of the head starts to

25   swell, okay?

 1          And you can get -- you know, it's like -- I don't know if

 2     any of you lived through the '70s the way I did, if you

 3     watched Saturday Night Live, the Coneheads, the babies looked

 4     like Coneheads because their soft tissue gets elongated.

 5          And you've got to be really careful when you're

 6     evaluating stations because we don't care about the descent of

 7     the soft tissue.  That has no impact on station.  We care

 8     about how the bones are descending, because we're not trying

 9     to deliver the soft issue of the scalp, we're trying to

10     deliver the head of the baby.

11          So many times people feel the soft tissue and they

12     confuse that oh, the baby is making progress.  The only thing

13     that's making progress is the soft tissue turning into a cone.

14     Q.   Okay.  Now I want to talk about -- a little bit --

15     introduce the concepts of labor monitoring.  We're going to

16     look at the records here once we get through the general

17     concepts so we know what we're looking at.

18     A.   Sure.

19     Q.   But what are the elements, what are the essence of

20     monitoring a labor?

21     A.   So when you monitor labor, you got two patients.  You've

22     got to monitor the mom and you've got to monitor the baby.

23          How do you monitor the mom?  You check the vital signs.

24     Make sure the blood pressure is okay, make sure the

25     temperature is right, check the pulse.  Make sure these are

1      okay.  Asking how she's doing in terms of pain management.

2      That's monitoring the mom, making sure everything is okay with

3      her.

4           How do we monitor the baby?  There are a couple of ways

5      to do it.  One way that was done in the birthing center in

6      this particular case is through listening with an instrument.

7      There are various instruments.  We have stethoscopes you can

8      listen with.  We have Dopplers you can listen with.  These

9      little sonar instruments you can listen with.

10          And you put your hand on the mom's uterus every time

11     she's contracting.  So you can do it without a monitor.  And

12     that's okay in a normal labor and everything's moving okay.

13     No problem with that, where you listen periodically, you

14     palpate periodically, and that's the way to evaluate the baby.

15          Then the other way to evaluate, how most institutions

16     outside of a birthing center do it, is with some combination,

17     either external fetal monitoring, like I told you about before

18     where you put a belt on the woman's abdomen, and you -- and

19     the machine records the mother's heartbeat and the frequency

20     of the uterine contractions.

21          Or when things aren't going so well, and we want more

22     information than that monitor can supply, we use internal

23     catheters to get accurate numbers on exactly what's happening

24     with the uterus.  And even sometimes we put a scalp electrode

25     on the baby so we can get a direct EKG of the baby rather than

1    just an indirect listen to the baby.

2    Q.   Okay.  So there's a couple concepts there I just want to

3    talk about a little further because they'll have applicability

4    when we look at this later.

5         If something arises -- and we talked about the need for

6    having to place the intrauterine pressure catheter in and that

7    measures uterine contractions, correct?

8    A.   Yes.

9    Q.   Does that measure anything about the heart rate?

10   A.   No.

11   Q.   Okay.  So if you're curious about the power, you can put

12   the pressure in -- the catheter in, but that won't tell you

13   anything about the heart.

14   A.   That's correct.

15   Q.   Okay.  Now, in this situation where a nurse is charting

16   that she can't tell what the baby's heart rate is, the

17   monitor's not working, or she's losing the fetal heart rate

18   with every contraction or pushing, what should be done in that

19   situation?

20   A.   And that happens because, you know, when the uterus is

21   contracting in the last stage of the baby's moving, sometimes

22   it can be hard to follow the heartbeat of the baby as the

23   baby's moving around.

24        And so what we do is we put a little clip on the baby's

25   head.  And that clip directly monitors the baby's heart rate.

GUBERNICK - DIRECT                                                  246

1    And it's called a scalp electrode.  And there are very few

2    contraindications.  We use them all the time.  We've done

3    thousands of them.  It's safe.  And it just is applied to the

4    baby's scalp and attached to a machine.  And then, no matter

5    where the baby -- you can take all the belts off, you don't

6    need belts anymore.  And it's constantly -- wherever the baby

7    is, it's picking up the baby's heart rate.

8    Q.   Okay.  Now because we're going to be looking at stuff.

9    How -- let's just take the contractions first.  If the

10   contractions are being recorded by the external or the

11   internal belt, how are they displayed?  How do you get any

12   information?

13   A.   So we're using an -- we're talking about an external

14   monitor?

15   Q.   Sure.

16   A.   So that's a sonographic machine.  That is picking up --

17   it's called a transducer.  And it's picking up the

18   contractions by placing the transducer directly on the uterus.

19        And we have a graph.  And what it shows is every time

20   there's a contraction, you see a little hill.  And then it

21   comes down.  And then you see another hill when there's

22   another contraction, and it comes down.

23        And what that's doing is that machine is able to tell

24   when the uterus is contracting.  Doesn't tell you how hard the

25   contractions are; doesn't tell you anything about the strength

1     of the contractions, it just tells you the timing and the

2     frequency of the contractions.

3     Q.   Can you get an idea of how long they're lasting?

4     A.   Yes.

5     Q.   And can you get an idea of how much rest the baby is

6     getting in between?

7     A.   Yes.  Not as accurate as an internal monitor; but yes,

8     you can get an idea.

9     Q.   And I'll talk about those in a minute.  I just saw my

10    notes.

11         One thing I forgot to ask you is a term we might hear

12    throughout is dystocia.  What is dystocia?

13    A.   Dystocia means that something is not fitting.  It's not

14    too dissimilar to cephalopelvic disproportion.  There's a

15    discrepancy inside.  Something is not fitting through

16    something.  It's really just another way of saying CPD,

17    cephalopelvic disproportion.

18    Q.   Okay.  Let's just talk about contractions in general.

19    You talked about what a contraction is.  How does a

20    contraction affect the oxygen to the baby?

21    A.   So we have to talk for a minute about how the baby gets

22    oxygen, okay?  And the baby has a -- the most important organ

23    for this exchange of oxygen to the baby is something called

24    the placenta.  So how it works is the mother's blood supply

25    goes to the placenta.  From the placenta, you have an

```
 1    umbilical cord.  From the umbilical cord, which has vessels in

 2    it, it goes to the baby.

 3         So the placenta is like the heart and lung of the baby

 4    because it's where the exchange of oxygen occurs.  And without

 5    a placenta, there is no -- if something happens to the

 6    placenta, that's devastating, that's life threatening to the

 7    baby, the various placental diseases.

 8         So what happens during a contraction is before the mom's

 9    blood vessels get to the placenta, they course through the

10    muscles of the uterus.  So when the uterus contracts, it

11    constricts those blood vessels.  You know, like the hose when

12    you're watering the lawn, it constricts it.

13         So when you constrict that, it constricts the blood to

14    the placenta, which constricts the blood flow to the umbilical

15    card which constricts the blood flow to the baby.

16         Now when you have a nice rhythm, when you have a

17    contraction, it's a little bit of constriction.  And then you

18    have a rest and the baby gets a rest for a couple of minutes.

19    And then the contraction comes.  Nature built us to tolerate

20    all of that, okay?

21         So as long as we have a nice contraction pattern, that

22    level of stress that the baby experiences during the

23    contraction is -- the baby recovers.  It's a recovery when the

24    contraction is over and there's a waiting time before the next

25    contraction.
```

1    Q.   So are there scientific principles or safety principles

2    built in to look at and assess contractions to know if there's

3    any -- if they're potentially causing harm to the baby?

4    A.   Yes.  We know, especially -- what we are especially

5    careful about is we're manipulating the contractions.  It's

6    one thing when someone has spontaneous contractions.  But when

7    we're manipulating the contractions with Pitocin, we're

8    concerned about -- let me tell you the things we're concerned

9    about.

10       We're concerned about the frequency of the contractions.

11   We don't want them to come too fast because we want the baby

12   to be able to recover.  We're concerned about the duration of

13   the contractions.  We don't want it to occur too long for

14   obvious reasons because during that contraction period, the

15   mother's vessels in the uterine wall are being constricted.

16       We want the duration in between the contractions to be

17   adequate because that's the resting time.  It's like when

18   you're talking about a prizefighter.  That's when the bell

19   rings and the fighter gets to rest for a couple minutes before

20   he gets up again and takes another hit, you know, during the

21   fight.

22       So we know we're looking not only at frequency, we're

23   looking at intensity, we're looking at duration, and we're

24   looking at the resting time in between the contractions.

25   Q.   If there is an intrauterine pressure catheter in, is all

1    that known with the greatest degree of certainty to the

2    hospital?

3    A.   Absolutely.

4    Q.   Okay.  And how does that differ from when it's external?

5    A.   So when it's external, you still know -- if it's a good

6    external monitor, we can pick up the frequency.  As I told you

7    before, we don't know anything about the intensity because

8    those external monitors are not designed to pick up intensity.

9         We sort of get an idea of the duration because we can see

10   the pattern of the contraction.  And we get somewhat of an

11   idea of the resting time in between the contractions.

12        So the most important piece of information that we lose

13   with an external versus an internal is the intensity of the

14   contraction.

15   Q.   What is resting tone?

16   A.   So resting tone, some uteruses completely relax.  That's

17   what we want to happen in between contractions.  Muscle

18   contracts, then relaxes, contracts.

19        Some uteruses don't completely relax in between the

20   contractions.  And you can well imagine, why are we concerned

21   about that?  We're concerned about that because if there's

22   some element of constriction in between the contractions,

23   there's some element of constriction of the mother's blood

24   vessels that are coursing through the uterine wall.  So

25   there's some element of oxygen deprivation going to the baby.

1          So in the ideal world, we want good, strong contractions.

2     We want them to happen.  We want the uterus to completely

3     relax.  We want some resting time in between the contractions.

4     And then we want it to start all over again.

5     Q.   Okay.  What's the concern if contraction durations are

6     lasting longer than 60 to 90 seconds?

7     A.   It's not healthy.  In other words, we're just not built

8     for that in utero.  We're not built for that kind of time of

9     maternal vessel constriction to go on.  It's not good for the

10    baby.

11         I'm not saying -- as soon as it happens, does the baby

12    get into trouble immediately?  No.  It's a stress on the baby.

13         And depending on how long that goes on for and how

14    intense that is, and with some biologic variabilities that

15    some babies can tolerate more stress than others, you're in an

16    area that you can potentially do harm to the baby.

17    Q.   Similarly, with respect to the resting time, what's the

18    harm or the concern when the resting time is less than 60

19    seconds between contractions?

20    A.   Same reason when the duration of the contraction is more

21    than 60 to 90 seconds.  When you don't give the baby enough

22    time to recover, when that mom isn't supplying really good

23    oxygen, the baby's running a little marathon inside.  And what

24    it really wants all the time during labor is oxygen.

25         Any opportunity when you're depriving the baby of oxygen

1    in any way by diminishing the resting time in between, by

2    expanding the duration of the contractions, that's having some

3    impact on the baby.  And depending on how long you let that go

4    on for will determine what ultimate effect it will have on the

5    baby.

6    Q.   Okay.  And if the frequency of contractions -- first of

7    all -- how are -- I guess you explained how resting time is

8    measured and how duration is measured.  How is frequency

9    measured?

10   A.   Frequency is measured by an external monitor, as well as

11   an internal monitor can measure frequency because that's what

12   it's designed to do.  You look at the strip.  There's an up,

13   there's a down.  That's the frequency.  You count in a

14   ten-minute window how many contractions you have.

15   Q.   Okay.  And what's the harm if the frequency of

16   contractions is greater than every two minutes?

17   A.   It's the exact same thing we talked about; same thing

18   about duration, about length of resting time.  If the

19   contractions are coming too frequently, obviously the resting

20   time is shorter.  You can't get -- you know, if you're

21   increasing the frequency of the contractions, you know, simple

22   math is you must be decreasing the amount of resting time.

23       And during the contraction, the baby's being -- getting

24   diminished oxygen.  And now you're creating that more

25   frequently and you're giving the baby less and less time.

1    It's like saying to the fighter, "Now instead of you having

2    two minutes in between rounds, you only get 30 seconds.  And

3    we're going to expand the length of the round from three

4    minutes to six minutes."

5    Q.   Okay.  Are these principles, these safety standards that

6    we're just discussing, the times relevant to contractions, are

7    nurses aware of this?

8    A.   They have to be aware of it.

9    Q.   And did you read the depositions of the two particular

10   nurses who cared for this labor and delivery?

11   A.   I did.

12   Q.   And are they aware of these principles that if the

13   contractions are too excessive, they can diminish the oxygen

14   to the baby?

15   A.   They are.

16   Q.   Talk about -- I think you might have mentioned it a

17   little bit before, but where this arises, where there's --

18   what's the term for it when you have these types of

19   abnormalities occurring?

20   A.   Now we're talking about jargon again, just words.

21        So the National Institute of Child Health and Human

22   Development, the Eunice Shriver Center, established some

23   definitions.  And we -- most of the time, we follow those

24   definitions.

25        And tachysystole is one of the words that they came up

GUBERNICK - DIRECT                                              254

1    with.  And what that is is more than five contractions in a

2    ten-minute window.  That's what defines tachysystole.

3    Q.   Okay.  So tachysystole is a term that only focuses on the

4    frequency element of the safety rules we just discussed?

5    A.   It's one of the several things that need to be evaluated.

6    They're just simply talking about frequency.  They're not

7    talking about the duration of the contractions, they're not

8    talking about resting tone and they're not talking about the

9    length of rest in between the contractions.

10   Q.   Okay.  Are you familiar with the term "hyperstimulation"?

11   A.   Yes.  Long before we talked about tachy- -- in 2008 when

12   the NICHD, the National Institute of Child Health and Human

13   Development, established tachysystole, we always called it

14   hyperstimulation.  I must say, some of us weren't probably

15   politically correct?  We still use the word hyperstimulation.

16   We all know what we're talking about, whether it's hyper-

17   stimulation or tachysystole.  It's the same word, it's the

18   same definitions.  It's more than five contractions in a ten-

19   minute window.

20   Q.   Okay.  So there's a term now -- and you mentioned a paper

21   that was written in 2008 that defined we're going to call

22   contractions that are more frequent as tachysystole.  Has

23   there been any such term to reach that tells you what you call

24   a contraction that's longer than 60 to 90 seconds?

25   A.   Yes.  Those are -- we call those tetanic contractions.

1    Actually the Eunice Shriver Center didn't bother to make that

2    definition for whatever reason.  But in the community of

3    obstetricians/gynecologists, we call that tetany where the

4    contractions are lasting too long.  And actually many times

5    what happens when they last too long, they couple one on top

6    of the other.

7    Q.   Okay.  You kind of mentioned two things.  What is the

8    difference between tetany and coupling?

9    A.   Well, coupling is more than one contraction -- okay? --

10   that overlap each other.  In other words, before the

11   contraction is over, the next contraction is already starting.

12   So in other words, there's been zero resting time; that the

13   contraction isn't complete before the next contraction has

14   started.  We call that coupling.

15   Q.   So whether people want to splice hairs, a tetanic

16   contraction versus a coupling contraction, is there any

17   difference in the risk to the baby?

18   A.   No, it's the same thing.  It's contractions, whether a

19   single duration is too long, or two of them are on top of each

20   other, the end of the game is the same.  The baby is being

21   deprived of blood flow; and because it's deprived of blood

22   flow, it's getting less oxygen.

23   Q.   And we talked about a special term for frequency that's

24   been recognized and published, tetany and coupling that

25   weren't in that particular paper, but is there a way to

1    describe or a term that's used to describe when the resting

2    time is simply too short, not the 60-second minimum required

3    for reoxygenation?

4    A.    I can't think of -- a particular term?

5    Q.    Yeah.

6    A.    No.

7    Q.    Okay.  And just because it doesn't have a fancy word like

8    tachysystole, does the -- when the rest is not at least 60

9    seconds, is it any less of a concern for the baby because it

10   doesn't have a term to call it?

11   A.    Yeah.  We don't have to define every element of what we

12   see.  In other words, we describe what we see.  We say the

13   contractions are occurring at this frequency, they're lasting

14   this long, they're in deterioration -- the time between the

15   contractions is, you know, 60 seconds, 90 seconds.  And we

16   know babies need good time in between the contractions, they

17   need nice quick contractions to get them over.  We don't want

18   to see coupling; we don't want to see tetany.

19   Q.    Okay.  And we haven't looked at the medical records yet,

20   we haven't gotten to specific facts of this case, we're just

21   talking about the concepts.

22        But when we look at charting and assessments of the labor

23   as we're moving through it, these are the things that should

24   be being assessed and thought about by labor and delivery

25   nurses who are managing labor and delivery.

1    A.   Absolutely.   Those -- remember, there is no obligation

2    for the primary healthcare provider, whether it be a midwife

3    or doctor, to be in the room at all times.   There is no

4    obligation.

5         But we rely on the nurses to understand fetal monitoring;

6    to understand when there's a problem; to act if there's a

7    problem; and at the very least, if it's an emergency, act; and

8    if it's not an emergency, bring it to the attention of the

9    person who would want -- whether it be a midwife or a doctor,

10   would want to change what's going on.   We rely on them.

11   They're an integral part of the team.

12   Q.   When you have this evidence of excessive uterine activity

13   that's potentially injuring the baby through decreased oxygen,

14   and the labor's having Pitocin being administered at the same

15   time, what's the standard or the safety rules applicable to

16   that situation?   How do they work?

17   A.   That's really -- you know, the number one thing we

18   promise in medical school is to do no harm.   And if we're

19   giving a drug that's hurting somebody, you stop the drug.   The

20   beautiful part about Pitocin, the half-life of Pitocin is a

21   minute and a half.

22        So when you turn off the Pitocin, it gets out of the body

23   really quick.   Some drugs you take it and can't get rid of it

24   for hours and hours; some of them, even days.   You buy these

25   long-acting cold remedies, you can't just stop them because

1    they're designed to last in your body for 24 hours.  Pitocin,

2    you turn it off, the half-life is a minute and a half.  By six

3    minutes, it's gone.

4        So your contractions are occurring too frequently, you're

5    not getting enough rest in, the duration is too long, you shut

6    the Pit off.  That's what you do.  Or, if you're at a high

7    dose of Pit, you turn the Pit down at the very least; turn it

8    down, shut it off.  In this particular case, there is a very

9    low dose to begin it.  Shut it off.  Some people are

10   hypersensitive to low doses so they start at a low dose.  Some

11   people take huge doses.  If you get to the point it's too

12   much, we cut back.  But there's a term called iatrogenic

13   meaning that we, as healthcare providers, are creating the

14   problem.  We're the ones that are creating the problem.  And

15   when you're giving -- when you have a normal tracing, and you

16   give Pitocin, and 20 minutes after you give Pitocin, you go

17   from a normal tracing to a not normal tracing, you've got to

18   ask yourself, "Did I do this?  Am I potentially doing harm

19   that I promised not to do?"  Cut back.  Stop it.  Do

20   something.

21   Q.   Okay.  You mentioned a couple concepts there I want to

22   just talk about.

23       Levels of Pitocin, you mentioned there can be high

24   protocol to lower dose protocol.  And then you also mentioned

25   hypersensitivity.

GUBERNICK - DIRECT                                                        259

1    A.    Right.

2    Q.    Talk about how that interplays with -- how Pitocin works.

3    A.    So you never know until you start giving Pitocin to

4    somebody how they're going to respond to it because we're all

5    different.  We're all built a little bit differently.

6          So the average woman responds to 11 milliunits of

7    Pitocin.  That's when we start seeing that we're having an

8    impact on their contraction pattern.  Some people require 20.

9    In this case, this particular person responded to two

10   milliunits.

11         So the standard protocol, we move really slowly.  Why do

12   we move slowly?  Because we know it's dangerous when it's not

13   used properly.  I mean, if it wasn't a dangerous drug, we'd

14   just zip, you know, give a bunch of Pitocin, see what happens.

15         But we start off at two milliunits.  That's a standard

16   throughout the United States, one to two milliunits, which is

17   one-fifth of the dose that the average person responds to.

18         And we go up with the Pitocin, if we don't see a response

19   with two milliunits, every 20 to 30 minutes, by two

20   milliunits.  So it's standard of care throughout the United

21   States to take two and a half to three hours to build somebody

22   up to the average dose of the person that responds because

23   we're so careful that we don't want to do any harm.  That's

24   how careful we are.

25         We already know the average person responds to 11.  We

1    don't give 11.  Most institutions, we start at two and go up

2    by two every 20 to 30 minutes.

3    Q.   So we talked a bit about adequate uterine activity.  If

4    someone -- I want to just talk about reasonable nursing

5    judgment and what would be reasonable and what would not be

6    reasonable and why.

7         If a labor is running, and a mother is at 2 milliunits of

8    the Pitocin, and the contraction pattern is not only adequate

9    but demonstrating the overactivity we talked about that places

10   the baby at risk, would it ever, under any circumstances, be

11   prudent to increase the dose?

12        MR. WELCH:  Objection.  Your Honor, it's improper

13   hypothetical, no facts in this case.

14        THE COURT:  Well, we can have a sidebar.  I don't

15   know what the facts in the case will demonstrate.

16        Mr. Cullan, is it your position that the facts will

17   demonstrate the Pitocin was increased?

18        MR. PATRICK CULLAN:  Yeah.  Is there a dispute that

19   the Pitocin was increased?

20        MR. WELCH:  That's -- your question --

21        THE COURT:  Let's have a sidebar.

22        (Bench conference on the record.)

23        THE COURT:  What is the objection?

24        MR. WELCH:  My objection is it's calling for a

25   hypothetical on the part of this witness.  There are not

1    sufficient facts that have been demonstrated in this case that

2    the hypothetical as posed to this witness are the facts of

3    this case.  And it would be highly prejudicial to the

4    defendant if those facts are not elicited if it's a proper

5    hypothetical.  He's just throwing concepts out there and

6    saying would it, under any circumstances, not be appropriate.

7    And I think if you're going to do hypotheticals, you have to

8    do it with the facts of this case.

