# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1022
_____

Doran Schmidt, Individually

*Plaintiff*

S.S., a minor, by and through her mother and next friend, Doran Schmidt

*Plaintiff - Appellant*

v.

Heather Ramsey, APRN-CNM; Midwives Place LLC

*Defendants*

Bellevue Medical Center L.L.C.

*Defendant - Appellee*

State of Nebraska

*Intervenor - Appellee*

-------------------------------

COPIC Insurance Company

*Amicus on Behalf of Appellee(s)*

_____

No. 16-1024
_____

Doran Schmidt, Individually

*Plaintiff*

S.S., a minor, by and through her mother and next friend, Doran Schmidt

*Plaintiff - Appellee*

v.

Heather Ramsey, APRN-CNM; Midwives Place LLC

*Defendant*s

Bellevue Medical Center L.L.C.

*Defendant - Appellant*

State of Nebraska

*Intervenor - Appellee*

-------------------------------

COPIC Insurance Company

*Amicus on Behalf of Appellee(s)*

_____

-2-

Appeals from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: January 11, 2017
Filed: June 22, 2017

_____

Before SMITH[1] and KELLY, Circuit Judges, and SIPPEL, District Judge.[2]

_____

SMITH, Circuit Judge.

After a jury awarded $17 million to a child born with severe brain damage, the district court[3] applied Nebraska's tort-reform act to reduce the verdict by almost 90 percent, to $1.75 million. The court declined, though, to retry the case based on alleged errors and omissions in the jury instructions. The child appeals the application and constitutionality of the Nebraska act. The hospital appeals the refusal to retry the case. For the reasons below, we affirm.

I. *Background*

A. *The Nebraska Hospital Medical Liability Act*

More than 40 years ago, the Nebraska legislature passed the Nebraska Hospital Medical Liability Act ("Act") to curb meritless medical malpractice claims and efficiently resolve meritorious ones. Neb. Rev. Stat. § 44-2801. The Act caps

---

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

[2]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri, sitting by designation.

[3]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

-3-

malpractice damages according to the time of occurrence. *Id.* § 44-2825(1). For incidents between 2004 and 2014, such as this case, the cap is $1.75 million. *Id.* Capped damages are allocated between two sources. The first is the health care provider, whose liability is capped at $500,000 per occurrence. *Id.* § 44-2825(2). The second is the "Excess Liability Fund" set up by the Act, which pays the remainder of damages up to the total cap. *Id.* § 2825(3).

The Act does not apply automatically, and it has a notable opt-out provision. A health care provider must affirmatively qualify for the Act's protections by filing proof of financial responsibility and paying into the Excess Liability Fund. *Id.* § 44-2824(1). A provider who does not qualify is "subject to liability under doctrines of common law." *Id.* § 44-2821(1). And even when a provider does qualify, a patient may opt out. *Id.* § 44-2821(2). To facilitate this opt-out right, a qualified health care provider must post a sign in its "waiting room or other suitable location" notifying patients that they are subject to the Act unless they opt-out. *Id.* § 44-2821(4).

## B. *S.S.'s Case*

S.S. was born on November 2, 2012, after a long labor. She was not breathing. She survived but suffered severe brain damage. Through her mother, S.S. sued three parties for medical negligence: (1) The Midwife's Place, where her mother received prenatal care; (2) Heather Ramsey, a certified nurse–midwife who worked at The Midwife's Place; and (3) Bellevue Medical Center ("Bellevue"), the hospital where S.S. was born. S.S. settled her claims with The Midwife's Place and Ramsey. The claims against Bellevue went to trial. These claims focused on the alleged negligence of two Bellevue nurses. A jury returned a verdict for $17 million.

Bellevue moved for post-trial relief. The court granted Bellevue's motion to amend the judgment under Federal Rule of Civil Procedure 60(b) by reducing the damages to $1.75 million based on the Act, holding that the Act applied and did not violate the United States Constitution. But the court denied Bellevue's motion for a

new trial under Federal Rule of Civil Procedure 59 based on alleged errors and omissions in the jury instructions, holding that Bellevue waived certain alleged errors and was legally incorrect about others. S.S. appeals from the Rule 60(b) ruling, and Bellevue appeals from the Rule 59 ruling.