9            THE COURT:  Let me inquire first of you, Mr. Welch.

10   Is there a dispute that the Pitocin level was increased after

11   the initial dosage was administered?

12           MR. WELCH:  No.

13           THE COURT:  Okay.  Overruled.

14       (End of bench conference.)

15           THE COURT:  We're back online.

16       Mr. Cullan, the objection's overruled.  If you wish to

17   restate your question, you may.

18           MR. PATRICK CULLAN:  Can I have it read back?

19           THE COURT:  Ms. Fauber, we will ask you, please, to

20   read it back.

21           COURT REPORTER:  If a labor is running, and a mother

22   is at 2 milliunits of the Pitocin, and the contraction pattern

23   is not only adequate but demonstrating the overactivity we

24   talked about that places the baby at risk, would it ever,

25   under any circumstances, be prudent to increase the dose?

1    A.    Never.

2    BY MR. PATRICK CULLAN:

3    Q.    Why?

4    A.    Because if you're getting an adverse reaction, you're

5    getting, you know, a complication from giving medicine, giving

6    more medicine is only going to add to the complication.  You

7    would anticipate that if somebody is contracting too

8    frequently with two milliunits, they're going to -- it's just

9    going to be worse when you give them four milliunits.

10   Q.    Okay.  If a nurse was really watching and assessing

11   carefully a laboring mother and that was the situation, and

12   she did, in fact, increase it to four, what significance would

13   that be to you as a physician?

14   A.    If a nurse saw that the contraction pattern was not safe

15   for the mother and the baby and she increased the Pitocin,

16   that nurse would be deviating from good and acceptable

17   practice.

18   Q.    Okay.  And so I just want to be clear.  If the

19   contractions are noted to be every minute and a half -- the

20   frequency of the contractions, every minute and a half to four

21   minutes lasting 60 to 70 seconds -- and we haven't talked

22   about the heart rate pattern so let's just deal with that --

23   and the Pitocin is running at two milliunits, and it's

24   increased to four, based on that information, is there any

25   reasonable rationale for that to happen?

1    A.   There is no --

2              MR. WELCH:   Let me interpose an objection to the form

3    of the question.

4              THE COURT:   Overruled.  He may answer.

5    A.   There is no safe rationale.  There is nothing safe about

6    increasing Pitocin with the information that I just heard.

7    BY MR. PATRICK CULLAN:

8    Q.   We haven't talked about heart rate yet.  Let me

9    think -- we haven't gotten there yet.

10             But if that same factual circumstance I just represented

11   to you was true, and the fetal heart rate was a Category II,

12   which we've not talked about yet, but it's indeterminate,

13   would that be prudent healthcare?

14   A.    No, it's cause and effect.  So if you have an abnormal

15   contraction pattern, the effect of that is going to be

16   something -- you're going to have evidence that the baby is

17   under some level of stress, some level.

18             And so if you're creating a situation but stressing the

19   baby, you're seeing it.  You go from a normal heart -- a

20   normal contraction pattern and a normal heart rate and a

21   reassuring heart rate to an abnormal contraction pattern and

22   an indeterminate heart rate pattern where you no longer say

23   it's reassuring, the ABCs of medicine are what you're doing is

24   having a negative effect.  And the standard of care is to stop

25   what you're doing.

1    Q.   Okay.  Maybe it's a good time to shift gears.  I want to

2    talk a little bit more about contractions in a minute, but

3    let's just address -- so we've talked about how you monitor

4    the contractions.  What's the other monitoring for the fetal

5    side of the equation?

6    A.   The fetal side, we look at the heart rate.  And what's

7    interesting about the heart rate, it's not just the beating

8    heart.  They're -- the heart rate of the baby is controlled by

9    the autonomic nervous system of the baby.

10        So it's not just that the heart is beating, it's that the

11   brain, the spinal cord, all the endocrine organs of the baby

12   are all telling the heart how to beat.  So in order to have a

13   normal heart rate, you have to have a healthy, intact central

14   nervous system.

15        And if the central nervous system is being stressed --

16   and the most common reason to be stressed in labor is from

17   oxygen deprivation by decreasing the amount of oxygen -- that

18   will change the heart rate pattern.

19        So when we talk about heart rate patterns, don't just

20   think of it as a single organ, that we're just looking at the

21   heart.  When we look at the heart, we're looking at the

22   central nervous system of the baby because we know that the

23   central nervous system of the baby is the most sensitive to

24   oxygen deprivation.  The last thing we want to do is damage

25   the brain of the baby.

1          And we know that changes in the status of the brain of

2     the baby will change the status of what we see on the heart

3     rate pattern.

4     Q.   Okay.  How is the heart rate pattern -- sorry, strike

5     that.

6          How is the heart rate displayed so that it can be

7     assessed by the healthcare professionals who are caring for

8     the labor?

9     A.   We're going to see that pretty soon.  It looks like an

10    EKG, like an adult EKG, if any of you have ever had that.  We

11    put a monitor on, whether it be internal or exterior, and we

12    watch the ups and downs of the heart rate.

13         And again the whole pattern of what we see, we're going

14    to get into it, I'm sure.  The patterns we see -- you have to

15    remember this throughout the day today -- what you see on the

16    heart rate is a function of the central nervous system.  That

17    is to say, the heart doesn't act independent of the central

18    nervous system.  So any oxygen deprivation to the central

19    nervous system will ultimately have an impact on the fetal

20    heart rate.

21    Q.   Okay.  And just quickly, if you can -- so with the heart

22    rate, we may hear concepts like accelerations, what are those?

23    A.   The good thing is when you excite the baby for whatever

24    reason, the heart rate goes up.  It's like when we get -- you

25    know, when we run or a loud noise goes off, our heart rate

GUBERNICK - DIRECT                                              266

1    goes up a little bit.  And again, that's our central nervous

2    system telling our heart and our endocrine system, pouring out

3    a little cortizone, saying, noise, run, you know.  And we

4    expect the baby to do the same thing.  So accelerations are

5    reassuring signs that the baby is responding to the

6    environment appropriately.

7    Q.   What are decelerations?

8    A.   So there are different kinds of decelerations.  Some of

9    them we anticipate in labor, but some of them, as I'm sure

10   we're going to get into, are a sign of a lack -- that the baby

11   is not getting sufficient oxygen.

12        And what we're concerned about is the frequency of them.

13   An isolated deceleration of the heart rate is not the end of

14   the world.  When they start to become repetitive, we start to

15   get nervous about that.

16        And the depth of the deceleration is something we get

17   nervous about, and the shape of it.  And as experts in reading

18   fetal heart rate monitors, we look at the frequency of them,

19   we look at when they happen in relation to the contraction.  I

20   said frequency, relation, and the depth of them.

21        And again, these are all things that are telling us how

22   much stress this baby is tolerating during this labor process.

23   Q.   Okay.  And what is a prolonged deceleration, and what's

24   the significance of that physiologically?

25   A.   So a prolonged deceleration, by definition, is when the

1    heart rate of the baby goes down from its baseline for greater

2    than two minutes but less than ten minutes, 15 beats.

3         And the significance of that -- that's a significant

4    event, the prolonged deceleration.  And generally what comes

5    -- remember we talked about differential diagnosis before.

6    And our differential diagnosis of a prolonged deceleration is

7    oxygen deprivation.  We're asking ourselves what has happened

8    here to reduce the oxygen to the baby that's caused it to have

9    such a significant deceleration.

10   Q.   When any of these -- I guess strike that.

11        Variability is something we're going to talk about a

12   little bit with the heart rate.  What is variability and what

13   significance does it have?

14   A.   So variability is the ups and downs.  When you watch a

15   baby -- a heart rate, the last thing you want to see is

16   something that looks like someone took a pen and just sort of

17   went across the line.

18        You want to see variability in that heart rate.  That's

19   what our nervous system tells the heart to do.  So we have

20   this variability of a couple beats per second.  One minute

21   it's 120, then 118, then 124.  If it's 120, 120, 120 all the

22   way through, that's a very depressed central nervous system.

23        So one of the elements we look at is not only

24   acceleration and deceleration in the actual heart rate, we

25   look at the variability of the heart rate, once again telling

1    us the oxygen status of the baby.

2    Q.   What is the significance of absent variability?

3    A.   Absent variability is the worst it gets.  We have

4    categories of fetal heart rate monitoring, depending on

5    what -- if we see accelerations, if we see decelerations, what

6    kind we see.

7         And the worst category of all is absent beat variability.

8    That's a baby that's in dire -- that's an obstetrical

9    emergency, absent beat variability is an obstetrical

10   emergency.  At that point, the clock is ticking.

11   Q.   Okay.  Sticking with variability, what is the baseline?

12   A.   So baseline is -- you look at the heart rate over a

13   ten-minute period and you average it out.

14        So like I said, there's variability.  So it could --

15   let's just take as an example, you see 118, 122, 124, back to

16   118.  You look at it over ten minutes and you call a baseline.

17   Say the baseline is 120.  You base everything you're going to

18   talk about -- because you can only talk about an acceleration

19   or a deceleration if it's above or below a baseline.  So you

20   have to start with a baseline.  So it's what we compare

21   everything to.

22        So we start with a baseline.  We establish what the heart

23   rate, how many beats per minute by looking at not one minute,

24   we look at ten minutes.  And then we decide if there are

25   accelerations or decelerations around that baseline.

1    Q.   Okay.  So all these components we've talked about,

2    accelerations, decelerations, variability, and baseline, go

3    into categories; is that true?

4    A.   Yes.

5    Q.   Walk us through the categories, what they are and what

6    they mean.

7    A.   So categories tell us what the status of the baby is.  So

8    a Category I tracing is to a 99 percent probability a healthy

9    baby.  It's a baby with a normal baseline.  It's a baby that

10   doesn't have what we call variable or late decelerations.  It

11   could have accelerations or not.  And it has good beat-to-beat

12   variability -- the beat-to-beat variability is above five

13   beats per minute -- five beats per second, excuse me.  So

14   normal beat-to-beat variability, normal baseline, lack of

15   decelerations.  And that's a Category I tracing.

16        A Category III tracing is as bad as it gets.  That's that

17   -- you take a ruler, and it looks like someone -- there's no

18   variability.  There's absent beat-to-beat variability.  And

19   with that, you either have repetitive late decelerations --

20   one of the kinds of decelerations we're going to talk about --

21   repetitive variable decelerations.  You could have something

22   called sinusoidal pattern.  So it's the worst you get.

23        And then you have something in the middle called a

24   Category II tracing.  And a Category II tracing simply is

25   defined as not a Category I or a Category II -- or III, excuse

1    me.  It means it's indeterminate.  You're not reassured, but

2    you're not scared out of your mind that the baby's in trouble.

3    You haven't determined what's going on.

4    Q.   So it's a gray area?

5    A.   It's a gray area.

6    Q.   A question mark.

7    A.   Excuse me?

8    Q.   A question mark.

9    A.   It's a question mark.  In other words, the goal when you

10   have a Category II tracing is to move it into the Category I.

11   And you hope you're not seeing it shift closer to a

12   Category III.

13   Q.   After if Category II tracing arises and Pitocin is being

14   running, what should be done?

15   A.   The simplest thing is cut it down if you've giving high

16   doses; stop it if you're giving low doses.  It's so simple.

17   Q.   Okay.  And why?

18   A.   Because we're advocates for the mother and baby.  And if

19   you're -- the telltale sign that you're in trouble of doing

20   what you promised not to do, to do no harm, is when you see

21   this transition, you start out with a beautiful baby with a

22   Category I tracing.  And you go to this indeterminate zone,

23   this Category II.  And God forbid you go to Category III.

24   That's physical evidence that you're watching a baby getting

25   into trouble.

1          The baby didn't come in with a Category III.  If the baby

2     starts with a Category I, goes to Category II, and then starts

3     approaching or gets to a Category III, that's a baby that

4     you're watching in trouble in front of your eyes.

5          So what do you do?  You have to stop the trouble.  If

6     you're giving Pitocin, stop it.  Give the mother oxygen.

7     Increase her IV fluids.  Put her on her side to increase blood

8     flow to the uterus.

9          If you can't resolve the category and delivery is not

10    imminent, then you've got to go to plan B because we want to

11    send a healthy baby home.  You have to do a -- that's an

12    indication for a caesarian section.

13    Q.   I want to talk a little bit about careful monitoring.

14         Is it possible for the monitor to pick up the baby's

15    heart rate?  That's what it's intended to trace, correct?

16    A.   Yes.

17    Q.   Sometimes will it skip and instead of recording the

18    baby's heart rate, it can pick up the mother's rate and

19    display that?

20    A.   Yes.  It's a transducer.  It's not perfect and especially

21    in the later stages of labor, when it's hard to pick up the

22    baby, you know, minutes or an hour or so before delivery when

23    the baby is descending into the pelvis, it's hard to pick it

24    up.  You know, placement is everything with these transducers.

25    And you could end up placing it over a maternal vessel.  And

1    in fact you think you're picking up a fetal heartbeat and

2    you're actually picking up a maternal heartbeat.

3    Q.   Good, careful monitoring, if somebody is really paying

4    attention as a healthcare professional managing a labor and

5    delivery, is that something that they would discern, that

6    they're actually picking up a maternal versus a fetal heart

7    rate?

8    A.   Yes, you would discern that because, first of all, if all

9    of a sudden there's an acute change, ask yourself why is there

10   an acute change all of a sudden.  For the better or worse, why

11   is there an acute change?

12        Really simple thing, take the mother's pulse.  Take her

13   pulse and then look at what's going on on the monitor.  If

14   they're exactly the same, chances are you're picking up the

15   maternal pulse rather than the fetal pulse.  So if the fetal

16   pulse is at 150, and all of a sudden it goes to 120, and the

17   mother's pulse is 120, it's more likely than not.

18        What do you do?  If you're not sure, you put in a scalp

19   electrode.  We have the technology.  We've had it for years.

20   That technology came about in the '70s.  We're not talking

21   about state-of-the-art here.  Scalp electrodes and pressure

22   transducers have been available since the 1970s.  So this

23   isn't like -- this isn't high-tech Google kind of stuff.

24   We're talking about 1970s technology.

25   Q.   Talk to me about -- so I contacted you to perform a

1    forensic analysis of what happened in this case; is that

2    correct?

3    A.   You did.

4    Q.   And what materials have you reviewed prior -- in

5    investigating this case?

6    A.   You sent me her records.  So I looked at her antepartum

7    records for this particular pregnancy, okay?  So I don't have

8    gynecologic records prior to this pregnancy.  But to this

9    pregnancy, I looked at the midwifery records, I looked at the

10   hospital records and I looked at various depositions.

11   Q.   Okay.  Have you looked at the depositions from the two

12   nurses who were involved in the care and treatment of this

13   case?

14   A.   I have.

15   Q.   And have you reviewed the fetal heart rate tracing from

16   the Bellevue Medical Center?

17   A.   I did.  That was part of the hospital records.

18   Q.   Okay.  And have you reviewed the fetal heart rate tracing

19   that was taken on October 31st at The Midwife's Place?

20   A.   I did.

21   Q.   And have you reviewed the radiological reports that were

22   taken and generated after Sage was born?

23   A.   I did.

24   Q.   Okay.  And have you reviewed the reports of other experts

25   who are opining in this case?

1    A.    Yes, I did.

2    Q.    And was one of those a report of Patrick Barnes --

3    A.    Yes.

4    Q.    -- who is a physician at Stanford, he's a pediatric

5    neuroradiologist?

6    A.    Yes, sir.

7    Q.    Just now generally, walk us through how you go about

8    analyzing this type of case.

9    A.    So I've been doing this for -- you know, I told you I've

10   been doing this since the late 1980s.  And as an expert, I'm

11   not an advocate in this case.  The outcome of this case is of

12   no significance to me.

13        What I do is I sit down and I look at this prospectively,

14   meaning I put myself in the shoes of the healthcare providers

15   as the time goes on.  In other words, I don't look at the

16   outcome and then go back and see what they did wrong if they

17   did something wrong.  I look at things prospectively.

18        In fairness -- in fairness, I'm not going to misrepresent

19   that I don't know that there was a bad outcome here, okay?

20   Mr. Cullan sends me a case, I know there's a bad outcome.  I'm

21   going to be honest with you.

22        However, I'm an expert at this.  And as an expert, I

23   don't let that influence my analysis going through this

24   prospectively and seeing if -- would a similar person of

25   training, in a similar or same circumstance, act the way these

1    people acted?  Did they conform to the standards of care?

2    That's what I was asked to do.

3        I was asked to take a look at these records and see did

4    people comply with the standards of care when it came to the

5    labor and delivery of this patient.

6    Q.   So I guess now would be a good time to start looking at

7    the actual records involved in this case.

8            MR. PATRICK CULLAN:  May I move to the ELMO?

9            THE COURT:  You may.

10           MR. PATRICK CULLAN:  And at this time, I would offer

11   Exhibit 2 into evidence, the chart from The Midwife's Place.

12           MS. CHEATLE:  No objection, your Honor.

13           THE COURT:  Exhibit 2 is received.

14   BY MR. PATRICK CULLAN:

15   Q.   Just tell us, what does the chart contain from The

16   Midwife's Place, the antenatal record.

17   A.   So we have the antenatal records.  So when people come in

18   for their visit, the mother's blood pressure is checked, her

19   weight is checked, her urine is checked for glucose and

20   protein.  The baby's heart rate is listened to.  Any tests

21   that are done are in the records such as screening for

22   diabetes or that nature.  Conversations are documented.

23   Birthing plans are in the record.  Any events that happen,

24   especially near term in terms of phone calls and conversations

25   are all documented in the records.

1    Q.   I'm just going to -- the chart's about 80-some pages.

2    I'll start with one of the earlier visits.  This is from --

3         MR. PATRICK CULLAN:  This is page 8, for the Court.

4    A.   Okay.

5    BY MR. PATRICK CULLAN:

6    Q.   Just walk us through -- I picked this at random.  What is

7    this?  What does it show us?

8    A.   So you look up on top and you see the date of it --

9    you're all looking at it, right?

10        So you see the -- it's recorded as July 13, 2012, at

11   12:46.  And it's subjective.  It's talking to the patient.

12   Patient presents at clinic for routine OB visit, 25 weeks.

13   For EDD, which is estimated date of delivery, is October 24.

14   She currently denies any concerns so the objective element is

15   talking to her.  She tells the healthcare provider that she's

16   feeling fetal movement.  It's a positive sign.

17        Changes since the last visit, client states that her lips

18   are dry.  And they talk to the patient, ask, "How have you

19   been doing since the last visit?"  Encourages increasing

20   fluids, so...

21        And then objective, it says -- objective is data, it's

22   not about conversation.  So what this sheet is saying is go

23   look at the antepartum sheet and you'll see the data.

24        And the assessment, in other words, what the evaluation

25   of the person who saw her was; that it's an intrauterine

1    pregnancy of 25 weeks within normal limits; in other words,

2    it's a normal, ongoing pregnancy.  Continuing with the

3    prenatal vitamins.  She's told to return in four weeks, which

4    is appropriate.

5         The nurse signs the note, and it's electronically signed

6    by the nurse-midwife Heather Ramsey.  It's dated -- I guess

7    she signed it the next day, which is July 14th at 9:24 a.m.

8    Q.   Okay.  Any concerns at this stage?

9    A.   Zero.

10   Q.   And if we kind of look at the notes running up to when

11   she was at term, we pretty much can see the same thing.  It's

12   assessed to be a normal pregnancy, within normal limits, good

13   fetal movement, reassuring?

14   A.   Right.  So you can see assessment, normal first

15   pregnancy.

16        MR. PATRICK CULLAN:  I'm sorry.  I moved -- I'm

17   displaying page 20, your Honor.

18        THE COURT:  Thank you.

19   A.   You see the date up on top.  It's October 22.  And bottom

20   line is this patient's doing well by the assessment of the

21   person who is examining her.

22   BY MR. PATRICK CULLAN:

23   Q.   Okay.  And she's basically coming to term at this point

24   in time, correct?

25   A.   You're correct, yes.  Her due date is three days from

 1     this exam.

 2     Q.   I want to move to the next date.

 3          MR. PATRICK CULLAN:   Page 22, your Honor.

 4     BY MR. PATRICK CULLAN:

 5     Q.   October 29, 2012.  What's the situation here in terms of

 6     where we're at in the pregnancy?

 7     A.   So she's past her due date.  You can see the date of the

 8     exam is October 29; the due date is the 25th.  She's four days

 9     past her due date.

10     Q.   Okay.  I can zoom in a little.

11          What's the significance of that?

12     A.   Well, 90 percent of people deliver plus or minus seven

13     days of their due dates.  So the four days are not --

14     Q.   So when you move past that, that becomes --

15     A.   Then you're an outlier.  You're in the 10 percent group

16     as soon as you go beyond 41 weeks.

17     Q.   Okay.  Any concerns at this stage with anything?

18     A.   No.  According to the assessment here, we have a normal

19     first pregnancy.

20     Q.   Good fetal movement, no concerns, no complaints?

21     A.   Right.

22     Q.   Okay.  And she's taking an early discharge class.  She

23     signed up for that?

24     A.   Yes.

25     Q.   And there's mention of some of the other types of

1    classes.  She took a Lamaze-type class called Hypnobabies.

2    That's mentioned in the records.

3    A.    Sure.

4    Q.    Anything unusual with what we see when you go through

5    this?

6    A.    I don't see anything unusual.

7    Q.    Okay.  Now I'll turn to the 31st record, this is page 24.

8    A.    Okay.

9    Q.    Tell us what's the -- just read through what's happening

10   here and tell us what's important in terms of your assessment

11   of what's happening.

12   A.    Okay.  Now we have a whole different history here.  We

13   have a patient that's been saying that she's been contracting

14   for over a day, the 24-plus hours; that she's had little

15   sleep.  She's 41 weeks.  She's seven days past her due date.

16   Remember I told you statistically 90 percent of people go

17   within plus or minus seven days of their due date.  Here she

18   is seven days, complaining of regular uterine contractions.