## II. *Discussion*
### A. *Rule 60(b) Motion*

We ordinarily review Rule 60(b) rulings for abuse of discretion. *Holt v. Howard*, 806 F.3d 1129, 1133 (8th Cir. 2015). But here the ruling was based on the district court's statutory and constitutional interpretations, which we review de novo as issues of law. *United States v. Smith*, 656 F.3d 821, 826 (8th Cir. 2011). Because an error of law *is* an abuse of discretion, the result in this case would be the same under either standard. *See Noah v. Bond Cold Storage*, 408 F.3d 1043, 1045 (8th Cir. 2005).

S.S. challenges the Act's damages cap on six grounds. She argues that it (1) does not apply in her case; (2) violates the United States Constitution's Seventh Amendment right to a jury trial; (3) violates the United States Constitution's Fifth Amendment right to just compensation for government takings; (4) violates the federal constitutional right of access to courts; (5) violates the United States Constitution's Fourteenth Amendment right to equal protection of the laws; and (6) violates the United States Constitution's Fourteenth Amendment right to substantive due process.

### 1. *Statutory Notice*

S.S. contends that Bellevue is not entitled to the Act's protections because Bellevue is not a "qualified" health care provider under the Act. Bellevue met the Act's financial requirements by filing proof of financial responsibility and paying into the Excess Liability Fund. *See* Neb. Rev. Stat. § 44-2824(1). The issue is whether Bellevue properly posted the required opt-out notice. *See id.* § 44-2821(4). S.S. argues that Bellevue did not, for two reasons.

-5-

The first is procedural. When Bellevue moved for post-trial relief under the Act, it attached evidence of compliance with the financial requirements but did not mention the notice requirement. After S.S. alleged in her response that Bellevue failed to comply with the notice requirement, Bellevue replied with evidence of notice and argued that notice is not required for qualification under the Act. S.S. insists that Bellevue waived these arguments by raising them in reply. Any such waiver, though, would not bind the court. *See Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006). And here the district court used its inherent docket-management authority, *see Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016), to allow S.S. to respond in surreply. We may therefore consider the issue of notice.

S.S's second reason is substantive—that Bellevue did not properly post notice. Bellevue responds that posting notice is not a requirement for qualification under the Act, because the qualification requirements are plainly set out in one section, *see* Neb. Rev. Stat. § 44-2824(1), and the notice requirement, which appears in a different section, expressly applies to health care providers who have "qualified" under the Act, *id.* § 44-2821(4). According to Bellevue, this indicates that qualification occurs before and separate from the notice requirement.

As Bellevue acknowledges, we touched on the notice requirement in *Lozada v. United States*, a Federal Tort Claims Act case addressing whether a federal hospital was in "like circumstances" with a qualified private hospital under the Act. 974 F.2d 986, 987–88 (8th Cir. 1992). The opinion's background section mentioned notice as a requirement for qualification, *id.* at 987, but notice did not form any basis of our holding, so this passing mention does not bind our panel, *see Passmore v. Astrue*, 533 F.3d 658, 660–61 (8th Cir. 2008).

We hold that notice is not a requirement for qualification under the Act, but rather a requirement imposed on those already qualified. The plain language of the Act reveals as much. *See Johnson v. City of Fremont*, 845 N.W.2d 279, 286 (Neb.

-6-

2014) ("[A]bsent anything to the contrary, an appellate court will give statutory language its plain and ordinary meaning."). Section 44-2824 begins by listing the requirements "[t]o be qualified under the . . . Act." Neb. Rev. Stat. § 44-2824(1). Every subsection in § 44-2824 discusses something about qualification. *See id*. § 44-2824. Section 44-2824 does not, however, mention posting notice. *See id.* Instead, notice is mentioned only in § 44-2821 and only as a requirement for each health care provider "who has qualified under the act." *Id*. § 44-2821(4). Although the Nebraska Supreme Court has not addressed the exact issue we face, it has been careful to observe the statutory distinction between being "qualified" and posting notice. *See Prendergast v. Nelson*, 256 N.W.2d 657, 662 (Neb. 1977) ("Every qualified health care provider is required to post a notice that he has qualified under the act."). We see no basis to ignore the statute's wording. Bellevue therefore did not lose the Act's protections even if it failed to properly post notice.[4]

## 2. *Right to a Jury Trial*

S.S. next contends that the Act's damages cap violates the Seventh Amendment right to a jury trial. The district court declined to apply the Seventh Amendment to state government and also concluded that Nebraska's cap would not violate it in any event. We need not decide whether the Seventh Amendment should be incorporated to bind the states via the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 763–66 (2010), because Nebraska's cap does not violate it.