19        She's examined.  And lo and behold, she's 2 to 3

20   centimeters dilated, she's 90 percent effaced, minus three

21   station, cephalic meaning that the head is down and posterior.

22   Q.    Okay.

23        THE COURT:  Mr. Cullan, let's go ahead and continue

24   for another ten minutes.  I can give you another ten minutes

25   this morning.

1          MR. PATRICK CULLAN:  Thank you, your Honor.

2     BY MR. PATRICK CULLAN:

3     Q.   From a standpoint of starting to weigh into the -- kind

4     of the risk analysis of a labor like this, what are we looking

5     at?

6     A.   Low risk.

7     Q.   Why?

8     A.   You have a healthy young woman who has no medical

9     problems, who is now 41 weeks, comes in complaining of a day's

10    worth of contractions, and she's dilating, which is great.

11    She's 2 to 3 centimeters, 90 percent, which is actually

12    terrific.

13         The minus three is not a red flag, it's a yellow flag.  I

14    wish she was at zero station.  Most first-time mothers would

15    be at a zero station.  So there's a little bit of concern

16    about the fitting of the baby.

17         But at this point, I would tell her I have a small

18    concern about that minus three station; but otherwise, my

19    diagnosis of this -- on this day is that she's in the early

20    stages of labor, what we call the latent phase of labor.

21    Q.   Okay.  We mentioned effacement and what that is.  Tell us

22    about the percentage.  She's 90 percent effaced.  Tell us what

23    that is.

24    A.   That's very significant.  Most first-time mothers, they

25    dilate a lot before they efface a lot.  And so they get to 4

1    or 5 or 6 centimeters, and still 40, 50, 60 percent.  The hard

2    work in laboring, the painful work, is the effacement, not the

3    dilating.

4         That generally takes longer -- that's like a latent phase

5    of labor, can be up to 20, 24 hours in a first-time mother.

6    They're not dilating much, but they're effacing.

7         So the fact that she's 90 percent and have to get to a

8    hundred, that's really terrific.  I must tell you, I don't see

9    too many first-time mothers presenting 90 percent effaced when

10   they first present in the early phases of labor.  This is

11   terrific.

12   Q.   I want to in detail go through the objective section of

13   this.  We heard in opening statement that there's going to be

14   representations that Sage's brain was eaten away two to three

15   days before she ever arrived at the Bellevue Medical Center.

16   Okay?  I'm going to represent that was said to the jury.

17        Now I want you to walk through the objective findings --

18   and explain again what objective means.

19   A.   Objective is what you're -- objective is what -- it's the

20   factual information.  Subjective is a conversation; objective

21   is the data you're collecting.

22   Q.   So walk us through the objective evidence that's

23   available to us from this day.  And tell us how it relates to

24   whether or not this child's brain has been eating -- has been

25   eaten away or is being eaten away at this time.

1    A.   So the most important --

2         MR. WELCH:  Let me interpose an objection, no proper

3    and sufficient foundation for this witness.  He's an expert in

4    obstetrics, not in neonatology, not in neurology.  So it's

5    asking for a counter opinion, and I don't believe he's

6    qualified under Rule 702.  And it wasn't disclosed.

7         THE COURT:  That can be addressed on cross.

8    Overruled.

9    A.   So if you look at the second sentence on the first line:

10   "See NST which is reactive."

11        So what that means, they put a belt on with a kind of

12   external monitor we talked about, and they evaluated the

13   baby's heartbeat.  And reactive is the best you can do.  That

14   means there are good accelerations.

15        I can tell you statistically that 999 out of 1,000 babies

16   are healthy, well babies when the NST is reactive.  It's a

17   very reassuring sign.  It's what we call an antepartum

18   evaluation.  It's not an in-labor evaluation.  But when we see

19   these accelerations which defines what a reactive nonstress

20   test is, it's extremely reassuring.

21   BY MR. PATRICK CULLAN:

22   Q.   We'll look at that in a minute.  But anything else from

23   the objective assessment to even suggest any evidence of a

24   brain being eaten away?

25   A.   No.  With all due --

1           MR. WELCH:  Your Honor, again I have to interpose the

2     same objection, no proper and sufficient foundation; also

3     outside of the Rule 26 report.

4           THE COURT:  Well, overruled.  He may answer.

5     A.   I would say based on the reactive nonstress test, with

6     all due respect, that's a ridiculous statement to suggest the

7     baby's brain is being eaten away.  To a 99.9 percent

8     probability, you have an intact central nervous system with a

9     reactive nonstress test.

10    BY MR. PATRICK CULLAN:

11    Q.   Why is a nonstress test done?

12    A.   Because she's not going to go to the hospital and she's

13    not going to stay at the birthing center.  So this is a

14    patient that wants to do things as naturally as possible.

15          So before you send the patient home -- because she is

16    laboring, she's 2 to 3 centimeters, she's 90 percent, she's

17    reporting contractions, she hasn't slept well in over 24

18    hours.

19          Before you send her home, here's the term again, you want

20    to do no harm.  You want to make sure that the baby's okay.

21    And the best way to make sure the baby is okay is to do a

22    nonstress test.  It's a very good thing they did the nonstress

23    test.  But we know, there's great clinical data, that when the

24    test is reactive, the baby, to approaching 100 percent

25    probability, greater than 99 percent probability, is fine and

 1    neurologically intact.

 2    Q.   So the whole purpose of the nonstress test is to make

 3    sure that Sage is doing well before they send her home.

 4    A.   Absolutely.

 5    Q.   Now, in the records -- this will be page 26, 27, and 28.

 6    And I'll just lay the -- 26 up, and it's sideways --

 7    A.   Uh-huh.

 8    Q.   -- as it was printed.  And this is how these medical

 9    records were provided to us during litigation.

10    A.   Okay.

11    Q.   Take a moment and explain what it is we're looking at

12    here.  And I think you can use the screen to make --

13    A.   Sure.  So what you're looking at is a classic reactive

14    nonstress test.  Can I use my finger on this?  Oh, great.

15         So here, you see these -- this is an acceleration.  This

16    is an acceleration.  This is an acceleration.

17         So you have nice variability that you all see.  It

18    doesn't look like somebody took a ruler and went across the

19    screen there.  You see those ups and downs, the variabilities

20    in contractions.  They look beautiful.

21         And you see, you know, these -- here's a contraction

22    here.  So she's contracting; she's not contracting a lot.  And

23    this is just a beautiful reactive tracing.  And I would have

24    sent her home as well.

25    Q.   Okay.  And it goes on.  They recorded Sage about a half

1    an hour --

2              THE COURT:  To remove the marks, I believe you touch

3    on the lower right side --

4              MR. PATRICK CULLAN:  I just did.

5              THE COURT:  Very good.  Thank you.

6    A.   So if you look here, this is sort -- that's sort of a

7    baseline, okay?  And you see these beautiful accelerations

8    here and here and here.  It's just another contraction here.

9    This is a contraction pattern not occurring too frequently.

10   So what you're seeing is somebody who is contracting, no

11   question about it, a beautiful reactive tracing.

12   BY MR. PATRICK CULLAN:

13   Q.   I want to point one thing out.

14             MR. PATRICK CULLAN:  I would offer Exhibit 3 at this

15   time.  And this is the fetal heart rate tracing from the

16   Bellevue Medical Center.

17             THE COURT:  Exhibit 3 is already in evidence from the

18   pretrial conference.

19             MR. PATRICK CULLAN:  Okay.

20   BY MR. PATRICK CULLAN:

21   Q.   Now, this strip that's been photocopied and provided to

22   us is actually what it would look like if it's coming out of a

23   machine, correct?

24   A.   Yes.

25   Q.   The dimensions, the time scale, correct?

1    A.   Yes.

2    Q.   And that's completely different -- I just want to clarify

3    this.  We're going to be looking at this later.

4              THE COURT:  And what is that exhibit?

5              MR. PATRICK CULLAN:  Exhibit 3, page 1.

6              THE COURT:  Thank you.

7    BY MR. PATRICK CULLAN:

8    Q.   And just -- tell us the difference between the two

9    monitors strips, the one we're looking at from Bellevue that

10   we're going to look at here in a minute and the one from The

11   Midwife's Place.

12   A.   Well, you can see it's a different -- it's on a different

13   pattern, okay?  It's just -- it's not the same.  That if you

14   look here, these dark -- there's -- these lines are one-minute

15   lines.  You don't see -- these tiny little boxes are ten

16   seconds, so you don't get to see that so well down below.

17        So the grid is -- the grid appears differently.

18   Q.   So they're different scales completely?

19   A.   Yeah, they're different grids.

20   Q.   But the principles are identical.

21   A.   Yes.

22   Q.   So I just want to follow up.  This is page 2 of the

23   nonstress test, page 27 of the exhibit, and again during this

24   time frame, anything other than an absolutely health baby

25   represented here?

1    A.    No.  I would call this tracing reactive, just as they do.

2    And reactive tracing means to the highest statistical

3    probability that you're dealing with a well baby.

4    Q.    What would you say if somebody came in and represented

5    that this is not reactive, that this is bad?

6    A.    If someone called this nonreactive, I would challenge

7    them.

8    Q.    Correct.  Is there any object -- we saw contemporaneously

9    -- before any lawsuit, it was called reactive.  Would there be

10   any reason now to try and represent this as anything else?

11   A.    No.  What was stated in the records is correct.  It's a

12   reactive nonstress test.  We're all looking at the

13   accelerations here.  They're beautiful.  A reactive nonstress

14   test is defined as two -- as two accelerations in a 20-minute

15   window that are 15 beats lasting 15 seconds above the

16   baseline.  And right here you see it.  Here's one and here's

17   one right here.

18   Q.    And that's nowhere near 20 minutes.  This is, I think --

19   I think these are six-minute panels.

20   A.    No, this is just a nice reactive tracing.

21   Q.    And then finally the last page of that tracing...

22   A.    Here you see another contraction down here.  You see

23   another acceleration right there.

24         So it's a pattern that if the patient was not ready to go

25   to the hospital, I would feel most comfortable sending her

1     home.

2             THE COURT:  Mr. Cullan, it is now 11:40.  So we will

3     recess until two o'clock.  Please come back and assemble in

4     the jury deliberation room before two o'clock, and we will

5     resume at that time.

6         Thank you.  We are in recess.

7         (Jury out and recess taken at 11:41 a.m.)

8         (At 2:06 p.m. on July 28, 2015, with counsel for the

9     parties, plaintiff Doran Schmidt, and the defendant's

10    representative present, and the jury NOT present, the

11    following proceedings were had:)

12            THE COURT:  Do we need to discuss anything before the

13    jury comes in?

14            MR. WELCH:  No, your Honor.

15            MR. PATRICK CULLAN:  No, your Honor.

16            THE COURT:  All right.  Please bring in the jury.

17       MARTIN GUBERNICK, PREVIOUSLY SWORN, RESUMED THE STAND

18        (Jury in at 2:06 p.m.)

19            THE COURT:  Please be seated.

20        Mr. Cullan, you may continue with your direct

21    examination.

22            MR. PATRICK CULLAN:  Thank you.

23                          DIRECT EXAMINATION

24    BY MR. PATRICK CULLAN:

25    Q.   Dr. Gubernick, I know you have a flight to catch.  We're

1    going to try and expedite getting through yours so defense

2    counsel has time to ask you questions as well.

3    A.   Thank you.

4    Q.   We left off with -- on October 31st, they had done the

5    assessment and sent Doran home.  And she went into the

6    Bellevue Medical Center the next morning?

7    A.   Yes.

8    Q.   I just want to go through those records quickly so that

9    we've seen them and know how to interpret them.

10        So this is the record.  And tell me if I'm not correct,

11   the times of various events are labeled here on the side.

12   A.   Yes, they are.

13   Q.   And then vital signs are recorded for Mom, for Doran, in

14   the second column.

15   A.   Yes, they are.

16   Q.   The third column is the fetal heart rate, how Sage is.

17   A.   You're correct.

18   Q.   And then contraction information.

19   A.   Yes.

20   Q.   And assessments.

21   A.   Yes.

22   Q.   Now, I just want to focus in on a few assessments.

23        First of all, they're very hard to read, but at any time

24   was there any concern on anyone's behalf as to Sage?

25   A.   No.

1    Q.   And if we go to 7 -- sorry, 5 a.m., did they do the first

2    vaginal exam?

3    A.   Yes.  She came in at approximately one o'clock in the

4    morning.  First vaginal exam was done at 5.

5    Q.   And she was 7 --

6    A.   She was 7 centimeters, 100 percent effaced, and minus one

7    station.

8    Q.   So 100 percent effaced, is there anything left to do in

9    terms of effacement?

10   A.   No.

11   Q.   Okay.  And the minus one station, what does that mean?

12   A.   The head's getting close to being engaged but not engaged

13   yet.

14   Q.   Okay.  Still not engaged?

15   A.   Right.

16   Q.   And then if we turn now -- this is just -- I just want to

17   briefly mention this.  At 8:35 it's recorded that she had an

18   SROM.  What's that?

19   A.   Spontaneous rupture of membranes.

20   Q.   And what's it state after that?

21   A.   "Clear fluid."

22   Q.   And what's the significance of that?

23   A.   Well, amniotic fluid is normally clear.  If the baby is

24   under any kind of stress in utero, they have a bowel movement

25   in utero.  And we call that meconium.

 1          So we like to see clear fluid because that means the

 2     environment inside is a healthy environment and the baby

 3     hasn't been stressed by any sort of thing.

 4     Q.   What's the risk now that the rupture -- the membranes

 5     have ruptured?

 6     A.   So the baby is in this environment, this balloon, called

 7     amniotic fluid, amnion.  And as soon as the membranes are

 8     ruptured, the clock is sort of ticking in terms of the ability

 9     for infection to ascend, to go up from the vagina, where

10     there's normal bacteria, into the cervix, into the uterine

11     cavity now that it's open because the membranes are ruptured.

12          So the clock is ticking in terms of the risk of

13     infection.

14     Q.   And then if we move down, at ten o'clock they check her

15     again and she's still at 7.  And the plan is then to do what?

16     A.   At ten o'clock, they're going to recheck her one more

17     time, I think, in the future.  And if her exam does not

18     change, she's going to be transferred to the hospital where

19     she's going to receive IV Pitocin.

20     Q.   Sorry, I was off on the thing.  It's "transfer to

21     hospital," correct?

22     A.   Right.  She's examined at ten.  I think you missed one

23     more exam at 11.  And then the decision is made to transfer to

24     the hospital about 11:20.  And she gets to the hospital

25     approximately noontime.

1    Q.   Okay.  Now I just want to turn to the hospital.

2              MR. PATRICK CULLAN:  This is Exhibit 3, page 1 for

3    the Court.

4    BY MR. PATRICK CULLAN:

5    Q.   And this is the fetal tracing that the hospital provided

6    in litigation, correct?

7    A.   Yes.

8    Q.   And there's approximately 18 -- each one of these boxes

9    is one minute.  Is that true?

10   A.   Yes, you're correct.

11   Q.   As we're looking here through this first almost hour of

12   tracing, is that evidence of adequate uterine activity?

13   A.   It looks that way, sure.

14        In other words, this is an external system, okay?  So we

15   don't know the amplitude of the contractions.  But certainly

16   the frequency of the contractions are very good.

17   Q.   Okay.  And there's adequate rest?

18   A.   Yes.  There's good rest.  Yeah, sure.

19   Q.   Okay.  And how is Sage doing in terms of her heart rate?

20   A.   Great.

21   Q.   Okay.  And then --

22   A.   Good accelerations, good beat-to-beat variability, no

23   decelerations.  So this is a reassuring tracing, a Category I

24   tracing.

25   Q.   And the nurses -- this is just kind of -- this is

1    Exhibit 4.  The nurses, when they were deposed, had to mark up

2    the tracings.  And they circled the contractions.  And they

3    noted if it's a Category I tracing or if it's a Category II.

4    And everybody agrees that Sage comes in at a Category I,

5    correct?

6    A.   Yes.

7    Q.   Just going back to the clean copy, if there's adequate

8    uterine tracing evidenced by the external monitor, is there

9    any indication to start Pitocin?

10   A.   No, because if -- again, it gets back to those Ps we

11   talked about.  If the power looks good, if she's contracting

12   well, there's good resting tone in between the contractions,

13   and power is not the issue, there's absolutely no indication

14   for Pitocin.

15   Q.   Okay.  They start the Pitocin and just -- here's the next

16   kind of hour of strip.  What has changed?

17   A.   It looks like a whole -- you know, it's a whole different

18   pattern.  I mean, just take a look at that.  See how more

19   frequent the uterine contractions are, how there seems to be

20   less resting -- especially if you go down to the bottom.

21       Do I have a finger here?  Yeah, I can do it.

22   Q.   Oh, sorry.

23   A.   If you look over here and you look over here, you're

24   starting to see the contractions are not coming down to

25   baseline before the next contraction starts.  So this is a

1    whole new ball game.

2         And if you look over here --

3    Q.   Sorry.

4    A.   If you look over here, these two little couplings that

5    you have here...

6    Q.   Okay.

7    A.   So all of a sudden, you start the Pitocin.  Obviously the

8    person's sensitive to the Pitocin.  They started two

9    milliunits.  And the contraction pattern looks totally

10   different.

11   Q.   Okay.  The contraction pattern, let's just walk through

12   that.  These types of things that are appearing with the heart

13   that we start to see more frequently --

14   A.   Right.  Those are called variable decelerations.  And by

15   definition, once you start seeing those, that's a Category II

16   tracing.

17   Q.   Okay.  And you mentioned just -- for instance, does this

18   contraction return to baseline --

19   A.   No.

20   Q.   -- before the start of another?

21   A.   No.  You see this here?  You see this here?  There's no

22   return back to baseline.

23   Q.   So if we look and contrast that to the first

24   monitoring -- I'm going to put up page one underneath page two

25   so we can see the first tracing, how are the contractions

1    different?

2    A.   Day and night.  Just look at it.  Before the contractions

3    go down to a zero baseline.  There's good resting time in

4    between the contractions.  She's having adequate contractions,

5    three contractions in ten minutes is adequate contractions.

6         And all of a sudden, you're seeing the contractions

7    getting bunched together.  They're coming more frequent.

8    They're coming on top of each other.  And there isn't full

9    relaxation of the uterus before the start of the next

10   contraction with some of these contractions.

11   Q.   Okay.  The heart rate category here is a what?

12   A.   It's a II.

13   Q.   Okay.  And the medical science and safety principles

14   applicable to heart rate monitoring, if you get a Category II

15   and you're on Pitocin, what should happen?

16   A.   You should turn down or turn off the Pitocin because you

17   want to move it back to a Category I.

18   Q.   Okay.  At this point in time, how much is the load?

19   A.   Load?

20   Q.   Two milliunits?

21   A.   She's getting two milliunits.

22   Q.   So can you turn that down or do you have to turn it off?

23   A.   You have to turn it off.

24   Q.   Okay.

25            MR. PATRICK CULLAN:  Your Honor, at this time, just

 1    to kind of go through some highlights, the doctor prepared a

 2    summary of events.  I'd like to use this as a demonstrative

 3    aid.  Would that be appropriate?

 4            MR. WELCH:  My only objection is, Judge, it's never

 5    been provided to us, so I can't verify what's on there is

 6    accurate or not.

 7        If the witness wants to refer to it, that's fine.  But I

 8    haven't checked the accuracy of it so I don't think it should

 9    be published to the jury.

10            THE COURT:  All right.  Unless you want to take the

11    time to give defense counsel a copy and have defense counsel

12    review it and then register any objection --

13            MR. PATRICK CULLAN:  I'll hand it to you.

14            MR. WELCH:  I don't have time to sit there and match

15    up the times with the records.

16            THE COURT:  All right.

17            MR. PATRICK CULLAN:  That's okay, your Honor.

18            THE COURT:  Objection sustained.

19            MR. PATRICK CULLAN:  Okay.

20    BY MR. PATRICK CULLAN:

21    Q.   I just want to walk through a couple more pages.

22        The actual strip itself is, I think, 19 pages -- or 17

23    pages?

24    A.   Yes.

25    Q.   And so this is just hour after hour after hour of

1    recordings, correct?

2    A.   Yes.

3    Q.   Does the fetal heart rate ever return to a Category I?

4    A.   No.

5    Q.   Does the uterine activity ever not -- is it -- are there

6    times when it's actually not excessive?

7    A.   In the course of the entire labor here, we may find a

8    small window where the contractions have spread out.  But we

9    look at the overall pattern.  And the overall pattern here is

10   a tachysystole, poor resting in between contractions, periodic

11   coupling meaning contractions one on top of each other, and

12   periodic tetanic contractions which are contractions that last

13   too long.

14        So over all, it's a contraction pattern that we don't

15   like to see because it's concerning that the baby's oxygen --

16   that the oxygen flow to the baby can be compromised.

17   Q.   Okay.  Now it's in here -- the Pitocin was just started.

18   Is it in here, according to the medical records, that the

19   patient starts to complain of significant pain and requesting

20   epidural intervention?

21   A.   Yes.

22   Q.   Okay.  Just walk us through what the monitor is picking

23   up here, if anything.

24   A.   I would say that's a loss of information.  There's a

25   classic example of where the baby could be moving, the mom

1    could be moving, whatever.  And we're missing information, and

2    that's always concerning when you're using a drug like Pitocin

3    to not be seeing what's going on.

4    Q.   Okay.  Now at some point in here, she is getting an

5    epidural; is that correct?

6    A.   Yes, approximately, I think, about 4:15.

7    Q.   Okay.  But she's not getting an epidural for 30, 40

8    minutes, is she?

9    A.   30, 40 minutes from this time?

10   Q.   Throughout that time.

11   A.   Yes, that's correct.

12   Q.   So if the nurse -- and I think the records will reflect

13   someone's charting the uterine frequency, the duration, and

14   the strength of the contractions.  Certainly they're not

15   gleaning this information from what we're looking at right

16   here on page 3 of the tracing, correct?