---

[4] Because we hold that notice is not a requirement for qualification, we do not reach the fact-bound issue whether Bellevue's notice—placed on a wall behind an information desk—was posted in a "suitable location" under the Act. *See* Neb. Rev. Stat. § 44-2821(4).

-7-

>The Seventh Amendment provides that
>
>>[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. "The right to a jury trial includes the right to have a jury determine the *amount* of . . . damages." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998). In *Feltner*, the Supreme Court held that this constitutional principle overrode a federal statute allowing judges to determine liability and assess damages in certain copyright cases. *See id.* at 345–47. S.S. maintains that this principle likewise overrides Nebraska's damages cap.

We are not persuaded. The statute in *Feltner* allowed a judge to determine damages in the first instance. *Id.* at 345–46. Because that role had historically belonged to juries, the statute collided with the Seventh Amendment. *Id.* at 355. As S.S.'s case illustrates, the Nebraska damages cap does not determine damages in the first instance. The jury in this case performed its historical role by finding liability and assessing damages. The Nebraska cap imposed an upper legal limit on that jury determination, *see* Neb. Rev. Stat. § 44-2825(1) ("The total amount recoverable under the . . . Act . . . may not exceed . . . ."), and the district court applied that limit as a matter of law.

The Seventh Amendment is not violated by a state-law cap on a jury's damages award. *Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir. 1989). In *Boyd*, a Virginia statute capped the plaintiff's multimillion dollar verdict at $750,000. *Id.* at 1193. The court held that this did not deprive her of a jury trial. *Id.* at 1196. While "it is the role of the jury as factfinder to determine the extent of a plaintiff's injuries. . . . , it is not the role of the jury to determine the legal consequences of its factual findings." *Id.* The Sixth Circuit cited *Boyd* in upholding the constitutionality of Michigan's cap, which

-8-

in that case reduced the plaintiff's non-economic damages from $5 million to $359,000. *Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 515, 517, 519 (6th Cir. 2005). We agree with *Boyd* and *Smith*. Applying Nebraska's damages cap to the jury's damages finding did not violate the Seventh Amendment.

### 3. *Takings Clause*

S.S. next contends that the Act violates the Fifth Amendment. "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (citation omitted). It prohibits the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). According to S.S., Nebraska's damages cap violates the Fifth Amendment "by limiting the collectible amount of adjudicated compensation only after a jury places a fair value on the property deprivation that plaintiffs have suffered."

We first address whether S.S. has a vested property right in uncapped damages. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). "[P]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (ellipsis in original) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)); *see also Watson v. Hortman*, 844 F. Supp. 2d 795, 801 (E.D. Tex. 2012) (looking to state law to determine whether plaintiffs had a vested property right in uncapped medical-malpractice damages).

The Nebraska Supreme Court has answered this state-law question. It has held that the damages cap does not violate the Nebraska Constitution's takings clause—which like the federal clause depends on a vested property right—because "a

-9-

person has no property and no vested interest in any rule of the common law or a vested right in any particular remedy." *Gourley ex rel. Gourley v. Neb. Methodist Health Sys., Inc.* 663 N.W.2d 43, 76 (Neb. 2003). This court recently noted, too, that "a cause of action . . . is not a vested interest until it is reduced to a final judgment." *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1145 (8th Cir. 2015). Under either formulation, the Act did not deprive S.S. of a vested property right.

S.S. asserts that the Supreme Court's decision in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), "definitively rejects the District Court's approach." We disagree. That case asked whether the government could, without compensation, require a public easement as a condition of granting a building permit. *Id.* at 828. The Court said no. Requiring a public easement triggered the Takings Clause because the right to exclude others is an essential component of property ownership, and requiring an easement was unrelated to the permit requirement. *Id.* at 831, 837. As we noted above, the property right that S.S. asserts is not similarly vested. The district court correctly concluded that the Act did not take S.S.'s property without compensation.