17   A.   Not from here, they're not.

18   Q.   So if they're remote monitoring at the desk, there's just

19   no way you can document anything with respect to contractions,

20   true?

21           MR. WELCH:  Objection, leading and suggestive.

22           THE COURT:  Please rephrase.

23           MR. PATRICK CULLAN:  Sure.

24   BY MR. PATRICK CULLAN:

25   Q.   Can a nurse at a nursing station, for instance, on this

1   last strip -- this is 20 minutes -- tell anything about the

2   contractions?

3   A.   She can't tell anything; I can't tell anything.

4   Q.   You'd have to -- what would you have to do to get any

5   information?

6   A.   You have to either readjust the Toco or put in an

7   internal pressure catheter.

8   Q.   Okay.  And again is there any return to baseline with any

9   of the contractions here on page 4?

10  A.   No.  No.

11  Q.   Potentially good rest here?  I mean, that's over a

12  minute, correct?

13  A.   That looks okay.

14  Q.   Okay.  And then we have some contractions here where we

15  don't, but what's happening here with respect to the

16  contractions?

17  A.   I think they're just coming -- I mean, again we're all

18  looking at this.  They're just coming one on top of the other.

19  Q.   But we're getting --

20  A.   And instead of getting that nice little flat area in

21  between the contractions, you're starting to get that loopy

22  look because it never really comes down and stays down.  In

23  other words, as it's starting to come down, it's getting ready

24  to go up again.  So it starts to get that loopy look of

25  contraction after contraction.

GUBERNICK - DIRECT                                              300

1    Q.   But this is over a minute of contractions.  So is that --

2    doesn't that make everything okay?

3    A.   This is not okay.  This is a tachysystole.  There's too

4    many contractions, not enough rest between the contractions.

5         And what's evident here is that we're starting to see --

6    we're starting to see decelerations, albeit at this point

7    relatively minor, but decelerations that a reasonable

8    healthcare provider would conclude is secondary to the

9    tachysystole that they've created with the Pitocin.

10   Q.   Did Sage demonstrate in that first hour of tracings any

11   of these types of decelerations or anything?

12   A.   No.

13   Q.   Just turning again, you know, we have times where Sage is

14   getting good rest, correct?

15   A.   Right.  That's what I said.  It's not continuous.  There

16   are some contractions with the arrest.  But then, I mean, look

17   down at the bottom there.  Look what's happening at the bottom

18   right.  I mean, you're not getting any rest there.  The

19   contractions are coming one on top of the other.

20        Start to look up on top.  Remember when I talked about

21   the straight line?  It's not looking as variable as it used to

22   look.  I'm not saying that is a straight line, that's not

23   absent variability.

24        But look here.  That doesn't look like what we saw

25   before.  That's starting to get kind of straight.  And that's

1    a reflection of oxygen delivery to the baby.  And no surprise

2    when you start doing this (indicating), you're going to start

3    getting this (indicating).  Okay?

4         So that's what we're seeing.  So what needs to happen

5    here?  Pitocin needs to be shut off.

6    Q.   I'm going to just keep kind of cruising through this.

7         We see more of the same.  Are these couplets you called

8    them?

9    A.   I would actually argue it's not more of the same, it's

10   starting to look a little worse.  Because that's starting to

11   look a little flat.  That's almost looking like you're using a

12   ruler.  That clearly is looking like you're using a ruler.

13        Look at this over here.  And you have these

14   decelerations.  So it's not more of the same, it's worse.

15        And there's another deceleration.  And there's some

16   coupling.

17        And look at this, look what's going on here.  I mean,

18   this is not an okay labor pattern.  And this is a labor

19   pattern that -- again, I'm going to use that word iatrogenic.

20   This is being induced by them giving Pitocin, and they've got

21   to stop the Pitocin.

22   Q.   Okay.  Any rest between these three contractions here?

23   A.   No rest here.  More decelerations here.  More flattening

24   up here.  Look at the runs of contractions here.  Look what

25   this looks like down here.

GUBERNICK - DIRECT                                                    302

1          So what's happening is the contractions -- we've gone

2     through this a good part of the day today.  The contractions

3     are coming one on top of the other, the muscle's contracting

4     too frequently, the blood flow through the muscle's getting

5     depressed, the oxygen delivery to the baby is getting

6     depressed, and you're seeing what's happening.

7     Q.   And this is -- okay.  This is seven o'clock.  This is the

8     shift change.

9     A.   Yes.

10    Q.   Okay.  And this deceleration here is when the nurse left

11    and made some notations in the chart.  Do you recall that?

12    A.   Yes.

13    Q.   Okay.  And what was the significance to the nursing

14    staff?  She documented a prolonged deceleration.  What's the

15    significance of --

16    A.   There's an audible prolonged deceleration.  Baby's heart

17    rate went down below 15 beats between two and ten minutes.

18    And the Pitocin -- I believe it was at that point that the

19    Pitocin was turned off.  So somewhere around here, the Pitocin

20    is being turned off.  I can't read that print there on screen.

21    Q.   Yeah, the print's small.

22    A.   But somewhere around 7:20 --

23    Q.   Oxytocin off --

24    A.   -- so that --

25          THE COURT:  Wait, wait.  We can't have two people

1    talking at the same time.

2    A.   I think that says "Pitocin off".  Yeah, there we go.

3    Here.  "Pitocin off," which is great.  Turn off the Pitocin.

4    And that's the response what they're seeing to what I would

5    call a nonreassuring heart rate pattern.

6    BY MR. PATRICK CULLAN:

7    Q.   Okay.  Now it was essentially -- if someone comes in and

8    represents that the Pitocin was being turned off so Mom could

9    rest, is that a valid...

10   A.   First of all, she's got an epidural in there for three

11   hours.  So she can rest?  I don't know what that means.

12   Q.   Okay.  So the Pitocin is turned off.  And then oxygen by

13   -- and then it's interrupted because of the way that the thing

14   prints -- but according to the medical records, from here on

15   out, Mom is wearing an oxygen mask, according to the records,

16   true?

17   A.   Yes.

18   Q.   What's the purpose of the oxygen mask?  What are they

19   concerned about?

20   A.   Well, what they're concerned about -- they're not

21   concerned about the mother's oxygen status, they're concerned

22   about the baby's.

23        So it's a general resuscitative measure that if the blood

24   supply to the baby is being diminished, you want to maximize

25   the amount of oxygen in that blood to get the most oxygen you

1   can get to the baby.  So you put 100 percent oxygen on the

2   mother.

3   Q.   The medical records reflect that -- we haven't seen with

4   these medical records, but it's at this time that Heather

5   Ramsey was paged, correct?

6   A.   Yes.

7   Q.   Okay.  And was a vaginal exam done -- I don't know if

8   it's reflected here.  Let's just stop here and look at the

9   tracing.

10  A.   Yeah.

11  Q.   Is this good information about what's happening to Sage's

12  heart in this time frame?

13  A.   No.  There's too much missing information.  This

14  patient -- they need a scalp electrode to be put on the baby,

15  especially with what we're seeing has been going on.

16  Q.   Okay.  That's recovery notes.

17       Just so we can introduce the -- a little bit about the

18  medical records here, these are the Bellevue records that

19  correspond with this time frame.  And I just want to point out

20  how these are set up.  So there are times that run across and

21  then there are columns.  And underneath the times are charted

22  what's taking place at those various time periods, correct?

23  A.   Yes.

24  Q.   And the categories of what is being charted is here?

25  A.   Yes.

1    Q.   And so, for instance, they typically chart if there's an

2    exam, who the examiner is, the vital sign for the mom, the

3    baby's heart rate, the uterine activity.  And that's kind of

4    what's discussed throughout.

5    A.   Yes.

6    Q.   Correct?

7    A.   Uh-huh.

8    Q.   And so if we look at this, the heart rate is continually

9    being described as a Category II, correct?

10   A.   Yes.

11   Q.   I don't know if that blows up.  So they're documenting

12   what they think the category is.

13   A.   Yes.  This is -- I didn't see it on the left, what time

14   you're talking about.  But yes, shortly after the start of

15   Pitocin, they're almost continuously -- almost continuously

16   reporting a Category II tracing.

17   Q.   Okay.  And at this time, the Pitocin is off -- turned

18   off, it is?

19   A.   Yes, I believe it was turned off around 7:20 or so.

20   Q.   1921?

21   A.   There you go.

22   Q.   Sorry.

23   A.   7:21.

24   Q.   And just prior to that, they had paged Heather Ramsey,

25   correct?

1    A.   Yes.

2    Q.   So Heather is not there actively participating in this,

3    correct?

4    A.   Right.

5    Q.   This kind of splits to the next page, but they reported a

6    deceleration for five minutes.  What does that mean?

7    A.   That, by definition, is a prolonged deceleration; greater

8    than two minutes, less than ten minutes.

9    Q.   So many Sage's heart dropped out of the normal range for

10   five minutes, correct?

11   A.   Yes.

12   Q.   And if you actually look at the tracing, did it continue

13   for longer than five minutes?

14   A.   I think so, yes.

15   Q.   But then you lose the actual heartbeat.

16   A.   Then we lose some information, correct.

17   Q.   So we see her heart was going along, and then it dropped.

18   And it dropped through the rest of this page.  And then at the

19   beginning of the other side of the page, it's just

20   indistinguishable activity, correct?

21   A.   Yeah.  You can't see on the monitor.  I mean, you get

22   some inkling of what's going on.  They can hear it on the

23   monitor sometimes, so they're describing it being five

24   minutes.  It looks a lot longer than five minutes though.

25   Q.   At this time, the records reflect also that an IV bolus

1    was given.  What's that for?

2    A.   Well, what you want to do is you want to increase blood

3    flow to the baby.  This is all about delivery of oxygen to the

4    baby.

5         One of the ways to do it, put a mask on, give her more

6    oxygen.  Another way to do it is to fill up her vascular

7    system with fluid so that the heart's, you know, pumping as

8    much fluid as possible.  So you give a lot of fluid, what we

9    call an IV bolus, to get the heart moving lots of fluid, lots

10   of blood, to the placenta.

11   Q.   Okay.  And just quickly again, not much rest -- I think

12   we did this one actually.

13   A.   Right.

14   Q.   But in fairness, at times potentially that's over the

15   60-second rule -- I mean the 60-second standard.

16        MR. PATRICK CULLAN:  Sorry.  I'll withdraw that

17   question.

18   BY MR. PATRICK CULLAN:

19   Q.   Turning to the next chart, just walk us through what you

20   see here.

21   A.   So here's an example -- and they've turned the Pitocin

22   off.  And I would have anticipated prospectively that the

23   contractions would slow down.

24        But what happens with some people, even though I told you

25   the half-life of Pitocin is a minute and a half, you get this

1    muscle memory.  Once you get the muscle contracting, it just

2    doesn't stop.  It's gotten used to contracting every minute,

3    minute and a half.  I wouldn't have -- prospectively I

4    wouldn't have anticipated this.  But look, she's still over --

5    she's overcontracting here, even off the Pitocin now.  And the

6    baby has variable decelerations.  We just finished a prolonged

7    deceleration.

8        This woman was stuck at 7 centimeters for almost 13

9    hours.  And now we're getting into the 14-, 15-hour range.

10   This has been -- it's my opinion that this has been going on

11   way too long and this baby is in harm's way.

12   Q.   Okay.  So if we continue now just to the next page, what

13   do we see?  Sage -- does she have a Category I heart rate

14   tracing?

15   A.   No, this is not a Category I.  I mean, there are

16   decelerations all over.  They're all over the place, the

17   decelerations.  So this is anything but a Category I.

18       And you've got -- still, even off the Pitocin, you have

19   these tetanic contractions.  That happens occasionally from

20   muscle memory.  Once you get the uterus started with an agent

21   like Pitocin, even when you pull back on the Pitocin, you're

22   still going to get the hyperstimulation.

23   Q.   What is a tocolytic?

24   A.   So we have agents that we use -- it's just the opposite.

25   First, you're giving Pitocin to increase the contractions.

1    Then we have these agents that we use to slow down the

2    contractions.  And we have those and those weren't used here.

3    But these contractions are coming too frequently now.

4    Q.   Is this adequate monitoring of her heart, page 9?

5    A.   No.  I don't believe -- I don't like the fact that we're

6    missing information.  We're missing information.

7         Again, if you had a beautiful tracing up here and then

8    you just occasionally lost some information, I wouldn't get

9    too excited over a minute or two of missed information.

10        But this tracing, you're looking at a tracing that if

11   it's going to go on, it's going to go no place but bad.  The

12   contractions are happening too often; the baby's responding to

13   these too often contractions with more and more decelerations;

14   we have intermittent diminished beat-to-beat variability -- as

15   I show you now, the variability is back, it was diminished

16   before.  And if this is allowed to go on, a reasonable

17   healthcare provider will anticipate that this baby is going to

18   get into trouble.

19   Q.   Okay.  And I think the records will reflect the nurse is

20   actually denoting that she's losing the heart information

21   during the contractions.  Didn't she record that?

22   A.   Yes.

23   Q.   If she's -- what is required of a healthcare

24   professional, a labor and delivery nurse, who knows -- she's

25   even documenting that she's losing the information during the

1    contractions?

2    A.   We're all -- we're advocates for the baby.  What do you

3    have to do if you're losing information?  This is 2012.  Put a

4    scalp electrode on.  Easy.  It takes literally about ten

5    seconds to put a scalp electrode on.

6    Q.   And that's what we talked about earlier?

7    A.   Yes.

8    Q.   And here -- more of the same?

9    A.   More of the same.  More of the same.

10   Q.   Now what are these big changes in --

11   A.   These are decelerations.  And these are certain kind of

12   decelerations that we call late decelerations.  This is an

13   example of poor perfusion through the placenta.  And we got

14   lots more decelerations we're starting to see again.  You all

15   see this.  We're starting to see the diminished beat-to-beat

16   variability here again, here and here.

17        I'm worried that even when it looks okay here, this could

18   just be artifact because it's an external system.  With an

19   external system, they get noise.  It sometimes looks like

20   normal beat-to-beat variability when, in fact, it's

21   diminished.  That's why she needs a scalp electrode.  Because

22   in lots of areas, you're seeing diminished beat-to-beat

23   variability.  And you're also seeing lots of little

24   decelerations going on here.

25        And this is a baby in trouble.  This is a baby that needs

1    to be rescued.

2    Q.   Okay.  Now we're at 10:30 here.  How would you describe

3    this contraction monitoring?

4    A.   I can't interpret that.  You know, you see -- remember

5    before how we had the nice hills and we were looking at the

6    hills?

7         Now look at this.  What are we seeing?  There's missing

8    information here.  I can't say for sure.  Is this a

9    contraction?  It might be.  Is this a -- I don't know.  You're

10   seeing what I'm seeing.

11        Now we're starting to get, you know, googly-goo here.  I

12   don't know what all of this is.  I'm concerned about what's

13   going on there.  Is there enough arresting tone?  How long are

14   there -- are these two contractions here or not, one on top of

15   the other?  That would be worrisome.

16   Q.   Okay.  And just turning now, we're approaching midnight.

17   And I want to focus on a couple things here, just the

18   contraction frequency and the amount of rest between these

19   contractions.

20   A.   So one thing I told -- remember I told you they turned

21   the Pitocin off.  What we've got to say is that they turned

22   the Pitocin back on.

23   Q.   And the time, according to the medical records, that they

24   turned -- first of all, we just went through the time.

25   A.   Right.

GUBERNICK - DIRECT                                          312

1   Q.   Was it ever a need to turn the Pitocin back on, based on

2   the uterine activity we just saw?

3   A.   No.  Because we're going to -- we're looking at this

4   screen here.  You can see what happened after turning the

5   Pitocin back on.

6   Q.   And the records reflect that the Pitocin was turned back

7   on at 9:53, so 2153 --

8   A.   Right.

9   Q.   -- which is right here.

10  A.   Pitocin is turned back on.

11  Q.   It's back on.

12       Is this contraction too long?

13  A.   Too long, and I think it's probably a couple.  It's

14  probably two contractions.

15       And again, you're starting to see that loop-de-loop again

16  that we don't like to see.  I mean, look at what's going on

17  here.  Big surprise.  She was hypersensitive to Pitocin

18  before.  They turned off the Pitocin.  She was still having

19  excessive uterine contractions.  And now they're returning the

20  Pitocin back on.

21       Well, guess what's going to happen in the next few

22  minutes.  We're going to see contractions occurring way too

23  often.

24  Q.   Okay.  Now it's also in this time frame, back when

25  they're turning the Pitocin on, that they're noting that the

1    mother has a fever.

2    A.   Yes.

3    Q.   Tell us about that and what's significant about that.

4    Quickly, if you can.

5    A.   There's something called chorioamnionitis.  And if the

6    membranes are ruptured for a long period of time, the placenta

7    can get inflamed, infected.  And then if that's allowed to go

8    on, the mother can get infected.  And if that's allowed to go

9    on too long, the baby can get infected.

10        So it's a progression from just a normal -- just an

11   inflammation of the chorion, called chorioamnionitis, to an

12   actual infection in the placenta to an infection -- the

13   placenta can actually get infected without the mother or the

14   baby being infected if the delivery happens relatively soon.

15        But if the placenta stays in the mother long enough, the

16   mother can start getting a fever, tachycardia, signs of

17   infection.  And if that's allowed to go on without

18   antibiotics for a long enough period of time, then the baby

19   gets infected.

20   Q.   Okay.  The T38.8C, what's that mean?

21   A.   It's a centigrade reading of a fever.  That's a fever.

22   Q.   On the risk factors that were existing here that this

23   could be a clinical chorioamnionitis were length of labor,

24   length of ruptured membranes, arrest of labor.  What else?

25   A.   Yeah.  If you want to --

1              MR. WELCH:  Judge, I'm going to interpose an

2     objection, extremely leading and suggestive.

3              THE COURT:  Sustained.  Please rephrase.

4              MR. PATRICK CULLAN:  I'll withdraw.

5     BY MR. PATRICK CULLAN:

6     Q.   We'll move on.

7          Was anything done at any time to treat this presumed

8     infection that now is becoming apparent?

9     A.   No.

10    Q.   Didn't they order antibiotics at one point?

11    A.   Yes.  When her fever went up to 38.6 -- and I think that

12    was around midnight, they ordered ampicillin and gent.  And

13    the pharmacy stopped it because the patient is penicillin

14    allergic.

15    Q.   You've been in many labors and deliveries.  Are the

16    patient's allergies stamped on the front of the chart?

17    A.   Yes.

18    Q.   Is it pretty much all over the chart?

19    A.   Yes.

20    Q.   If you're a professional labor and delivery room nurse

21    who's taking good active management of a patient, is that

22    something you should know?

23    A.   Yes.

24    Q.   So why was the drug not given?

25    A.   I mean, I can tell you what was said in the deposition.

1    I have no idea why it was not given.

2    Q.   Is it the standard of care to order a medication or to

3    send the order to get a medication the patient is documented

4    to have an allergy to?

5    A.   You never give a drug to -- that a patient is allergic

6    to, no; especially when there's so many alternatives.  You

7    don't have to give penicillin.  There are many other drugs

8    that you can give that aren't penicillin that are just as

9    effective.

10   Q.   Okay.  I want to talk about this strip because what do we

11   see in this particular panel?  Because Nurse McLandsborough

12   testified -- and I think she'll testify consistent with her

13   deposition -- that she had no idea what the baseline was of

14   that other than she knew the variability was diminished or

15   absent.

16        What should be happening here under these circumstances?

17   A.   An emergency cesarean section, which is just -- this is

18   just a tragedy here.  I mean, look at this contraction

19   pattern.  Look at this.  If I wanted to show somebody classic

20   hyperstimulation, look at this.

21   Q.   Is there a minute rest here?

22   A.   A minute?  I don't know if there's any rest.

23   Q.   How about here?

24   A.   I don't think there's any rest there.

25   Q.   Okay.  Now if somebody comes in and says, as a physician

GUBERNICK - DIRECT                                              316

1    practicing here in Omaha, they see this all the time, every

2    day, what would you say about that?

3    A.   Don't go to that hospital.

4    Q.   Now, this is a Category III, is it not?

5    A.   Here it's a Category III.  We lost the beat-to-beat

6    variability.  And this is an emergency.  This is -- this is an

7    absolute -- this is an obstetrical emergency, that -- this is

8    a baby that is on the slippery slope of irreversible brain

9    damage.

10   Q.   Now this is midnight here.  Sage is born another hour and

11   three minutes later.

12   A.   Yeah.

13   Q.   Let's turn the page because I want to talk about this

14   section of the strip for a moment.  Now we're going from 0016

15   to birth, 0103.

16   A.   Right.

17   Q.   The nurses documented that this is absent variability.

18   A.   This is about as bad as it gets, okay?  This is

19   practically what I would almost refer to as preterminal,

20   before death.

21        And then all of a sudden the tracing dramatically

22   improves.  But lo and behold, the heart rate is the same as

23   the mother's heart rate.  What they're doing here, more likely

24   than that, is they're just picking up the mother's heart rate

25   for a while.  They don't know what's going on.

1   Q.   I want to focus in on that section, that transition.  I'm

2   going to clear the board.

3        Just talk to us about what you're talking about.

4   A.   This is a wandering baseline up in somewhere -- I don't

5   even know if we can establish a baseline here, but the baby is

6   somewhere up in the 150s.  And you can see it's like we've

7   taken a pen and just drawn a straight line.

8        The autonomic nervous system of this baby is not working,

9   okay?  And the beat-to-beat variability is absent.  And that

10  is a -- that is a dire sign of a baby losing its neurologic

11  capability.

12       And then if we move to the right, move the sheet to the

13  right --

14  Q.   All right.

15  A.   -- that just doesn't look like the same baby anymore.

16  And you've got to ask yourself, is there a dramatic

17  improvement here all of a sudden?  Why would there be a

18  dramatic improvement?