4. *Access to Courts*

S.S. next contends that the Act impairs access to courts by limiting recoverable damages. The right of access to the courts "provide[s] some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). This means that "the [access] right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415.

S.S. argues that the cap will deter lawyers from representing plaintiffs in medical-malpractice cases, leaving injured people without access to courts. Yet S.S. has offered no proof that Nebraska's cap, which has been in effect for decades, discourages lawyers to the point of restricting access. She has not cited any evidence, for example, of attorneys declining malpractice cases because of the cap. *Cf. Walters*

-10-

*v. Nat'l Assoc. of Radiation Survivors*, 473 U.S. 305, 312 (1985) (noting affidavits and declarations of numerous attorneys supporting access claim); *Watson*, 844 F. Supp. 2d at 800 ("[T]he plaintiffs cite survey data indicating that fewer Texas lawyers are accepting medical malpractice suits after the [statutory] cap was enacted."). And S.S. has not shown that she had difficulty obtaining counsel because of Nebraska's cap. In sum, S.S. has not shown denial of access to the courts.

### 5. *Equal Protection*

S.S. next contends that the Act violates the Fourteenth Amendment right to equal protection of the laws. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Laws frequently classify persons with consequences that advantage some and disadvantages others. But certain classifications are impermissible because of who they effect and how. *Romer v. Evans*, 517 U.S. 620, 631 (1996). To "reconcile the principle with the reality," the Supreme Court has noted that "if a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* If, on the other hand, a law classifies on the basis of a suspect class, such as race, or "impinge[s] on personal rights protected by the Constitution," we subject the law to "strict scrutiny," and we will uphold it only if it is "suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440.

S.S. claims that the Act violates the Equal Protection Clause by treating the catastrophically injured—that is, those with injuries justifying damages above the cap—differently from those less injured, even though the two groups are similarly situated. This, she says, impairs the fundamental rights of the catastrophically injured and therefore subjects the Act to strict scrutiny, which it cannot pass.

-11-

We disagree and conclude that strict scrutiny is not the appropriate test. Several of our sister circuits have so concluded, and we agree. "[A] limitation on a common law measure of recovery does not violate a fundamental right or create a suspect classification." *Boyd*, 877 F.2d at 1196; *see also Smith*, 419 F.3d at 519–20 (echoing *Boyd*); *Patton v. TIC United Corp.*, 77 F.3d 1235, 1247 (10th Cir. 1996) (reviewing Kansas cap under rational-basis test); *Davis v. Omitowoju*, 883 F.2d 1155, 1158–59 (3d Cir. 1989) (echoing *Boyd*); *Lucas v. United States*, 807 F.2d 414, 422 (5th Cir. 1986) (reviewing Texas cap under rational-basis test).[5] S.S. has not shown that uncapped damages are a fundamental right, or that those with malpractice damages above an amount that varies state-by-state are a suspect class.

We ask, then, whether the Nebraska cap "bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631. The Act states:

> (1) The Legislature finds and declares that it is in the public interest that competent medical and hospital services be available to the public in the State of Nebraska at reasonable costs, and that prompt and efficient methods be provided for eliminating the expense as well as the useless expenditure of time of physicians and courts in nonmeritorious malpractice claims and for efficiently resolving meritorious claims. It is essential in this state to assure continuing availability of medical care and to encourage physicians to enter into the practice of medicine in Nebraska and to remain in such practice as long as such physicians retain their qualifications.
>
> (2) The Legislature further finds that at the present time under the system in effect too large a percentage of the cost of malpractice insurance is received by individuals other than the injured party. The intent of sections 44-2801 to 44-2855 is to serve the public interest by providing

---

[5]S.S. criticizes the district court for focusing on whether a fundamental right was "violated," rather than "burdened" or "implicated." But the district court plainly focused on whether the right was "burden[ed]" and cited "burden" language from the Supreme Court.

-12-

> an alternative method for determining malpractice claims in order to improve the availability of medical care, to improve its quality and to reduce the cost thereof, and to insure the availability of malpractice insurance coverage at reasonable rates.