19       But lo and behold, if you look at what's being monitored,

20  this is the mother's heart rate.  This is the heart rate that

21  she has.

22  Q.   Okay.  Then I want to go down to the end.  So for

23  instance, if we just look in here, the mother's heart rate is

24  actually displayed; HR129.

25  A.   Yes.

1   Q.   And if we go right above that, we see what's recording.

2   And that's basically 129.

3   A.   Yes.

4   Q.   Now, if you're a professional healthcare provider who's

5   paying good attention to this labor, is that something that

6   should become apparent?

7   A.   Apparent.  And again, put a scalp electrode on.  It

8   happens to all of us that we can get confused at the very end

9   stages of labor.  It wasn't their fault that the monitor is

10  picking up baby and sometimes mom.  We're not blaming them.

11  But we have the ability to distinguish between the two.  You

12  put a scalp electrode on the baby.  This way you know you've

13  got the baby, especially when -- oh, I can't go up there.

14  Especially when you know that you had this (indicating).  I

15  mean, this is -- this baby's got to come out, you know?  And

16  if you see this and you say, well, is that the mother?  What

17  happened all of a sudden?

18       Put a scalp electrode on.  Takes seconds to do.

19  Q.   I want to talk about now a couple things.  We talked

20  about this before.  What is the science behind a Category I

21  going to a Category III as to when the injury occurred to a

22  baby?

23  A.   So that's a classic -- when we look to see when did this

24  all happen; and a classic intrapartum -- during labor -- event

25  is when you watch the tracing go from Category I, Category II

 1    to Category III.

 2         If the mom comes to the hospital with Category III

 3    tracings, you don't know when -- the injury can be difficult

 4    to time because it could have been happened before she got to

 5    the hospital, while she was in the hospital, did it start out

 6    of the hospital and just continue while in the hospital?

 7         But when you start out with a beautiful tracing, and then

 8    it goes to an indeterminate tracing, and then it goes to a bad

 9    tracing, it's pretty obvious what's happening.

10    Q.   I just want to talk for a moment about the brain injury.

11    The type of brain injury Sage has, what's the various ways you

12    can get that?

13    A.   So there are multiple pathways to get to an ischemic

14    injury -- an irreversible ischemic -- what we call an ischemic

15    encephalopathy; an injury to the brain as a result of oxygen

16    deprivation.

17         And there isn't one avenue to get there, there are many.

18    If it's acute -- and what does acute mean?  It's like throwing

19    somebody into a pool with weights and dropping them in the

20    bottom of the pool and drowning them.  If it's acute and it

21    happens suddenly, that's one type of an ischemic injury.

22         Another type of ischemic injury is prolonged.  In other

23    words, you don't throw the person into the bottom of the

24    swimming pool, you just slowly take away their oxygen over a

25    period of time.  And they just slowly get worse and worse.

1        That's what we call a partial prolonged injury.

2            And then is there are traumatic injuries, there are

3        infectious injuries, there are genetic injuries, there are

4        injuries due to diseases that the baby has, like collagen

5        vascular disease that can lead to a stroke in the baby.  So

6        there are many ways to end up with an ischemic encephalopathy.

7        Q.   Okay.  I want to talk about a couple of those.

8            Because defense counsel in opening statement -- and I

9        think we're going to hear a lot about if your pH is above 7,

10       it couldn't have happened during labor.

11       A.   Well, that's just not true.

12       Q.   Okay.  And why?

13       A.   Because the -- well, the American College of ObGyn and

14       the American Academy of Pediatrics, they set up a criteria for

15       one of those pathways that I just talked about, an acute

16       asphyxia, throwing somebody in the pool.

17           And they said to meet that -- to really know that you

18       have that, you have to have low pH, bad Apgar scores, multi-

19       system organ failure -- in other words, the liver, kidney,

20       everything falls apart from oxygen deprivation.

21           And you have to have radiologic evidence that you went

22       from a good -- immediately post birth the baby's head looked

23       okay and then a day or two later, it doesn't look okay.  So

24       that's a criteria.  And that is true for an acute asphyctic

25       event.

1        But that criteria doesn't apply to all the other avenues,

2   all the other alternative pathways to brain damage.  It

3   doesn't apply to trauma.  It doesn't apply for infection.  It

4   doesn't apply for hyperstimulation or tachysystole over a

5   prolonged period of time.  It doesn't happen from genetic

6   factors.

7        So that criteria that you heard about applies -- it is

8   true.  And it applies to an asphyctic acute injury.  That's

9   not what happened in this case.

10  Q.   I want to talk about -- so what are the factors that

11  caused Sage's injury?

12  A.   This is a multifactorial injury.  This is a result of a

13  prolonged hypoxia related to the inappropriate use of Pitocin,

14  which caused tachysystole, and diminished oxygen -- oxygen

15  deprivation over a prolonged period of time.

16       There is an element of chorioamnionitis where this

17  placenta got infected.  The mother didn't get infected until

18  the last hour before she delivered.  The baby never showed any

19  signs of infection.  But if you inspect the placenta -- and

20  the placenta's the heart and lung of the baby.  If you impact

21  the placenta with an infection, that can have an impact on the

22  perfusion of the baby.

23       So there's an element of the chorioamnionitis which

24  affected the placenta.  There's an element of the hypoxia

25  related to the inappropriate use of Pitocin.

1           And then this baby was stuck for 12 to 13 hours in the

2      pelvis with the uterus contracting without any movement.

3      There's a traumatic element to this, of the head sitting in

4      the pelvis as the uterus contracts, not over two or three

5      hour, not over four hours; over 12 or 13 hours.

6           So this is a multifactorial injury related to trauma,

7      related to infection, and related to hyperstimulation or

8      tachysystole, whatever you want to call it.

9      Q.   Doctor, after all of that, I wanted to talk about a

10     couple final things.  We heard a lot about chorioamnionitis

11     during opening statement --

12     A.   Right.

13     Q.   -- and how there's -- and how that caused Sage's injury a

14     couple days before she arrived at Bellevue Medical Center.

15          I want to talk -- just talk to us, if you will, quickly

16     about what is chorioamnionitis, what is histological

17     chorioamnionitis versus clinical?

18     A.   So when we send the placenta to pathology, they take

19     slides and they look at the placenta to see if there's any

20     evidence of infection.  And if they see infection in the

21     placenta, histologists and pathologists call it

22     chorioamnionitis.

23          Dr. Baergen, who is going to testify, is at my

24     university.  I've sent her dozens and dozens -- probably a

25     hundred placentas.  I can't tell you how many times she's

1    written "chorioamnionitis" and the baby goes home healthy,

2    mother goes home healthy; no one's ever gotten antibiotics;

3    nobody has an infection; everything is fine.

4        So what she's capable of seeing is histologic

5    chorioamnionitis.  You look on a slide.  In the placenta

6    there's chorioamnionitis.

7        I know whether the mother gets infected.  How do I know?

8    Her heart rate goes up, tachycardia.  She gets a fever.  She

9    looks sick.  I treat her with antibiotics.

10       The pediatricians know if the baby is infected.  They get

11   blood cultures, the blood cultures are positive.  So in a

12   category of chorioamnionitis, the placenta can get infected,

13   the mother can get infected, and the baby can get infected.

14   It could be all of those, one of those, two of those.

15       In this case, the placenta got infected.  The mother got

16   a low grade infection about an hour before delivery.  There's

17   no evidence in the medical records that the baby was ever

18   infected.

19   Q.   Okay.  And did they look for that in the baby?

20   A.   Yes.

21   Q.   How did they look for it?

22   A.   They did blood cultures on the baby.

23   Q.   Blood cultures ever come back with anything?

24   A.   No.

25   Q.   Okay.  At term and term or post-term mothers, what

1    percentage will have histological chorioamnionitis?

2    A.   With long labors it can be, like, 50, 60 percent.

3    Q.   Okay.  We're going to hear from a pathologist from your

4    institution.  What's her name?

5    A.   Rebecca Baergen, who is an outstanding placental

6    pathologist.  Let me go on the record and say that.

7    Q.   Here is -- this is page 37 of Exhibit 2.  This is a

8    pathology report that reports the histological

9    chorioamnionitis, correct?

10   A.   Right.  I'm sure she's right.

11   Q.   And this is actually the report from the Medical Center

12   done by Dr. DiMaio?

13   A.   Sure.

14   Q.   He writes:  There's no significant histopathologic

15   change.  No significant change.

16   A.   Right.

17   Q.   And then he writes that there is some pigment-laden

18   macrophages consistent with meconium.

19   A.   Right.

20   Q.   And there's membranes with chorioamnionitis -- and that's

21   what we're talking about, correct?

22   A.   Right.

23   Q.   And there's also a placental disc, that's where the gas

24   exchange occurs?

25   A.   Yes.

1   Q.   -- that has no significant histopathologic change.

2   A.   Right.  So parts of the placenta got infected.  And of

3   note here, they see meconium.  Remember when she ruptured her

4   members, she had clear fluid.  And then all of a sudden she

5   delivers and there's meconium.  What does that tell you?  That

6   tells you the baby was stressed in labor.

7   Q.   Okay.  If the baby had expelled a lot of meconium, would

8   have -- the nurses are supposed to check, right?

9   A.   Yes.

10  Q.   And they're supposed to be monitoring the fluid that's

11  coming out of the vaginal vault?

12  A.   Yes.

13  Q.   And if there's meconium, they're supposed to note that,

14  right?

15  A.   Yes.

16  Q.   But safe to say -- well, how many reports have you seen

17  just like this sent back from Dr. Baergen, and the patient

18  went home fine, baby's fine?  How many times?

19  A.   Dozens.

20  Q.   But there's chorioamnionitis.  Doesn't that mean the baby

21  must have been injured a couple days ago?

22  A.   Absolutely not.  One thing has nothing to do -- she's

23  saying the placenta got infected, okay?  And if she says, I

24  believe it.  She's a great placental pathologist.  That has

25  nothing to do with clinical chorioamnionitis, either in the

1    mother or the baby.

2    Q.    Now, is chorioamnionitis a risk factor that can cause

3    some degree of hypoxia to a baby?

4    A.    Absolutely.

5    Q.    How?

6    A.    Well, first of all, if the placenta is infected, it can

7    affect the oxygen exchange to the baby.

8         If the mother's infected and she gets sick, she can have

9    a delivery problem, if she gets sick enough, of delivering

10   oxygen to the placenta.  And if the baby gets

11   chorioamnionitis, if the baby actually gets infected, the baby

12   can have issues with oxygen exchange.

13        So all of those things are possible.  In this particular

14   case, it was just the placenta that was infected.

15   Q.    Doctor, what are your ultimate opinions about the nursing

16   staff here?  What -- how did they violate the safety

17   principles?  How did they violate the standard of care?

18   A.    When they --

19             MR. WELCH:  Wait.  Objection, form of the question.

20   You used the term "safety principles" and that violates this

21   Court's order.

22             THE COURT:  Sustained.  The question will be

23   specifically directed to standards of care.

24             MR. PATRICK CULLAN:  Fair enough, your Honor.  I

25   withdraw the question.

1    BY MR. PATRICK CULLAN:

2    Q.   Doctor, what are your opinions as to how these nurses

3    violated the standard of care in the management of this labor

4    and delivery?

5    A.   They violated the standard of care when they started

6    Pitocin on this patient.  This patient was ten hours stuck at

7    7 centimeters.  In order to start Pitocin, you need to

8    evaluate the Ps we talked about.

9        If they didn't do it, they need to have a physician do

10   it.  They need to know before starting Pitocin as an advocate

11   for the baby that before you start that medication, you have

12   to know that it's the powers, and not the CPD, that's causing

13   this baby to be stuck for ten hours.

14       When they started the Pitocin, as soon as they see the

15   tachysystole and the reassuring tracing, they've got to turn

16   off the Pitocin.  And the failure to turn off the Pitocin was

17   a deviation from good and acceptable practice.

18       They then -- the patient went 13 to 14 hours.  And she

19   finally changed 1 centimeter.  The failure on the part of the

20   nursing staff not to diagnose arrest of the active phase of

21   labor was a deviation from good and acceptable practice.  And

22   they should have advocated for this mom, for her to have a

23   cesarean section.

24       Restarting the Pitocin --

25           MR. WELCH:  Your Honor, if I could interpose an

1   objection to that last statement by the witness, it's a

2   misstatement, it's incorrect under Nebraska law as I

3   previously raised with the Court.  I'd move that that be

4   stricken.  Nurses do not diagnose.

5           THE COURT:  All right.  I will advise the jury that I

6   will be instructing you later at the end of the trial on the

7   law, specifically the law in Nebraska.

8       And beyond that, defense counsel can cross-examine on

9   that question when the opportunity comes up.

10      You may proceed.

11          MR. WELCH:  Just so the record is clear, your Honor,

12  I neglected to also ask that the testimony of the witness be

13  stricken and the jury be told to disregard that opinion.

14          THE COURT:  All right.  To the extent that

15  Dr. Gubernick may have offered any opinion regarding a

16  responsibility under the law, you may disregard that.  I will

17  be instructing you about what the law requires.

18      But he is testifying as to his opinions regarding the

19  standard of care and whether or not the two nurses who were

20  working at Bellevue Medical Center may have breached a

21  standard of care.

22      Go ahead.

23  BY MR. PATRICK CULLAN:

24  Q.   Okay.  So if I've heard you so far correctly, the first

25  one was the failure to evaluate the fit of the pelvis and

1    baby?

2    A.   Yes.

3    Q.   The second one was the failure to put in the IUPC to

4    assess the strength of the contractions?

5         MR. WELCH:   I'm going to interpose an objection to

6    that.  That was not his opinion.  If it is this witness's

7    opinion, it's a misstatement of Nebraska law.  Nurses are not

8    permitted to diagnose to do that.  And therefore, I would move

9    that the question be stricken.

10        THE COURT:   Overruled.  I will allow the witness to

11   answer.

12   A.   Yes, of course.  The force we talked about, evaluating

13   CPD and what are the powers.  And I should have expanded on

14   that to say -- you've heard me say multiple times today that

15   the only way to do that objectively, the only way to do that

16   is to put in an internal pressure catheter.

17        And in some institutions, nurses put in internal pressure

18   catheters.  In some institutions, they need to ask a physician

19   to do that or a nurse-midwife.  So I'm not saying that they

20   physically need to put in the internal pressure catheter.  But

21   before starting the Pitocin, they need to have the knowledge

22   and they need to be an advocate to say, "We are not starting

23   the Pitocin until an internal pressure catheter is placed."

24   And their failure to do that was a deviation from good and

25   acceptable practice.

1    BY MR. PATRICK CULLAN:

2    Q.   Okay.  And then the third -- turning on the Pitocin, in

3    and of itself?

4    A.    Turning on the Pitocin, not turning it off in a timely

5    manner; restarting it when it shouldn't have been started; and

6    in the late stages of labor, not turning it -- certainly not

7    turning it off in the later stages of labor and advocating for

8    cesarean section for the patient.

9    Q.   Okay.  I want to take these one at a time.

10        Did the failure to evaluate for the fit -- was that a

11   proximate cause of any damage to Sage?

12   A.   Yes.

13        MR. WELCH:  Objection, no proper and sufficient

14   foundation.

15        THE COURT:  Overruled.  He may answer.

16   A.   Yes.

17   BY MR. PATRICK CULLAN:

18   Q.   And of her brain damage?

19   A.   Yes.

20        MR. WELCH:  Same objection.  And I would ask that my

21   objection precede the answer, and move that the answer be

22   stricken, no proper and sufficient foundation for this witness

23   to make a causation opinion.

24        THE COURT:  The objection is overruled.

25        I will ask the witness that when an objection is

1    interposed, please wait so I can rule on the objection.

2              THE WITNESS:  Sorry.

3              THE COURT:  That's fine.

4       Go ahead.

5    BY MR. PATRICK CULLAN:

6    Q.   And so the turning on of the Pitocin, was that

7    a proximate -- the violation of the standard of care as you've

8    said, was that a proximate cause of the brain injury that Sage

9    suffered?

10             MR. WELCH:  Same objection, your Honor, no proper and

11   sufficient foundation for this witness to opine.

12             THE COURT:  Noted, overruled.  He may answer.

13   A.   Yes.

14   BY MR. PATRICK CULLAN:

15   Q.   The failure to diagnose the excessive uterine activity

16   and shut the Pitocin off after it was started, was that a

17   proximate cause of this injury and damage to Sage?

18             MR. WELCH:  Same objection, no proper and sufficient

19   foundation, qualifications of this witness to render a

20   causation opinion in this case.

21             THE COURT:  Overruled.  He may answer.

22   A.   Yes.

23             MR. PATRICK CULLAN:  Can we have a standing objection

24   with regard to -- I'm just going through -- I mean, just with

25   regard to the record.

1            THE COURT:  As far as I'm concerned, you certainly

2     may.  Sometimes lawyers are concerned about whether the other

3     courts would recognize a standing objection.

4            MR. PATRICK CULLAN:  Sure.

5            THE COURT:  So I won't require counsel not to

6     interpose the objections.

7         But go ahead, Mr. Cullan.

8            MR. PATRICK CULLAN:  Understood.

9     BY MR. PATRICK CULLAN:

10    Q.   And was the failure to recognize that the Category II was

11    not going to bring back -- would not revert back, based upon

12    the circumstances, and advocate for a cesarean section, was

13    that also a proximate cause for Sage's brain injury?

14           MR. WELCH:  Objection, no proper and sufficient

15    foundation, and outside the scope of this witness's

16    qualifications to so opine on causation.

17           THE COURT:  Overruled.  He may answer.

18    A.   Yes.

19    BY MR. PATRICK CULLAN:

20    Q.   Okay.  And do you have an opinion as to when Sage's

21    injury occurred?

22    A.   I'd say to a reasonable degree of medical

23    certainty that --

24           MR. WELCH:  No, wait.  Well, I've got an objection.

25    He can answer whether he has an opinion.

```
 1              THE COURT:  First, just tell us yes or no if you have

 2     an opinion.

 3     A.   Yes, I have an opinion.

 4     BY MR. PATRICK CULLAN:

 5     Q.   And what is that opinion?

 6              MR. WELCH:  Objection, no proper and sufficient

 7     foundation for this witness to opine as to causation and

 8     timing, outside the scope of his practice and expertise.

 9              THE COURT:  Overruled.  You may answer.

10     A.   More likely than not, the irreversible injury occurred

11     somewhere approximately around midnight.

12     BY MR. PATRICK CULLAN:

13     Q.   And that's because of the data that shows that a

14     Category I going to a Category III is evidence of the injury

15     occurring?

16     A.   Yes, sir.

17     Q.   Okay.

18              MR. PATRICK CULLAN:  At this time, I have no further

19     questions.  Thank you.

20              THE COURT:  Cross-examination?

21              MR. WELCH:  I would, your Honor.  It will take me a

22     second to get set up.

23              THE COURT:  All right.

24              MR. WELCH:  May I inquire, your Honor?

25              THE COURT:  You may.
```

```
 1                         CROSS-EXAMINATION

 2    BY MR. WELCH:

 3    Q.   Doctor, good afternoon.

 4    A.   Good afternoon.

 5    Q.   Last time we talked was in your hometown, New York City,

 6    in December; is that correct?

 7    A.   You're correct.

 8    Q.   You're an expert witness here today on behalf of the

 9    plaintiff, true?

10    A.   Yes.

11    Q.   As I understand it from your deposition, today you're

12    charging $11,000; is that correct?

13    A.   Yes, you're correct.

14    Q.   And I take it you've already been paid.

15    A.   Yes.

16    Q.   All right.  And you also charge travel here, as I

17    understand it from your deposition, of $3,000; is that

18    correct?

19    A.   Yes.

20    Q.   Plus, of course, your expenses.

21    A.   Excuse me?

22    Q.   Plus, of course, your expenses.

23    A.   I charge $3,000.  And I worked while I was traveling,

24    yes.

25    Q.   When I took your deposition, the cost for that was
```

1    $5,500, correct?

2    A.    Yes, a half a day.  I think we went beyond a half a day,

3    but that's what I charged.

4    Q.    And you initially charged a retainer in this case of

5    $3,000, I think, to initially review some records; is that

6    correct?

7    A.    You're correct.

8    Q.    And you've actually charged more than $3,000, I assume,

9    in getting ready for trial here today and also to prepare for

10   your deposition, true?

11   A.    Yeah.  Well, as I told you, I use my travel time to

12   prepare for the trial, yes.

13   Q.    Sure.  But when I took your deposition in New York, you

14   had to prepare for that deposition.

15   A.    You're correct.

16   Q.    And you would have billed for that also.

17   A.    I would think so.

18   Q.    Do you know how much you would have billed for that?

19   A.    No, but it wouldn't surprise me if it was four or five

20   hours of prep.

21   Q.    Okay.  And you typically charge what per hour?

22   A.    $550 an hour.

23   Q.    Okay.  So without -- if we added that prep time in, at

24   least by my quick math, we're up to about, oh, over $25,000

25   that you've charged for this case.  Is that fair?

1    A.    Yes.

2    Q.    Now, you testified at your deposition that I took that

3    you have probably testified by deposition 75 to 100 times.

4    Does that sound about that?

5    A.    In 25 years, yes, maybe two or three a year on average,

6    yes.

7    Q.    You told me that you get about one to two new cases every

8    month, correct?

9    A.    Yes, that's true.

10   Q.    And you've been testifying for the last 20 years, about

11   80 to 90 percent for plaintiffs; is that correct?

12   A.    Yes.

13   Q.    All right.  But I think you told me within the last four

14   or five years, it's been about 50/50 between plaintiffs and

15   defendants, correct?

16   A.    Not testifying, receiving cases.

17   Q.    Okay.  All right.

18         Have you testified about 50/50 for plaintiffs versus

19   defendants?

20   A.    No, I haven't.

21   Q.    Okay.

22   A.    About 70/30 in the last couple years.

23   Q.    For plaintiffs?

24   A.    Yes.

25   Q.    So over the last 20 -- I think you said you've been doing

1    this since 1989 -- you've testified against doctors and

2    hospitals all over the United States, correct?