Neb. Rev. Stat. § 44-2801. As the Nebraska Supreme Court has recognized, the Act was intended "to address a perceived medical liability crisis." *Gourley*, 663 N.W.2d at 64.

Other than a passing allegation, S.S. does not argue that the Act was irrational when enacted. She instead argues that the Act has outlived its usefulness—that Nebraska has attracted more doctors and is doing so at a rate comparable to states like New Hampshire that do not limit malpractice damages. Our inquiry, however, is not whether the Act is necessary or even prudent; we ask simply whether it is rational. Nebraska's goal of capping malpractice damages to reduce insurance costs to make the State more attractive to doctors is rational. We note, too, that the Act provides, in exchange for capped damages, greater certainty of some recovery by ensuring that qualifying providers are financially responsible. Providers must prove their financial responsibility up to $500,000 and pay into a fund to satisfy the remainder of damages up to the cap. Neb. Stat. Rev. § 2824(1). The Act does not violate S.S.'s right to equal protection of the laws.

### 6. *Substantive Due Process*

S.S. last contends that the Act violates her right to substantive due process because it does not provide a just substitute remedy for uncapped damages. This argument is a twist on the holding of *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, in which the Supreme Court refused to strike down a particular act because the act provided "a reasonably just substitute for the common-law or state tort law remedies it replace[d]." 438 U.S. 59, 88 (1978). The Court declined to decide whether due process requires a just substitute remedy anytime a legislature curtails a common-law one. *Id.* In fact it found that proposition "not at all clear," *id.*, noting that

-13-

"[a] person has no property, no vested interest, in any rule of the common law," *id.* at 88 n.32 (quoting *Mondou v. New York, New Haven & Hartford R.R. Co.*, 223 U.S. 1, 50 (1912)). Thus, contrary to S.S.'s argument, *Duke Power* did not uphold the challenged act on the basis of a substitute remedy; it merely refused to strike the act for lacking one, because it *did not* lack one. *See id.* at 88.

We decline to extend *Duke Power* to hold its inverse: that a statute violates due process when it curtails a common law remedy without providing a just substitute. Moreover, at least one court has relied on *Duke Power* to reject a due process challenge to a damages cap. *See Lucas*, 807 F.2d at 421–22. And under our own precedent, the Nebraska cap's rational basis for equal protection purposes "also satisfies substantive due process analysis." *Exec. Air Taxi Corp. v. City of Bismark*, 518 F.3d 562, 569 (8th Cir. 2008). The district court did not err in rejecting S.S.'s substantive-due-process challenge.[6]

B. *Rule 59 Motion for New Trial*

We review the denial of a new trial for abuse of discretion. *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 866 (8th Cir. 2010). We also review the district court's jury instruction determinations for abuse of discretion. *Reed v. Malone's Mech., Inc.*, 765 F.3d 900, 907 (8th Cir. 2014). We review de novo, though, the interpretations of state law embedded in the instructions. *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1180 (8th Cir. 1997). The instructions need not be flawless; it is enough that they "fairly and accurately present the evidence and law to the jury given the issues in the case." *Reed*, 765 F.3d at 907 (quoting *Retz v. Seaton*, 741 F.3d 913, 919 (8th Cir. 2014)).

---

[6]S.S.'s motion to strike district court docket entries 287 and 288 from the appellate record is denied as moot. We have not relied on the materials in those docket entries in deciding this appeal.

-14-

Bellevue challenges the district court's jury instructions and verdict form on three grounds. It argues that the court erred in (1) not instructing the jury on Nebraska law regarding nurses' liability for following the orders of a certified nurse–midwife; (2) including a joint-and-several liability instruction when there were no absent tortfeasors, but only settling ones; and (3) not allowing the jury to allocate fault between Bellevue and the settling defendants.

### 1. Jensen *Instruction*

Bellevue contends that the district court erred in not instructing the jury about Bellevue's nurses' liability for following the orders of a certified nurse–midwife such as Ramsey. Bellevue asked the court to instruct the jury that its nurses "are not authorized to alter or circumvent" the orders of a "private treating practitioner" and cannot "determine for themselves what is a proper course of medical treatment." In addition, it asked the court to tell the jury that, "[c]onversely, a hospital is generally insulated from liability if its staff merely follows the direct orders of the patient's private practitioner or is practicing under that practitioner's direct supervision."