3    A.   This is the most west I've ever come, so I don't know

4    about all over the United States.  But I've been in several

5    states.

6    Q.   Is this your first time in Nebraska?

7    A.   Yes, sir.

8    Q.   Do you know where Bellevue, Nebraska is even located?

9    A.   I can't tell you where Bellevue is, no.

10   Q.   So whether it's south of Omaha, or north of Omaha, or

11   west of Omaha, you -- I mean, you don't know.

12   A.   You're correct.

13   Q.   Okay.  You've been sued yourself over five times for

14   medical malpractice.

15   A.   I have, yes.

16   Q.   Four of those cases you actually went to trial.  And you

17   won those cases, didn't you?

18   A.   I did.

19   Q.   And in those cases we had a situation just like we have

20   here.  We had a jury, correct?

21   A.   A situation like here in that we had a jury, correct.

22   Q.   And that was back in New York.

23          MR. PATRICK CULLAN:  Objection, relevance.

24   A.   Yes, sir.

25          THE COURT:  Excuse me?

1              MR. PATRICK CULLAN:  Objection, relevance.

2              THE COURT:  The relevance?

3              MR. WELCH:  He's an expert.  His credibility is at

4      issue.

5              THE COURT:  I'll let you follow up a little more.

6              MR. WELCH:  Sure.  I just have a couple more

7      questions.

8      BY MR. WELCH:

9      Q.   When you were a defendant yourself, you had the

10     opportunity to bring in other experts in obstetrics or

11     gynecologists to testify you met the standard of care,

12     correct?

13     A.   You're correct.

14     Q.   And you took the witness stand yourself and defended

15     yourself, didn't you?

16     A.   I did.

17     Q.   All right.  Yet the plaintiff in that situation had other

18     experts in your specialty who came in and testified that you

19     fell below the standard of care.  Correct?

20     A.   Yes.

21     Q.   And you would agree with me that experts can be qualified

22     and disagree on the standard of care.

23     A.   Yes.

24     Q.   As they did in the four cases that you were sued.

25     A.   Yes.

1    Q.   Now, you're not a member of the American College of

2    Obstetrics and Gynecology.

3    A.   No.  I voluntarily resigned.

4    Q.   Right.  And ACOG -- that's the acronym, correct, ACOG?

5    Yes?

6    A.   Yes.

7    Q.   They publish, I think, that about 90 percent of

8    obstetricians or gynecologist are members.  Does that surprise

9    you at all?

10   A.   I don't know.  If they say it, I have no reason to

11   believe they're not being truthful.

12   Q.   Okay.  I think you testified earlier you do about 75

13   deliveries per year, and that's been about for the last four

14   or five years.

15   A.   About, yes.

16   Q.   Okay.  Let's talk about -- a little bit about what you're

17   not.  You're not a expert on placenta pathology.

18   A.   Not at all.

19   Q.   Okay.  And you -- right at the end of your direct exam,

20   you talked about Dr. Rebecca Baergen is at the same hospital

21   where you're at, correct?

22   A.   Yes.  I've known her for years.

23   Q.   All right.  And would it be fair to say that she is

24   recognized worldwide as a expert in her field?

25   A.   I don't know worldwide, I consider her an outstanding

1    placental pathologist.

2    Q.   And you would certainly defer to her in this case with

3    respect to opinions related to placental pathology.

4    A.   If we're other talking about --

5             MR. PATRICK CULLAN:  Form of the question -- object

6    to the form of the question.

7             THE COURT:  Overruled.

8    A.   If all we're talking about is what she sees under the

9    microscope, I have no issue.  She's smarter than I am on that

10   issue.

11   BY MR. WELCH:

12   Q.   I take it you would let her answer as to when the fetus

13   had an inflammatory response in her placenta because that's

14   her expertise.

15   A.   It's not up to me to let her or not let her testify.  She

16   can say whatever she wants to say.

17   Q.   Okay.  But you would defer to her as to when an

18   inflammatory response in the placenta occurred.

19   A.   If we're talking about what she sees under the

20   microscope -- remember, all she got was the placenta.  She

21   didn't get the mother; she didn't get the baby.  Thank God.

22   All she got was the placenta.  Whatever she says about the

23   placenta, I would defer.

24   Q.   You're not a neonatologist, are you?

25   A.   No.

1    Q.   All right.  So you don't treat critically ill children

2    with cerebral palsy, do you?

3    A.   No.

4    Q.   You are not an N-I-C-U doctor who takes care of these

5    children with cerebral palsy.

6    A.   No, those are pediatricians.

7    Q.   Okay.  Would you defer to a neonatologist on the cause of

8    cerebral palsy and the timing of those injuries?

9         MR. PATRICK CULLAN:  Objection --

10   A.   Not in this case.

11        MR. PATRICK CULLAN:  Objection, form of the question.

12        THE COURT:  Overruled.  The answer will remain.

13        MR. WELCH:  I didn't hear your full answer so I'll

14   ask the court reporter to read it back to me.

15        (Answer repeated.)

16   BY MR. WELCH:

17   Q.   So normally you would but not in this case?

18   A.   No.  What I'm saying is if we're going to be talking

19   about mechanisms of encephalopathy, I'm quite confident how

20   this child developed an encephalopathy.

21   Q.   Have you read the neonatology opinions in this case?

22   A.   No.

23   Q.   Okay.  So with respect to the defense experts and the

24   neonatology opinions, you don't know what they say.

25   A.   No.  What they say -- once the baby's born, that's their

1    job.  My job is to evaluate labor.

2    Q.   Sure.  So I take it not knowing what the defense

3    neonatologists have to say in this case, you can't tell me

4    whether you agree or disagree with their opinions because you

5    don't know them.  Is that fair?

6    A.   I guess that's fair.

7    Q.   You're not a pediatric neurologist, are you?

8    A.   I'm not a pediatric anything.

9    Q.   Whether it's a pediatric, a pediatrician or a neurologist

10   or a radiologist, that's not you.

11   A.   Or a urologist or a cardiologist, that's not me.  I'm

12   just a plain ole ObGyn.

13   Q.   And pediatric neurologists, they treat children with

14   cerebral palsy, long term, do they not?

15   A.   Yes.

16   Q.   Okay.  And would you defer to a pediatric neurologist on

17   the cause of Sage's injuries and the timing as to when it

18   occurred?

19   A.   Not in this case, no.

20   Q.   Okay.  Have you read the opinions of the pediatric

21   neurologists, the defense experts in this case?

22   A.   No.

23   Q.   So you don't know what they'd have to say as to whether

24   you'd agree with them or disagree with them?

25   A.   That's not my job.  I'm not a pediatrician so I

1    wouldn't -- I wouldn't have an opinion on anything they said.

2    I'm looking at this purely from the point of view as an

3    obstetrician.

4    Q.   Okay.  And you are not a maternal-fetal medicine

5    specialist.

6    A.   I am not.

7    Q.   Okay.  A maternal-fetal medicine specialist would have

8    more education and training than you do in obstetrics and

9    high-risk obstetrics, do they not?

10   A.   They have more training.  They don't have more training

11   in obstetrics than I do, they have more training in taking

12   care of sick women and sick babies during pregnancy than I do.

13   Q.   All right.  They also deliver children, do they not?

14   A.   Some do, some don't.

15   Q.   Okay.  Do you, in your practice, refer patients to a

16   maternal-fetal medicine specialist?

17   A.   I consult with them on a regular basis.  I almost never

18   refer a patient out to them.  I have one in my office, so...

19   I mean, so I have a world's expert in my office.

20   Q.   Maternal-fetal medicine specialist, another name for them

21   is perinatologist.

22   A.   Some call themselves a perinatologist.

23   Q.   Have you read any of the reports of Dr. Andrew Robertson

24   in this case, a maternal-fetal medicine specialist?

25   A.   No.

1   Q.   Have you read reports of James Smith, Jr., another

2   maternal-fetal medicine specialist?

3   A.   I only read what he had said when we had a conference.

4   So I know his opinions, yes.

5   Q.   All right.  Dr. Robertson, you've not read anything that

6   he had to say about this case.

7   A.   No.

8   Q.   And I take it not knowing what Dr. Robertson has to say,

9   you wouldn't be able to agree or disagree.

10  A.   If he doesn't agree with me, I disagree with him.

11  Q.   Okay.  So if he doesn't agree with you, in your opinion

12  he's wrong.

13  A.   Yes, sir.

14  Q.   Now, I think your curriculum vitae is marked as an

15  exhibit in this case but I don't think it's been discussed

16  with you.  A curriculum vitae is what?

17  A.   It's an overview of your life as you see it.

18  Q.   Okay.  And as you see it in this case, it's one page,

19  correct?

20  A.   Yes.  I trained under the KISS principle.  My first year

21  law student daughter has a ten-page CV and says I should

22  expand mine.  I'm going to keep mine at one page.

23  Q.   Fair enough.  So your curriculum vitae is -- I've got it

24  right here -- one page.

25  A.   Yes.  I gave you the straight, simple facts.

1   Q.   Right.  It's got your education on it, where you did your

2   residency, where you went to college, where you went to med

3   school.

4   A.   That's it.

5   Q.   Okay.  I notice on your CV that you don't have any

6   medical articles that you've ever written.

7   A.   That's right.  I've never -- I'm not a researcher.  I

8   haven't written any articles.  I'm a clinician.

9   Q.   Okay.  And you've never written any textbooks or chapters

10   in textbooks in obstetric or gynecology for that matter.

11   A.   You are correct.

12   Q.   Okay.  And would it be fair to say that you've never done

13   really any medical writing in your professional work once you

14   got out of school?

15   A.   I think that's fair.

16       MR. PATRICK CULLAN:  That's asked and answered.  I

17   think he asked and answered that already.

18       THE COURT:  Overruled.

19       MR. WELCH:  I'm sorry, was there an answer?

20   A.   Yes.  I said that's fair.

21   BY MR. WELCH:

22   Q.   And you're not a reviewer for any obstetrical journals or

23   medical articles, fair?

24   A.   That's also fair.

25   Q.   Now, you brought up a ACOG criteria on direct examination

1    on neonatal encephalopathy, correct, in direct exam?

2    A.   Specifically acute asphyxia, that subset of neonatal

3    encephalopathy, yes, I did.

4    Q.   Okay.  And this monograph that was done in 2003, that was

5    a product of evidence-based medicine; is that right?

6    A.   Yes.

7    Q.   All right.  And evidence-based medicine, as I understand

8    it, Doctor, is basically that physicians -- and in this case,

9    we had not only the American Academy of Pediatrics, but also

10   the American Academy of Obstetrics and Gynecology reviewed

11   medical literature, studied this in depth, and came up with

12   certain criteria; is that correct?

13   A.   Certain criteria for an acute asphyxia, yes.

14   Q.   The way they did that evidence-based medicine is we have

15   Level I, Level II, and Level III type studies, correct?

16   A.   You're correct.

17   Q.   And are you familiar with what a Level I study is?

18   A.   Yes.

19   Q.   What is a Level I study?

20   A.   Well, there's different criteria.  I can't give you the

21   specifics, but it has to do with prospective randomized

22   studies.

23   Q.   So they may take a group of, say, in this case, women who

24   deliver with certain categories if they are first-time

25   mothers, if they have certain findings on the fetal monitor

1    strips, and they study that and then they study the children,

2    just as a general rule.

3    A.   As well as, like, they'll just look at multiple

4    institutions and just pull the records and do what's called a

5    meta-analysis.

6            MR. WELCH:  I want to just show something to the

7    witness so we could just have it on for -- it's a

8    demonstrative exhibit.

9            THE COURT:  All right.  Ms. Frahm, will you please

10   shut down the monitors in the jury box.

11           MR. PATRICK CULLAN:  May I have a copy?

12           MR. WELCH:  I don't have a copy.

13       (Off-the-record discussion had.)

14           MR. PATRICK CULLAN:  I guess -- okay.  That's fine,

15   your Honor.

16           THE COURT:  You may.

17   BY MR. WELCH:

18   Q.   Doctor, this is the criteria to define an acute

19   intrapartum hypoxic event as sufficient to cause cerebral

20   palsy.  Do you see that?

21   A.   Yes.

22           MR. PATRICK CULLAN:  May I object and have it zoomed

23   out so that all --

24           MR. WELCH:  All right.  We can --

25           MR. PATRICK CULLAN:  He's kind of leaving out the

1    important --

2              MR. WELCH:  All right.

3    BY MR. WELCH:

4    Q.   See it all right?

5    A.   Yeah.  Now I can see it really well.

6    Q.   Okay.  And this was put together by the American College

7    of Obstetrics and Gynecology and also the American College of

8    Pediatrics, true?

9    A.   Yes.

10   Q.   All right.  And the essential criteria -- and they must

11   meet all four; is that right?

12   A.   If we're talking about acute intrapartum hypoxia, which

13   this case is not; but yes, we could talk about it if you'd

14   like to talk about it.

15   Q.   Okay.  And you would agree with me that under the facts

16   of this case, Sage does not meet the first criteria, which is

17   evidence of metabolic acidosis and fetal umbilical cord

18   arterial blood obtained at delivery below a pH of 7, true?

19   A.   That's true.  And I wouldn't expect her to meet the

20   criteria.

21   Q.   Okay.  And -- did you say you wouldn't have expected her

22   to meet the criteria?

23   A.   No.  This is not an acute intrapartum hypoxia.  This is

24   -- when you get to number four, it's what it is, where it says

25   exclusion of other identifiable etiologies, such as trauma,

1    infectious conditions, genetics.  This is what -- she has what

2    they say you need to exclude in order to define it as acute

3    intrapartum hypoxia.

4         So I agree with them.  And I wouldn't anticipate that she

5    would meet the criteria because I don't believe she had an

6    acute intrapartum hypoxic event.  She developed an

7    encephalopathy from an alternative pathway.

8    Q.    Intrapartum is defined as how by the American College.

9    A.    Intrapartum is during labor.

10   Q.    Yes.  This happened during labor, did it not?

11   A.    Yes.  But it wasn't an acute, it was a partial prolonged,

12   as I talked about.

13   Q.    The American College defines that as a labor being the

14   active phase of labor, does it not?

15   A.    Excuse me?

16        MR. PATRICK CULLAN:  Objection, form.  That's

17   nonsensical.

18   BY MR. WELCH:

19   Q.   The acute intrapartum hypoxic, as the America College

20   defines it, is exactly the timing that we have here with Sage,

21   don't they?  That's how they define it.

22   A.   It's the timing, but it's not the mechanism.

23   Q.   Sage also did not meet the fourth criteria, true?

24   A.   Didn't meet the which criteria?

25   Q.   The fourth criteria, that she had --

1    A.    She has --

2    Q.    -- you have to exclude --

3          THE COURT:  Whoa, whoa.  We have two people talking

4    again.  Please finish the question.

5    BY MR. WELCH:

6    Q.    You have to exclude other identifiable etiologies.  And

7    I've highlighted infectious conditions since she had an

8    infectious condition in this case.

9    A.    As you could have highlighted trauma also because she had

10   a traumatic condition as well.  So I agree with your

11   underlining.  It just wasn't complete.

12   Q.    The pH cord gas, in this case, was normal, was it not?

13   A.    It was a normal gas.  And if it was a venous gas, it was

14   a normal gas for the mother.  It was never documented whether

15   it was venous or arterial, arterial representing the baby, the

16   baby's oxygen status; venous reflecting the mom's oxygen

17   status.  Whoever it was, it was normal.  More likely than

18   not, it was the mother's.

19   Q.    So whether it's the mother's or the baby's, so whether

20   it's arterial or venous, doesn't make any difference.  In your

21   opinion, it's normal.

22   A.    Yes.

23   Q.    And it was 7.33.

24   A.    Excuse me, when you say it doesn't make any difference, I

25   don't believe it was the baby's arterial gas.  I believe it

1    was -- so it's not like it doesn't matter whether it's

2    arterial or venous.  It's my opinion, based on the Apgar

3    scores, based on what that baby looked like at birth, that

4    this baby was acidotic at birth.

5    Q.   But the objective medical evidence, Doctor, does not

6    support that, with a cord gas of 7.33, true?

7    A.   If it was arterial, it wouldn't support it.  There's no

8    objective evidence that it was arterial.

9    Q.   So was Heather Ramsey ever asked what -- whether it was

10   arterial or venous?

11   A.   She was asked in her deposition and she -- and of course,

12   why not say it was arterial.  There was no documentation in

13   the medical records to say that it was arterial.

14   Q.   So Heather Ramsey did say it was arterial.

15   A.   She -- if I remember her deposition correct, she felt it

16   was arterial.

17   Q.   She's the one that drew it, right?

18   A.   Probably.

19   Q.   All right.  Wouldn't you think the person that's actually

20   drawing the sample would know whether it was arterial?

21   A.   I would also think the person who drew it would document

22   what she did.  So there are a couple of things that aren't

23   necessarily so.

24   Q.   So you would agree with me that the objective cord gas in

25   this case does not support hypoxia-ischemia, intrapartum.

1    A.   I don't agree with your statement.  If we knew it was an

2    arterial gas -- and I wouldn't care, even if it was a normal

3    arterial gas, but we don't know it was arterial gas because

4    this criteria is not what happened in this case.

5         So I don't care about this criteria because this is not

6    an acute asphyxia.  This is a partial prolonged asphyxia.  And

7    you don't need to meet these requirements to be a partial

8    prolonged.  You're picking -- you're talking about, you know,

9    a Chevy Volt when what happened here was a Chevy Impala.

10   Q.   Doctor, isn't it true in this case that a cord pH of 7.33

11   is very inconsistent with the strip in your opinion?

12   A.   If it's arterial, it's inconsistent.  I believe more

13   likely than not it's not arterial.

14   Q.   But that was your opinion back in December when I took

15   your deposition, wasn't it?

16   A.   You asked me is it inconsistent if this is the baby's

17   gas, and I would say yes.  I would have anticipated an

18   acidotic baby based on the descriptions the people in the room

19   gave, not that I saw.  The people in the room said they were

20   surprised at how bad the baby looked when the baby was born,

21   that the baby had poor Apgar scores, was pale, did not respond

22   well.

23        That baby sounds acidotic to me.  So I would not have

24   anticipated a normal gas.  And I think more likely than not

25   the baby did not have a normal gas, the mother had a normal

1   gas.

2   Q.   And I think you told me in December that this strip was

3   totally inconsistent with the injuries in this case with a

4   normal cord pH.

5   A.   If the pH was reflective of the baby, I said I would be

6   surprised.  Yes, I stick to that statement.

7   Q.   All right.  And that specifically the injuries in this

8   child, you testified previously are inconsistent with the

9   normal pH, true?

10  A.   If it's -- how many times do I have to say it?  If it's

11  the baby's pH.  But we have no objective evidence that it's

12  the baby's pH.

13  Q.   Even though we have the person that took the sample

14  that's testified that it was arterial, true?

15  A.   The very person who is being accused of negligence, yes.

16  Q.   Is Heather Ramsey in this courtroom?

17  A.   I've never met Heather Ramsey.  I wouldn't know.

18  Q.   And I think you told me at your deposition that you can't

19  have this injury to Sage without metabolic acidosis, tissue

20  death.  And this cord pH is not showing that injury, true?

21  A.   I think you've asked me this question nine times and I've

22  answered.  I would be surprised if this is the baby's pH.

23  It's my medical opinion to a reasonable degree of medical

24  certainty it's not the baby's pH.

25  Q.   Doctor, I'm going to ask you one more time.  Please

1    answer the question.

2         You can't have this injury without metabolic acidosis,

3    tissue death.  And this cord pH is not showing this injury,

4    true?

5    A.   I don't agree with that statement.

6    Q.   I'm looking at page 167 from your deposition, Doctor.

7    A.   Yes, sir.

8    Q.   Line 2:  Okay --

9         Question:  Okay.  Assume that we removed chorioamnionitis

10   from the picture, pulled the piece of the puzzle out, would

11   Sage Schmidt -- Schmidt -- am I pronouncing it correctly?

12        Me, Mr. Welch:  Schmidt.

13        Question:  -- Schmidt be neurologically normal?

14        Answer:  I can't answer that.

15        Question:  Assume we pulled out -- now, you were talking

16   about hypoxia, not necessarily metabolic acidemia or metabolic

17   acidosis, correct?

18        Answer:  Well, hypoxia leads to an asphyxia and asphyxia

19   leads to metabolic acidosis.

20   A.   I recall that.  And I stick by that statement.  That has

21   nothing to do with what you just asked me.

22   Q.   Now, you talked quite a bit on direct examination about

23   whether we have decelerations, whether we have variability.

24   You talked about this strip in great detail with plaintiffs'

25   counsel.

1          The sole purpose for fetal monitoring is to determine the

2     acid-based status of the infant, is it not?

3     A.   The sole purpose of fetal heart rate monitoring, is that

4     what you said?

5     A.   Yes.

6     Q.   Yes, the fetal monitoring.

7     A.   I think ultimately that's true.  I mean, it's sort of --

8     I don't love that statement, but I understand where -- whoever

9     authored -- you pulled that from, where they're coming from, I

10    think that's the ultimate goal.

11    Q.   I pulled that out of the NICHD, which you've already

12    referred to.

13    A.   Yeah.  I understand.  Even they don't like -- they're

14    good, but I don't have to agree with everything.  I understand

15    where they're coming from, so I already agreed with it.

16    Q.   And that's why you do it, right, at the end of the day?

17    A.   Sort of the end -- at the end of the day, whatever we do,

18    all the things we do, we want to send home a healthy mother

19    and baby.  That's what I told you.

20    Q.   Okay.  And I think this strip, as you testified to, was

21    Category II, which is indeterminate all the way up until about

22    midnight, right?

23    A.   Yes.  I think I said there may have been small elements

24    of time where if you just looked -- if you just flashed on

25    that time, it may not have been always a Category II.  But I'd

1    say more importantly, the overall pattern was Category II,

2    yes.