Bellevue's proffered instruction derives from *Jensen v. Archbishop Bergan Mercy Hospital*, 459 N.W.2d 178 (Neb. 1990). There a trial court refused to instruct the jury that nurses have a duty to "intervene and provide or obtain proper care" for a patient when they reasonably should know that the doctor's treatment is improper. *Id.* at 181. The Nebraska Supreme Court affirmed on the basis that hospital staff generally lack authority to alter or depart from an attending doctor's orders or to determine the proper course of treatment. *Id.* at 183. The instruction Bellevue requested largely mirrors *Jensen*'s language about nurses lacking authority to depart from doctors' orders. But Bellevue seeks to expand the principle of *Jensen* from a treating doctor's orders to those of a certified nurse–midwife such as Ramsey. (One of Bellevue's defenses was that its nurses merely followed Ramsey's orders.)

The district court refused to give this instruction for three reasons. One, the court was not confident that the Nebraska Supreme Court would extend *Jensen*'s rationale to certified nurse–midwives. Two, trial testimony established that the applicable standard of care required "medical professionals in a hospital setting to work as a team," which means communicating with other professionals and raising questions when a course of treatment appears wrong. And three, while S.S.'s own expert criticized Ramsey's decisions (particularly her prescribing Petocin and not thoroughly monitoring pelvic and cephalic measurements), "the great weight of [S.S.]'s breach-of-standard-of-care and causation evidence focused on the interpretation of fetal-heart-monitor data by [Bellevue] employees." The court thought this evidence allowed the jury to reasonably find that S.S.'s damages were caused by "[Bellevue] employees' alleged mis-reading of fetal heart monitor data, and/or their failure to read the data in a timely manner and alert a medical provider to the need for emergency action." These actions of Bellevue's employees did not involve following Ramsey's orders.

We need not decide whether the Nebraska Supreme Court would extend *Jensen* to certified nurse–midwives. *Jensen* does not preclude liability when nurses fail to observe and report things they should have observed and reported. This is the essence of the district court's point about teamwork being the standard of care. Bellevue responds that *Jensen* cannot be overruled by expert testimony. But that mischaracterizes the district court's ruling. The court merely drew the distinction the Nebraska Supreme Court drew in *Critchfield v. McNamara*, 532 N.W.2d 287, 292 (Neb. 1995). *Critchfield* held that notwithstanding *Jensen*, a case could go the jury on a claim that hospital nurses "failed to timely report an abnormal change in [the newborn]'s condition to responsible medical personnel." *Id*. "It is obvious," said *Critchfield*, "that the hospital, via its nursing staff, has a duty to report medically significant changes in the condition of a patient without delay to the treating physician or the physician in charge. . . . Such a requirement is basic to appropriate medical care." *Id.* at 293. Substituting "certified nurse–midwife" for "treating physician," as

-16-

Bellevue would have us do, would not support Bellevue's requested instruction. The district court did not err in refusing it.

## 2. *Joint and Several Liability*

Bellevue next contends that Instruction No. 11 allowed the jury to hold Bellevue jointly and severally liable for the actions of settling parties, which violates Nebraska law. Instruction No. 11 defined proximate cause and then told the jury that

> [w]here the independent negligent acts, or failures to act, of one or more than one person combine to proximately cause the same injury, each such act or failure to act is a proximate cause, and each such person may be held responsible for the entire injury. This is true though some may have been more negligent than others. It is no defense that all those who might have been held responsible are not parties to this case.

This instruction is appropriate "when *only one* joint tort-feasor is sued so that a jury does not lay the responsibility at the doorstep of the absent tort-feasor." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 391 (8th Cir. 2016) (quoting *Smith v. Kellerman*, 541 N.W.2d 59, 66 (Neb. Ct. App. 1995)). Bellevue contends that the instruction was inappropriate in this case because there were no absent tortfeasors, only settling ones. Thus, the effect of the instruction here, according to Bellevue, was to allow the jury to hold Bellevue jointly and severally liable for the actions of the settling defendants. And under Nebraska law, a non-settling defendant is liable only for its proportionate share: "when the claimant settles with a joint tort-feasor, the claimant forfeits . . . joint and several liability." *Tadros v. City of Omaha*, 735 N.W.2d 377, 382 (Neb. 2007).