3    Q.   And so we don't have a Category III, at least your

4    opinion, until about midnight.

5    A.   That's my opinion.

6    Q.   And we know from the cord gas that the fetal acid-based

7    status of this infant was normal at the time of delivery.

8    A.   I know you like that cord gas --

9            MR. PATRICK CULLAN:  I'm going to object --

10   A.   I know you like --

11           MR. PATRICK CULLAN:  Objection.

12           THE COURT:  Wait a minute.

13           MR. PATRICK CULLAN:  I'm going to object as

14   argumentative at this point, your Honor.  This point has been

15   beat to death.

16           THE COURT:  Overruled.  He may answer.

17   A.   You know, do we want to have a discussion again about the

18   cord gas?

19   BY MR. WELCH:

20   Q.   Can you...

21   A.   The answer is no, I don't agree with you.

22   Q.   Okay.  But you did agree that the purpose for fetal heart

23   rate monitoring is to determine the fetal acid base.

24   A.   At the end of the day, sure.

25   Q.   Okay.  You would agree with me that the literature

1    indicates that fetal heart rate monitoring has about a 98 to

2    99 percent false positive rate in predicting cerebral palsy,

3    correct?

4    A.   I would agree with that statement.

5    Q.   Okay.  So your opinions in this case are based heavily on

6    your review of the fetal monitor strips, correct?

7    A.   That's certainly a strong element.

8    Q.   We spent a lot of time on it, didn't we?

9    A.   Yes, sir.

10   Q.   All right.  And so you agree with me that the tool on

11   which you were basing your opinions in this case --

12   A.   Yes.

13   Q.   -- that my nurses fell below the standard of care and

14   that injuries caused to Sage Schmidt have a 99 percent false

15   positive rate in predicting injury to a fetus.

16   A.   That's true.  We jump into the pool way too often.  We

17   probably save too many people who can get out of the pool

18   themselves because we're unwilling to hurt a baby in labor.

19   You're absolutely right.  And that's why the cesarean section

20   rate has risen in this country.  We take babies out that have

21   a bad tracing that end up doing just fine to catch that one

22   baby who wouldn't be fine.  And I'll do that every day of the

23   week.

24   Q.   So you agree with me that the basis for your opinions in

25   this case are based upon a tool that only 1 percent of the

1    time has been shown to be accurate.

2    A.   And when that 1 percent is your baby, it's 100 percent.

3    Q.   That's your opinion.

4    A.   That's my opinion.

5    Q.   Okay.  And you understand in this case that there are

6    others who disagree with that opinion, true?

7    A.   With what I just said?  No, I don't know anybody who

8    disagrees with what I just said.

9    Q.   Okay.  Well, you wouldn't because you haven't read the

10   reports.

11   A.   So bring somebody in to disagree that when it's your

12   baby, it's 100 percent when your baby gets injured.  Bring

13   someone in that disagrees with that statement.  Go at it.

14   Q.   You would agree with me that even among obstetricians,

15   they can't agree on what a tracing shows or the significance

16   of the tracing.

17   A.   See, now that's inaccurate.  What you fail to talk about

18   -- you talk about the false positive rate, which is very high.

19   But what you didn't talk about is the false negative rate.

20   And what we can all agree on is what a healthy baby looks

21   like.

22        MR. WELCH:  Your Honor, I've let the witness -- I

23   think I asked a proper question in a leading manner and now

24   the witness is going beyond that.

25        THE COURT:  All right.  Sustained.

1    BY MR. WELCH:

2    Q.   You would agree with me that review of a fetal monitor

3    strip is not objective.

4    A.   I would agree that there's a subjective component to it,

5    but it's not purely subjective.

6    Q.   Okay.  Children that are born to first-time mothers who

7    deliver vaginally, just about 100 percent of them have

8    molding, do they not?

9    A.   I wouldn't say 100 percent, but I would agree with your

10   premise that it's a lot.

11   Q.   Above 90?

12   A.   I think so.

13   Q.   All right.  And molding, just for the jury, is the fetal

14   head has what they call sutures; is that right?

15   A.   Yes.

16   Q.   And basically those sutures allow the head to mold so

17   that it can go through the pelvis.

18   A.   I would agree with you.

19   Q.   Okay.  And that's very -- and that's very common.  And

20   sometimes that's referred to as trauma, correct?

21   A.   Somebody may refer to that as trauma.  I wouldn't, but

22   some people would.  And I wouldn't have a problem with that.

23   Q.   And caput -- I think you explained what that is -- that's

24   basically swelling of the soft tissues.

25   A.   You're correct.

1   Q.   That's the cone head.

2   A.   You're right again.

3   Q.   And again, with first-time mothers who deliver vaginally,

4   that happens in about 90 percent of the cases, isn't it?

5   A.   Somewhere -- it's a lot.  I don't know if it's 90, but

6   it's a lot.  I'll agree with the premise that it's a frequent

7   occurrence.

8   Q.   This child had no cephalohematoma, correct?

9   A.   You're correct.

10  Q.   And cephalohematoma is what?

11  A.   It's a hematoma, which is a collection of blood,

12  underneath the skull.

13  Q.   The child had no bruising, correct?

14        MR. PATRICK CULLAN:  Objection to form.

15        THE COURT:  Overruled.

16  A.   I don't have a recollection that the child had no

17  bruising.  But whether the child had bruising or didn't have

18  bruising wouldn't change my opinion whatsoever.

19  BY MR. WELCH:

20  Q.   Okay.  You reviewed the records of the NICU, did you not?

21  A.   I did.  I just don't remember.  If you tell me that they

22  commented there is no bruising, I trust you.  But I just don't

23  remember that statement.

24  Q.   It states no bruises.

25  A.   I believe you.

1   Q.   And the two ultrasounds that were done on this child on

2   November 2nd, 2012, I think at about six hours of birth, were

3   read by the radiologist as normal, correct?

4   A.   Yes.

5   Q.   All right.  And then the ultrasound that was done the

6   next day was also read as normal, correct?

7   A.   Yes.

8   Q.   An MRI that was done on Sage about five and a half days

9   or so after delivery showed no obvious herniations,

10  hemorrhage, or hydrocephalus, correct?

11  A.   Right.  But that has nothing to do with what we're

12  talking about.

13  Q.   You would agree with me.  Or do you remember?

14  A.   I agree it has nothing to do with what we're talking

15  about.

16  Q.   I don't think that was my question.  My question was do

17  you remember?

18  A.   I remember it, and it has nothing to do with what we're

19  talking about.

20  Q.   Okay.  And you would also admit that if we were only

21  talking about head trauma in Sage, we would not have any

22  neurologic injury in your opinion.

23  A.   I think if that's the only thing that happened, if they

24  let her labor too long, which they did, and the tracing was

25  beautiful, and the baby wasn't hypoxic, I think this baby

1    would not have been damaged.

2    Q.   Tachysystole.  You talked a little bit about that on

3    direct exam.  Are you aware that current literature that finds

4    that uterine tachysystole that sometimes can be occasionally

5    prolonged is almost always benign?

6    A.   I'm sure somebody wrote that.  Certainly the NICHD has

7    spent a lot of time and money warning obstetricians against

8    tachysystole.  The American College warns against it.  If

9    somebody somewhere -- did you find an article where somebody

10   somewhere looked at some tachysystole that didn't have a bad

11   consequence?  I don't doubt that for a minute.

12   Q.   Let's talk about chorioamnionitis briefly.  You would

13   agree with me that it's well known in the literature that it

14   increases the risk of cerebral palsy in term infants and that

15   some studies show that it increases it about five times with

16   term infants.

17   A.   Five times is a very small number.  But yes, if you look

18   at a subpopulation of babies that develop cerebral palsy, the

19   mother had a higher incidence of chorioamnionitis than the

20   general population.

21   Q.   Okay.  Are you familiar with the work by the CDC at all

22   that indicates those studies show increase in the risk with

23   chorioamnionitis and cerebral palsy?

24   A.   Yes.  Chorioamnionitis is a risk factor for the reasons

25   we talked about.

1    Q.    If I use the acronym FIRS, are you familiar with that at

2    all?

3    A.    Yes.

4    Q.    That stands for fetal inflammatory response.

5    A.    Syndrome, yes.

6    Q.    Have you ever done any writing on it yourself?

7    A.    No.

8    Q.    This would probably be within the gamut of the

9    neurologists or neonatologists; is that fair?

10   A.    To talk about FIRS?

11   Q.    Yes.

12   A.    Pediatricians would talk about that, yes.

13   Q.    The nurses in this case were under the direction of a

14   certified nurse-midwife for this labor, were they not?

15   A.    You're correct.

16   Q.    And you do not work with midwives currently, do you?

17   A.    I do not.

18   Q.    You have in the past, true?

19   A.    I have.

20   Q.    All right.  And from your review of the records -- and it

21   was not one of your opinions in the standard of care against

22   the nurses, the nurses faithfully fulfilled the orders of the

23   nurse-midwife in this case, did they not?

24   A.    They fulfilled the orders of the nurse-midwife.  Yes,

25   they did.

1    Q.   I mean, the nurse-midwife ordered certain things, such as

2    Pitocin, correct?

3    A.   Yes.

4    Q.   And the nurses complied with that order, correct?

5    A.   They did.

6    Q.   Did you find in your forensic review in this case that

7    the nurses failed to follow any order that the nurse-midwife

8    gave?

9    A.   No, just the opposite.  They stopped an order that was

10   dangerous in terms of a drug that was -- the patient was

11   allergic to.

12   Q.   The nurses stopped it?

13   A.   Well, the pharmacy actually picked it up, and the nurses

14   didn't deliver it.

15   Q.   And it's not your opinion in this case that failure to

16   deliver an antibiotic in this case had any effect on Sage's

17   injuries, true?

18   A.   I would have been critical if the baby was infected, that

19   the baby didn't get antibiotics in labor.  But we know the

20   baby never got infected, so the antibiotics are a moot issue.

21        But had this baby been damaged by chorioamnionitis, I

22   would have been very critical that antibiotics weren't given

23   during labor so that when the baby was born, the baby didn't

24   already have antibiotics in its system.  But we already know

25   the baby never got infected, so it's a moot issue.

1    Q.   So your opinion in this case isn't that failure to give

2    antibiotics caused any damage, true?

3    A.   No, because the baby never got infected.

4    Q.   Accelerations as shown on the fetal monitor strip, I have

5    down in my notes that you indicated that's not an acidotic

6    fetus, correct?

7    A.   As a general principle -- I mean, rules get broken.  But

8    as a general rule, when you see accelerations, that's a

9    reassuring sign that the baby is not acidotic.

10   Q.   It's not your opinion in this case, Doctor, that the

11   nurses at Bellevue Medical Center did not care or have

12   professionalism towards this mother and this baby, is it?

13   A.   I'm sorry?

14        MR. WELCH:  Could you read the question back?

15      (Question repeated.)

16   A.   I have no opinion on their care.  I'm sure they're nice

17   people.  I don't think they did this maliciously, they just

18   did it below the standard of care.

19   BY MR. WELCH:

20   Q.   And you read in their depositions, they have a tremendous

21   amount of experience as obstetrical nurses.

22   A.   They're veteran nurses.

23   Q.   And I take it when you treat your patients, you try to

24   treat them professionally, do you not?

25   A.   I do.

1    Q.   And you consider yourself to be a dedicated healthcare

2    professional, right?

3    A.   I do.

4    Q.   Okay.  And you have no basis in fact to say that these

5    two women caring for this mother and baby were nothing other

6    than caring people and healthcare professionals.

7    A.   I don't think "caring" comes into this case at all.

8              MR. PATRICK CULLAN:  I'm going to object to

9    relevance.  I think this is seeking to inject sympathy.  It

10   has no relevance.

11             THE COURT:  Sustained.

12   BY MR. WELCH:

13   Q.   Doctor, in this case you testified, and I quote, I mean,

14   take this woman in an alley and just put her out of her misery

15   rather than what you are doing to her.  End quote.

16        Did you testify to that?

17   A.   What I testified to was in situations like this, I had a

18   chairman who said, "Why did you let this go on?  Why were you

19   so cruel to this person?"  As a matter of fact, he went one

20   step further to say, Are you having an affair with, you know,

21   is that what this -- with the spouse?  He would say that to

22   the female residents.

23        And he would say that it's more humane to take them out

24   to a back alley -- I was quoting somebody else -- and beat

25   them with a baseball bat than do what they did.  That's what I

1    said.

2         I was quoting somebody else.  I didn't say that about

3    this person.  It was in the context of my training as a

4    resident.

5    Q.   But you were directing that comment against Certified

6    Nurse-Midwife Ramsey, Nurse Laabs, and Nurse McLandsborough.

7    A.   The point I was trying to make is that they let this baby

8    sit for 13 hours; 13 hours in a single position while the

9    uterus was contracting away.  And to me, it's not only a

10   breach of the standard of care, I think it's -- I think it's

11   cruel.

12   Q.   So you don't think you owe these ladies an apology for

13   stating that.

14   A.   No, sir.  If you let them read my entire deposition, it

15   was in the context of what people said to me.  It wasn't what

16   I said to them.

17        You took it out of context.  And if you want to read the

18   entire page, everybody in this room will know that you took

19   that statement out of context.

20   Q.   You said it, didn't you?

21   A.   I said -- if you're really interested, why don't you read

22   the whole page so people in this room will know that I didn't

23   direct it at the nurses.  It was something that was directed

24   at me during my residency as a general principle.

25   Q.   Doctor, Certified Nurse-Midwife Ramsey never ordered an

1    IUPC in this case, did she?

2    A.   No, she did not.

3    Q.   So she -- and you don't know at Bellevue whether nurses

4    can place an IUPC, do you?

5    A.   I don't know whether they can or can't.  It's irrelevant

6    to this case.  They don't have to.  They can get somebody else

7    to do it.  It's not a problem.

8    Q.   So as I understand your opinions, the nurses should not

9    have followed Certified Nurse Ramsey's order to start Pitocin.

10   A.   You're correct.  We all need to be advocates for our

11   patients, yes.

12   Q.   They should not have followed Certified Nurse-Midwife

13   Ramsey's order to let the patient labor down.  True?

14   A.   When you say not follow orders, they just wouldn't do --

15   I'm not suggesting they don't do it.  I'm suggesting a

16   dialogue.  You know, we're a team.  And we all have a common

17   goal which is the well-being of our patient.

18        So I'm not suggesting that they shouldn't follow the

19   orders, they shouldn't do it.  I think what they should do is,

20   you know, say, "Hey, Heather, what's going on here?  This

21   woman's been stuck for a day, for 12 hours, 13 hours.  You

22   think Pitocin is a good idea?  Why don't you put in an

23   internal pressure catheter.  Let's see what the contractions

24   look like before we give the Pitocin."

25        I'm not suggesting a mutiny here; I'm suggesting a

1    dialogue.

2    Q.   Doctor, your -- it's your opinion that the nurses fell

3    below the standard of care because they followed the nurse-

4    midwife's order to restart the Pitocin, true?

5    A.   Yes.   The Pitocin, as we all saw, should have never

6    been --

7              MR. WELCH:   Your Honor, I think I asked it in a

8    leading manner.

9              THE COURT:   All right.   I'll just ask that you answer

10   yes or no, if you can.

11             THE WITNESS:   Yes, Judge.

12             MR. WELCH:   May I take moment, your Honor?

13        (Off-the-record discussion had.)

14             MR. WELCH:   Thank you for your time, Doctor.   No more

15   questions.

16             THE COURT:   Let's go ahead and take our break at this

17   juncture.   Please reconvene in the jury room at five minutes

18   after 4.

19        We're in recess.   Thank you.

20        (Jury out and recess taken at 3:53 p.m.)

21        (At 4:07 p.m. on July 28, 2015, with counsel for the

22   parties, plaintiff Doran Schmidt, and the defendant's

23   representative present, the following proceedings were had:)

24             MR. PATRICK CULLAN:   Just for scheduling, he's got a

25   flight to catch.   So when we're finished with him, is it okay

1    if that's the end of the day?

2              THE COURT:  That's fine.

3         Very good.  Please bring in the jury.

4         (Jury in at 4:09 p.m.)

5              THE COURT:  Redirect?

6              MR. PATRICK CULLAN:  Thank you.

7                     REDIRECT EXAMINATION

8    BY MR. PATRICK CULLAN:

9    Q.   Dr. Gubernick, I just want to follow up with some of the

10   discussion you had before the break with defense counsel.

11        First let's talk about can't the nurses just do what

12   they're told.  Do you remember that line of questioning?

13   A.   Right.

14   Q.   What's your understanding of nurse -- are nurses in labor

15   and delivery -- do they -- are they educated?

16   A.   You know, maybe 100 to 150 years ago, that was the right

17   answer, that nurses do what they're told.

18        But now, we're in a different place and time where the

19   people who work in the hospital, we're a team.  And

20   everybody's part of the team, and we have a common cause.

21        And I can tell you, the nurses -- they actually rule --

22   they rule labor and delivery.  But seriously, what we are, I

23   mean, I just can't keep reiterating this, we're advocates

24   because we all want the same thing.  We want to do the best

25   job we can do to send people home healthy.

1          And there's never an excuse where, in your mind you're

2     thinking, well, this is not in the best interests of the

3     mother or baby, but the doctor told me to do it or the midwife

4     told me, so I'm going to do it, even though my training, my

5     experience, my years as a nurse tell me that this doesn't feel

6     right.

7          And like I said before, I'm not talking about a mutiny

8     here; I'm talking about dialogue, conversation.  You don't

9     have to yell at anybody.  You don't have to call anybody out

10    on it.  You go to a nice quiet place and say, "Could you

11    please explain to me why we're doing this because I'm

12    confused.  And I just want to make sure we're doing the right

13    thing."

14         That's the kind of dialogue that occurs in Nebraska, in

15    New York, in California, in Illinois, in Washington; you name

16    it.  Because as patients, you know, as well as being a doctor,

17    I've been a patient a couple times this year.  As a patient,

18    that's what we expect from our healthcare providers.

19    Q.   Okay.  A couple of questions on that.  And some of them

20    may be quite obvious, but is that commonly referred to in the

21    literature as the collaborative practice model?

22    A.   Yes.

23    Q.   Okay.  Is one of the components of that is that there's

24    no more -- nurses are to be respected, their opinions are to

25    be listened to, and they should feel free to engage in a

1    dialogue with any co-healthcare professional they're working

2    with?

3    A.   Not only should they be respected, these people have 20

4    years of experience.  And they've been doing thousands of

5    deliveries on labor and delivery.  It would be foolish on the

6    part of myself, a nurse-midwife, not to listen to these

7    people.  Especially in the wee hours of the morning, when

8    we're all tired, we've all had enough.  We've had a patient in

9    labor for a day or two, in this case three.  Everybody gets

10   tired.  Everybody gets on edge.  Everybody misses their

11   family.

12       So we're all human.  And sometimes we just need a nudge

13   from somebody to say, "Hey, listen, this is --

14       And sometimes, too, we get emotional because the patient

15   wants a vaginal delivery and we want to give them -- what we

16   want to do is we want to make people happy, so we go out of

17   our way.  And sometimes to a fault, we go out of our way to

18   try to make somebody happy.

19       And someone has to say, "Hey, listen, I know you want to

20   make somebody happy, but let's talk about safety here for a

21   minute."

22       So that's -- that's all of our jobs, not just the nurse's

23   job, the midwife or doctor, charge nurse on the floor, you

24   name it.  That's what our jobs are.

25   Q.   In that line of questioning, if the culture at the

1    Bellevue Medical Center is such that it is a "follow orders"

2    mentality and there's not a collaborative practice model as

3    was suggested, is that in line with the safety principles that

4    govern labor and delivery in 2012 as it was?

5    A.    Absolute --

6                MR. WELCH:  Judge, I'm going to object.  The question

7    is argumentative, no proper and sufficient foundation.  It's a

8    representative of the impart of the question --

9                THE COURT:  Sustained.

10   BY MR. PATRICK CULLAN:

11   Q.   Is a -- is it within the standard of care to just simply

12   say, "I was following orders"?

13   A.    Absolutely not.

14               MR. WELCH:  Your Honor, I guess I'm going to object

15   to the question, along the lines that I objected previously.

16   I believe it's a -- this gets into a legal conclusion as to

17   what the law in Nebraska is with respect to nursing personnel.

18   And move that the question, and if there was an answer, be

19   stricken.

20               THE COURT:  Well, again, I will advise the jury on

21   the law and what the law requires in the state of Nebraska.

22   Dr. Gubernick is offering his opinion regarding standards of

23   care.

24         Overruled.

25   BY MR. PATRICK CULLAN:

1    Q.   Just going in reverse order kind of, the next thing that

2    was discussed was accelerations.  And if accelerations are

3    present, if you can find them somewhere on the strip, that

4    somehow in and of itself, regardless of the other

5    circumstances, should be reassuring.  Is that accurate?

6    A.   No.

7              MR. WELCH:  Objection, leading and suggestive.

8              THE COURT:  Overruled.

9    A.   No.  An acceleration in and of itself is a reassuring

10   sign.  You see the heart rate go up.  That's a reassuring

11   sign.

12        We don't just look at things in and of themselves; we

13   look at things in their totality.  You've got to look at the

14   whole strip and you've got to look at where the strip was for

15   the last half hour and what's going on.

16        So if you have flat line and decelerations and then all

17   of a sudden, you've got one acceleration, that's not

18   reassuring.  That usually doesn't happen.  But -- so what I'm

19   saying is usually you see an acceleration with a Category I

20   tracing.

21        But if you have a Category II tracing, or even

22   hypothetically speaking, a Category III with an isolated

23   acceleration, you have to look at the totality of the

24   situation and not just hang your hat on one particular example

25   of something that might be reassuring when you have all kinds

1    of other evidence that things are not reassuring.