The district court concluded that even though joint and several liability was inapplicable in this case, Instruction No. 11 was "appropriate to guide the jury on the question of causation," because the acts of two Bellevue employees were at issue. Bellevue is right that this is a questionable justification where there is no absent

-17-

tortfeasor. Although the acts of two persons were at issue, the jury was told in the preceding instruction that those persons were legally one entity—Bellevue. Thus, the court did not have to give Instruction No. 11. But the question is whether this *possible* error of using an unnecessary instruction, when viewed in light of all the other instructions, prejudiced Bellevue. *See Linden v. CNH Am., LLC*, 673 F.3d 829, 839 (8th Cir. 2012).

Here, we hold that it did not. The instruction might have been unnecessary, but the jury could have understood it just as the district court intended: as a way to sort out the actions of two people. A redundant instruction is not necessarily prejudicial. More importantly, Bellevue does not claim that Instruction No. 11 allowed an incorrect finding of negligence. Joint and several liability, after all, does not allow a non-negligent person to be found negligent—it merely allows more than one negligent person to be found legally responsible for 100 percent of a jointly caused injury. And Bellevue has not argued on appeal that there was insufficient evidence to support the jury's negligence verdict. Bellevue's opposition to Instruction No. 11 concerns fault *allocation*, not fault determination. In short, Bellevue seeks credit for S.S.'s settlement with the midwife parties. Yet, as we discuss below, Bellevue did not request an allocation instruction and did not object to the district court's failure to provide for allocation in the verdict form. Therefore, giving Instruction No. 11 in this case was not reversible error.

### 3. *Allocation of Fault*

Bellevue last contends that the district court erred by not allowing the jury to allocate fault between Bellevue and the settling parties. The district court ruled that Bellevue waived this argument by failing to submit a jury instruction on allocation and by not objecting to the verdict form, which did not provide for allocation. Bellevue says that (1) allocation is mandatory under Nebraska law and cannot be waived; (2) by giving Instruction No. 11, the district court practically prevented

-18-

Bellevue from objecting to the verdict form; and (3) not allowing allocation was plain error. We disagree.

First, it is not clear that the allocation statute, Neb. Rev. Stat. § 25-21, 185.11, applies in cases such as this one where the plaintiff was not negligent. *Compare Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 721 (8th Cir. 2008) (seeming to suggest that the statute applies only when the plaintiff was negligent), *with Ammon v. Nagengast*, No. A-15-1184, 2017 WL 1540753, at *5, (Neb. Ct. App. Apr. 18, 2017) (noting that the statute applies even when the plaintiff was not negligent). But even if the statute applies, it does not unconditionally mandate allocation. Rather, it mandates that a plaintiff's claim against a non-settling defendant "be reduced by the amount of the [settling party]'s share of the obligation *as determined by the trier of fact*." Neb. Rev. Stat. § 25-21, 185.11(1) (emphasis added). The reduction requires a fact finding. Yet, as the district court noted, Bellevue failed to submit the tortfeasors' relative obligations to the trier of fact. It therefore waived this determination, and, with it, an allocation. Bellevue has not cited any case in which a defendant did not request an allocation but received a new trial because no allocation was made.

Second, the district court's decision to give Instruction No. 11 did not prevent Bellevue, as a matter of strategy, from objecting to a non-allocation verdict form. On the contrary, insisting on an allocation verdict form would have furthered Bellevue's argument on Instruction No. 11, because an allocation might have enabled us to determine whether Instruction No. 11 misled the jury.

Finally, there is no plain error warranting reversal. "Plain error is a stringently limited standard of review, especially in the civil context, and must result in a miscarriage of justice in order to compel reversal." *Bady v. Murphy–Kjos*, 628 F.3d 1000, 1003 (8th Cir. 2011) (quoting *Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 858 (8th Cir. 2006)). In light of the uncertainty over whether the allocation statute even applies, the failure to require allocation did not result in a miscarriage of justice.

-19-

## III. *Conclusion*

Accordingly, we affirm the district court's judgment.

_____