2    BY MR. PATRICK CULLAN:

3    Q.   Okay.  I just want to go back.  And we talked about if

4    you're in a Category II, the goal of every healthcare

5    professional monitoring that labor is to get it back to a

6    what?

7    A.   A Category I.

8    Q.   Okay.  And if it's not going back, can they look at the

9    strip and say, "I see an acceleration here, I see an

10   acceleration here," and rely on that to establish the safety

11   of the child?

12   A.   Absolute --

13          MR. WELCH:  Objection, no proper and sufficient

14   foundation; but more importantly, outside the scope of cross.

15          THE COURT:  Well, I'm going to sustain the objection

16   based upon the wording of the question.  The wording was not

17   based on a standard of care, you were asking whether they can

18   do something.  So sustained regarding wording.

19          MR. PATRICK CULLAN:  Okay.

20   BY MR. PATRICK CULLAN:

21   Q.   Sticking with the topic of accelerations, if you're in a

22   Category II that's not reverting to a Category I, can you --

23   strike the "can" -- is it reasonable to go in there and hunt

24   for accelerations and use that to justify continued therapy,

25   continued inaction to change the circumstance?

1             MR. WELCH:  Objection, form, and outside the scope of

2    cross.

3             THE COURT:  Sustained.

4    BY MR. PATRICK CULLAN:

5    Q.   Counsel talked about the CDC has recognized

6    chorioamnionitis as a risk factor for cerebral palsy.  Do you

7    recall that line of questioning?

8    A.   Yes.

9    Q.   And I guess we've done this again.  How many times has

10   Dr. Baergen, who's come in here and told you that there was

11   chorioamnionitis in the placenta of a baby you had just

12   delivered and it walked out normally?

13   A.   Many, many, many --

14            MR. WELCH:  Objection to -- outside the scope of

15   cross, and it's repetitive of direct examination, asked and

16   answered.

17            THE COURT:  Well, I do believe it has been asked and

18   answered.  Sustained.

19            MR. PATRICK CULLAN:  Okay.

20   BY MR. PATRICK CULLAN:

21   Q.   With respect to the risk, put it in -- that you discussed

22   with counsel, can you quantify what it means in actual real

23   life medical practice?

24   A.   What we have to look at is the converse of what he said

25   because it is true that babies that have cerebral palsy, their

1    mothers have a higher incidence of chorioamnionitis than the

2    general population.  There is a correlation.

3        But the converse of that, 90 plus percent, 95, 96 percent

4    of moms who have chorioamnionitis, their babies do just fine

5    because if it's just related to the placenta, the mother or

6    the baby is not affected.  And even if either the mother or

7    the baby are affected, we give antibiotics in labor and the

8    antibiotics take care of the problem.

9        And the overwhelming majority of moms who are diagnosed

10   with clinical, not histologic but even clinical

11   chorioamnionitis, they do fine and their babies do fine.

12   Q.   Okay.  I know there was a -- you discussed tachysystole.

13   He mentioned there may be an article out there that suggests

14   it is almost always benign.  When it's not benign, what is it?

15   A.   It's dangerous.

16   Q.   What does that mean, dangerous?  How?

17   A.   First, I don't know the article, so I have to -- but I'm

18   sure somebody's looked at tachysystole.  I looked at a hundred

19   cases, and many of these -- it's not about -- these troubled

20   tracings are not about being able to predict that the baby is

21   going to be neurologically impaired.

22       They're about the fact that we can't assure that the

23   baby's not neurologically impaired.  In other words, we talked

24   about false positives being 99 percent.  What we didn't talk

25   about is the false negatives; in other words, a reassuring

1    tracing is very reassuring that the baby's not in trouble and

2    the baby is going to be fine.

3         So a good tracing has a very high predictability of a

4    healthy baby.  A bad tracing, as you heard, does not have a

5    good predictability of a bad baby.  And that's why cesarean

6    section rate is high in this country.  Like I told you, we're

7    going to jump in the pool when we don't like the tracing, and

8    we're going to take that baby out, knowing that the majority

9    of the babies we're doing sections on for a nonreassuring

10   tracing are actually going to be fine.

11        I'm not -- no obstetrician is ashamed of that because

12   we're just -- any baby we send home damaged is too many.  1

13   percent is -- if it's 1 percent -- if we let bad tracings go

14   on and 99 percent do just fine and 1 percent is severely brain

15   damaged, that's too many.  We say in our society, that's

16   unacceptable.  Maybe in other societies it's acceptable; in

17   our society, that's unacceptable.

18   Q.   The next topic that was discussed was the neuroimaging

19   that Sage underwent after she was born.  Do you recall that

20   line of questioning?

21   A.   Yes.

22   Q.   And the first ultrasound was done -- I think he was

23   correct -- at five or six hours of life.  That was normal,

24   right?

25   A.   And predictable, because if you have a partial prolonged

 1    injury that's going on for hours in labor, you're not going to

 2    see those changes on ultrasound for a couple of days.  You're

 3    not going to see it the first day or two.  It takes time for

 4    tissue that's been damaged for a lack of oxygen to present

 5    itself on an ultrasound or an MRI as bad tissue.

 6          So the normal ultrasound just reaffirms what I'm saying,

 7    that two or three days before she went into labor, if that --

 8    excuse my expression, but if that brain was bad -- I don't

 9    know what was used here in this courtroom, eaten away, bad --

10    Q.    Eaten away.

11    A.    -- we would have seen an abnormal ultrasound right after

12    birth because it would have had days for that hypoxic event to

13    develop.

14          But when it happens intrapartum, it takes several days.

15    It takes a couple of days.  Neuroradiologists who are more

16    specialized than I am in the field of reading these things,

17    they're going to come in and they're going to tell you that it

18    takes time for these pictures to become abnormal.

19          So if this brain was already bad two, three, four days

20    before delivery, that ultrasound would have been abnormal.

21    And it's the very fact that the ultrasound was normal that is

22    evidence that this was an intrapartum event.

23          MR. WELCH:  Judge, I'm going to move that the

24    witness's answer in response to counsel's question be stricken

25    due to the fact that it violates Rule 702.  This witness does

1    not have sufficient qualifications or ability to opine as he

2    just did as to the significance of fetal ultrasounds, outside

3    the scope of his practice or expertise.

4         And furthermore he referred to other experts, which I

5    think is improper, hearsay, and move that the jury be told to

6    disregard his answer.

7              THE COURT:  Overruled.

8    BY MR. PATRICK CULLAN:

9    Q.   You know Dr. Baergen who is going to testify, correct?

10   A.   Yes.

11   Q.   And you're on the East Coast; Cornell, Columbia, those

12   are on the East Coast, correct?

13   A.   Yes, sir.

14   Q.   Are you familiar with the neuroradiologist from

15   Stanford --

16   A.   Yes.

17   Q.   -- Dr. Barnes?

18   A.   I mean, I've never met him, certainly aware of him.  He's

19   got a big reputation.

20   Q.   Okay.  The next thing that was mentioned -- I can't read

21   that -- oh, you discussed with counsel the fetal tracing,

22   fetal heart rate tracings.  Do you remember that, about

23   whether it's good?

24   A.   Yes.

25   Q.   And I think the insinuation was that it's -- I can't read

 1   what I wrote, but fetal heart rate tracing is not perfect,

 2   right?

 3   A.   Certainly.

 4          MR. WELCH:  I'll interpose an objection.  The

 5   question is argumentative, use of the word "insinuation".

 6          THE COURT:  Overruled.

 7   A.   It's an imperfect system.  Yes, I agree with you.

 8   BY MR. PATRICK CULLAN:

 9   Q.   And I think counsel tried to state that it's just flawed;

10   it's inherently flawed.

11          Are you aware of any institution, hospital, labor and

12   delivery unit that does not employ a fetal heart rate tracing

13   or a tocometer?

14   A.   No.  What I said -- he took the argument that because

15   we're not good at identifying damaged babies --

16          MR. WELCH:  Your Honor, I'm going to object.  I think

17   it's been asked and he answered it.  Now he's going on into a

18   narrative.

19          THE COURT:  Sustained.

20   BY MR. PATRICK CULLAN:

21   Q.   If someone suggests that it's just so imperfect, why does

22   every institution in this country use it?

23   A.   We use it --

24          MR. WELCH:  Objection, form, that this witness can

25   opine as to why every institution uses something.

1          THE COURT:  He may offer his opinion.  Overruled.

2     A.    We use it because it's really good at identifying healthy

3     babies.

4     BY MR. PATRICK CULLAN:

5     Q.    I mean, if it's so bad, do you have an understanding --

6     or what's your opinion as to why Bellevue Medical Center would

7     use technology that they then turn around and say is useless?

8          MR. WELCH:  Objection, form, foundation,

9     argumentative.

10          THE COURT:  Sustained.

11    BY MR. PATRICK CULLAN:

12    Q.    Counsel brought up the ACOG Joint Compendium from 2003.

13    Do you recall that?

14    A.    I did -- I do.

15    Q.    And I just want to talk about -- and you discussed with

16    him timing and how you're sure the injury occurred when you're

17    saying it did.  Do you recall that?

18    A.    Yes.

19    Q.    Is the suggestion made in that text -- and this is the --

20    are you familiar with the Neonatal Encephalopathy and

21    Neurological Outcome, 2nd Edition publication?

22    A.    Yes.

23    Q.    We discussed this.  Are you familiar that on page 210,

24    they discuss what evidence there is to support the

25    identification of the timing of a neurological insult?

 1              MR. WELCH:  Objection, your Honor, no proper and

 2     sufficient foundation, was not used on direct.  And

 3     furthermore it violates this Court's previous order.  This was

 4     not a document identified by plaintiffs' counsel that this

 5     witness was relying on.  In fact, the witness, in his

 6     deposition, said he was not relying on any medical literature

 7     with respect to his opinions.

 8              THE COURT:  Well, Mr. Cullan, did Dr. Gubernick

 9     identify this document as one he relied on for his opinions?

10              MR. PATRICK CULLAN:  I think this was -- I don't know

11     if you want to do this -- I think this was discussed at the

12     hearing.  In his underlying deposition, I can't represent to

13     the Court that he did.

14              THE COURT:  Sustained.

15     BY MR. PATRICK CULLAN:

16     Q.   Then I would just ask is the statement contained therein

17     authoritative that identifies what evidence supports drawing

18     the conclusion that an injury occurs --

19     A.   Is there --

20              MR. WELCH:  Objection, your Honor.  Now he's using a

21     document which is not previously disclosed.  The Court has

22     already sustained the objection.  Now he's asking whether it's

23     authoritative.  The Court has already stricken --

24              THE COURT:  Sustained.

25              MR. PATRICK CULLAN:  To lay foundation for cross-

1    examination using this document at a later date.

2              THE COURT:  Excuse me?

3              MR. PATRICK CULLAN:  Just to identify the document as

4    authoritative for use with other witnesses for impeachment

5    purposes.

6              THE COURT:  All right.  The witness may respond as to

7    whether or not he considers the document to be a reliable

8    authority.

9    A.   The document is reasonably reliable, yes.

10   BY MR. PATRICK CULLAN:

11   Q.   Okay.  And particularly in terms of what it identifies as

12   how -- what you should look at to identify when the injury

13   occurs?

14   A.   Yes, sir.

15   Q.   Would that also be true with respect to the 23rd Edition

16   of the Williams Textbook of Obstetrics?

17   A.   Yes, it's reasonably reliable.

18   Q.   Thank you.  I'm not using this any further.

19        Let's talk quickly about the cord gases.  How many cord

20   gases were taken in this case?

21   A.   One.

22   Q.   What is -- the standard of care is to take how many?

23   A.   Two; one on the baby side, one on the mother's side.

24   Q.   Under the circumstances that this cord gas was taken with

25   Sage in the condition she was, would a reasonably prudent

1    healthcare professional get one cord gas?

2    A.   No.

3            MR. WELCH:  Objection, form of the question as it

4    relates to the parties involved in this lawsuit.  The witness

5    has already testified nurses don't take cord samples.

6            THE COURT:  Well, I understand that the midwife took

7    the cord sample.  And I think that her actions are relevant to

8    the issues in this case.

9        Overruled.  He may answer.

10   A.   The standard of care is to take one on the mother's side,

11   which is venous, and one on the arterial side, which is the

12   baby.

13   BY MR. PATRICK CULLAN:

14   Q.   Okay.  If someone's a novice -- I mean, you've taught

15   people how to do this?

16   A.   Many times.

17   Q.   If someone's inexperienced or in a hurry or not being

18   careful, what's easier to get?

19   A.   It's much easier to get the vein than the artery.  The

20   vein is much bigger than the arteries.

21   Q.   Explain how.

22   A.   So what courses through the umbilical cord are two

23   arteries and the vein.  And the vein -- we all know veins

24   are -- the walls of the veins are thin.  And the arteries are

25   little and tight.

1        And the difference in size is maybe three- to four-fold

2    in diameter.  You see the big vein coming through, and on each

3    side, you have a little artery.  So if you're going to hit one

4    of them, statistically you're much more likely to hit the vein

5    than one of those arteries.

6    Q.   And I just want to explain -- you had a discussion with

7    counsel for a long time about what the significance of it is

8    if it's venous versus what the significance is if it's

9    arterial.  Do you recall that conversation?

10   A.   Yes.

11   Q.   So if you take the easy route and you draw the blood from

12   the vein, whose status are you measuring?

13   A.   The mother's side.

14   Q.   Okay.  So if you get a blood draw back and it's good,

15   what information does that tell you about the mother?

16   A.   She's being well oxygenated.

17   Q.   Okay.  What information does this tell you about the

18   baby?

19   A.   Very little.

20   Q.   Okay.  Conversely, if you take, as the standard of care

21   requires, two samples, one from the vein and one from the

22   artery, what information now do you have about the baby?

23   A.   Obviously you can see the difference.  These are pipes

24   going into the baby and out of the baby.  And if the

25   placenta's severely affected, they'll both be affected.  It's

1    wherever the real damage occurs.

2         But if you get -- if the mother is being well oxygenated

3    and the problem is in the placenta or past where the mother's

4    vessels are entering the placenta, then you get a nice pH on

5    the mother and the baby is in trouble because you'll get a bad

6    pH on the baby.

7         So one is on the baby's side and one is on the mother's

8    side.  We like to see both to see where the trouble began.  So

9    we're being, like, detectives.  Is it the mother's lungs?  Is

10   it the mother's heart?  Is it at the level of the placenta?

11   Is it at the level of the cord?

12        And in this particular case, you have no reason to

13   believe the mother wasn't healthy and doing well.  They were

14   giving her oxygen, she was on her side, she's being well

15   oxygenated.

16        So if this came from the vein, it's no big surprise.  The

17   baby came out pale, poor Apgars, needed resuscitation.  I

18   wouldn't anticipate a normal gas on that baby.  I would have

19   anticipated that this baby would have had an abnormal gas.

20   And we're never going to know.  It's up to you people to

21   decide which side that came from.

22        But I will tell you, it's inconsistent with a baby who

23   came out looking shocky like this baby did.

24   Q.   Okay.  I want to -- the next thing he talked about was

25   Level I, Level II, Level III evidence.  Do you recall that?

1   A.   Yes.

2   Q.   Level I evidence is where you do prospective, going-

3   forward studies, correct?

4   A.   Yes.

5        MR. WELCH:  Your Honor, I mean, I know it's running

6   late, but it's leading and suggestive.

7        THE COURT:  Overruled.

8   BY MR. PATRICK CULLAN:

9   Q.   So to do a prospective study as to whether or not, taking

10  the situation like Doran went through where you have a baby

11  stuck for 13 hours and then running it through with Pitocin,

12  how would you do a Level -- explain to the jury how you would

13  do a Level I study in that regard.

14  A.   You'd have to go to a Third World country where the laws

15  would allow you to do that.  In this country, thank God, we

16  wouldn't let that happen.

17  Q.   Okay.  What's an institutional review board?  How's that

18  involved?

19  A.   They would --

20       MR. WELCH:  Judge, outside the scope of cross.  Now

21  we're going into IRBs?

22       MR. PATRICK CULLAN:  He brought up Level I studies

23  that have to have an IRB approval prior to it even being

24  allowed.  It needs to be ethically appropriate.

25       MR. WELCH:  I didn't go into that.  I just asked him

1    if he knew what a Level I study was.  Now we're getting into

2    IRBs?

3              THE COURT:  Sustained.

4              MR. PATRICK CULLAN:  Okay.

5    BY MR. PATRICK CULLAN:

6    Q.   Just one quick follow-up on the same topic.  Do you know

7    of any institution in the United States, Europe, that would

8    allow such a Level I study to ever be conducted?

9    A.   Never would this be allowed to be studied.  I've never

10   seen anybody stuck this long.

11             MR. WELCH:  Judge, I'm going to object, move that it

12   be stricken.

13             THE COURT:  Sustained.  The jury will disregard the

14   last volunteered comment.

15   BY MR. PATRICK CULLAN:

16   Q.   I guess this goes -- based upon your review of the case,

17   counsel talked about timing, if a pediatrician came in or a

18   neonatal intensive doctor came in and said that no, this brain

19   was eaten away three days before she ever got to Bellevue or

20   such like that, as was represented in opening statement -- two

21   questions.

22        First, do you have -- is there any objective evidence to

23   support that?

24             MR. WELCH:  Objection, form of the question, outside

25   the scope of cross, calling for an opinion of what others may

1    say which this witness knows nothing about.  And it's

2    argumentative.

3          THE COURT:  Sustained.

4    BY MR. PATRICK CULLAN:

5    Q.   Well, counsel discussed with you your opinion as to

6    timing.  Do you recall that?

7    A.   Yes, he did.

8    Q.   He said, well, if a neonatologist has a different

9    opinion, what would you say about that?  And he asked you if

10   there was a pediatrician, things of this nature.  Do you

11   recall that line of questioning?

12   A.   I remember that.

13   Q.   Is there any evidence that you're aware of, having gone

14   through the records, that this brain was eaten away three days

15   before she ever got to Bellevue?

16         MR. WELCH:  Objection, form of the question, no

17   proper and sufficient foundation, misstatement of the question

18   that was asked to the witness on cross-examination, so

19   therefore --

20         THE COURT:  Sustained.  The witness has already

21   testified as to his opinion as to when the damage occurred.

22         MR. PATRICK CULLAN:  Okay.  Thank you.

23   BY MR. PATRICK CULLAN:

24   Q.   Oh, there was talk about ACOG and how many members it

25   has.  Do you recall that?

1    A.    Yes.

2    Q.    So I want to just talk a little bit about what ACOG is.

3    ACOG is a professional association, true?

4    A.    It's a fraternity of obstetricians, yes.

5    Q.    Do they go to Washington, DC and lobby for laws and

6    preferential legal treatment, special interest legislation for

7    obstetricians?

8              MR. WELCH:  Judge, I'm going to object; one, outside

9    the scope of cross; two, it's argumentative.  I don't know

10   what that has to do with this case, even if it's true.

11             THE COURT:  Overruled.  He may answer.

12   A.    Yes, they do.  It's one of the reasons I resigned, yes.

13   BY MR. PATRICK CULLAN:

14   Q.    Okay.  One last topic.  I can read that now.  Counsel put

15   up the essential criteria.  Do you recall that?

16   A.    For an acute asphyxia.  Yes.

17   Q.    Did Sage -- let's talk about the applicability of that

18   criteria.  Did Sage have a placental abruption?

19   A.    No.

20   Q.    Did she have a uterine rupture?

21   A.    No.

22   Q.    Did she have anything that led to an acute asphyxia?

23   A.    No.

24   Q.    Okay.  The number four criteria specifically excludes

25   trauma.

1    A.    Yes.

2    Q.    Are they talking about car accidents?

3    A.    They're talking about all kinds of trauma.  They're

4    talking about trauma that happens from being in labor too

5    long.  They're talking about forceps, vacuums.  And they

6    include car trauma -- any trauma to the head.  You can

7    traumatize the head of the baby many different ways.

8         So they're talking about a direct, physical insult to the

9    head of the baby.  That can happen in labor, that can happen

10   during the delivery, and that can happen antepartum with an

11   accident.

12   Q.    Okay.  But by the very express criteria, the fourth one

13   excludes that type of mechanism.

14   A.    Yes.  They exclude that as a form of acute asphyxia.  And

15   I think I've said it enough times today that this was not an

16   acute asphyxia and that's why this child did not -- that's why

17   this case doesn't meet that criteria.

18        This was an alternative pathway to an ischemic

19   encephalopathy, not that pathway, not the throw the child in

20   the swimming pool with weights on them to the bottom of the

21   pool, like a placental abruption or uterine rupture or

22   something of that nature.

23   Q.    Just one final question.  Had the -- one series of

24   questions, I suppose.

25        Had an intrauterine pressure catheter been inserted prior

1     to the institution of Pitocin, what do you believe it would

2     have shown?

3                 MR. WELCH:  Objection, outside the scope of cross,

4     and it was asked and answered on direct examination.  It's

5     cumulative.

6                 THE COURT:  Sustained.

7                 MR. PATRICK CULLAN:  No further questions.  Thank

8     you.

9                 THE COURT:  Very good.

10         Thank you, Dr. Gubernick.  You may stand down and you are

11     excused.

12                THE WITNESS:  Thank you.

13                THE COURT:  We will end the day at this time, so you

14     can go home a little bit early.

15         Please enjoy your evening with family and friends.  Talk

16     about something other than the case.  Keep an open mind until

17     all the evidence is in and you've heard the arguments of

18     counsel.

19         Please reconvene in the jury room before nine o'clock

20     tomorrow.

21         We'll plan to start promptly at 9:00.

22         (Jury out at 4:39 p.m.)

23                THE COURT:  And for the lawyers' information, I do

24     have an 8:30 sentencing so you'll need to move materials back

25     to the back tables.

1          All right.  Thank you.

2          Have a good evening.

3

4          (Adjourned at 4:41 p.m.)

5

6

7          I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

8

9

        /s Brenda L. Fauber            February 16, 2016
10      Brenda L. Fauber, RDR, CRR                Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25